## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY;<br>TROPICAL AUDUBON SOCIETY;<br>MIAMI PINE ROCKLANDS COALITION;<br>and SOUTH FLORIDA WILDLANDS<br>ASSOCIATION,<br><br>    *Plaintiffs,*<br><br>        v.<br><br>RYAN ZINKE, in his official capacity as<br>Secretary of the U.S. Department of Interior;<br>U.S. DEPARTMENT OF THE INTERIOR;<br>U.S. FISH AND WILDLIFE SERVICE;<br>GREG SHEEHAN, in his official capacity as<br>Principal Deputy Director of the U.S. Fish and<br>Wildlife Service; and JIM KURTH, in his<br>official capacity as Deputy Director for<br>Operations and Acting Director of U.S. Fish<br>and Wildlife Service,<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:17cv2444<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

### I. INTRODUCTION

1.　　The Center for Biological Diversity, Tropical Audubon Society, Miami Pine Rocklands Coalition, and South Florida Wildlands Association (collectively, Plaintiffs) challenge the U.S. Fish and Wildlife Service's (Service or Defendant) decision to permit a shopping center and apartment complex called Coral Reef Commons (the Project), which will result in the destruction of some of the last pine rocklands in Florida, literally paving paradise to put up a parking lot.

2.      Highly distinctive and once wide-ranging, pine rocklands are landscapes comprised of limestone outcrops with canopies dominated by slash pine and inhabited by many endemic yet imperiled plants and animals. These unique ecosystems have been severely reduced from development and may be found only in small fragments in south Florida.

3.      Coral Reef Commons will further destroy and fragment this disappearing landscape, including habitat for several of Florida's most iconic yet endangered native species like the Florida bonneted bat, Florida leafwing butterfly, Bartram's scrub-hairstreak butterfly, Miami tiger beetle, eastern indigo snake, Rim Rock crowned snake, gopher tortoise, white-crowned pigeon, Everglades bully, Florida brickell-bush, Carter's small-flowered flax, deltoid spurge, and tiny polygala, as well as the Dade County pine (*Pinus elliottii* var. *densa*), a slash pine that is included in the International Union for the Conservation of Nature and Natural Resources' (IUCN) Red List of Threatened Species, which is regarded as the most objective approach for evaluating the conservation status of plants and animals. The Richmond tract of pine rocklands in Miami-Dade County, where Coral Reef Commons is planned, contains 260 taxa of native plants. According to the Service's own analysis, the Project will result in the loss of more than 80 acres of habitat, including critical habitat for several species, and further fragment remaining habitat in the Richmond Area.

4.      Coral Reef Commons would destroy the connectivity and dispersal of species across the Project site, and create negative impacts from pesticides, noise, lighting, and traffic. Additional loss of habitat and stressors could push some of these species to the brink of extinction, especially in light of population growth, cumulative development, and the impacts of climate change.

5.      Plaintiffs contend the Service's approval of the Coral Reef Commons Habitat Conservation Plan (HCP), Incidental Take Permit (ITP), Biological Opinion (BO), and Environmental Assessment (EA) associated with Permit Number TE15009C-0 is in violation of the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA).

6.      Thus, for the reasons described below, Plaintiffs request that the Court: (1) declare that the Service's approval of Coral Reef Commons is in violation of NEPA and the APA; (2) set aside the Service's BO and Permit Number TE15009C-0; and (3) enjoin the Service from authorizing any further agency action under Permit Number TE15009C-0 until it lawfully complies with the statutory and regulatory demands of NEPA and the APA.

## II. PARTIES

7.      Plaintiff Center for Biological Diversity (Center) is a non-profit 501(c)(3) organization with more than 61,000 active members across the country, including in Miami-Dade County. The Center's mission is to protect and conserve endangered species and their habitats.

8.      Plaintiff Tropical Audubon Society (Tropical Audubon) is a non-profit 501(c)(3) organization with approximately 1,500 members in south Florida, including in Miami-Dade County. Tropical Audubon's mission is to conserve and restore South Florida ecosystems, focusing on birds, other wildlife, and their habitat.

9.      Plaintiff Miami Pine Rocklands Coalition, Inc. is a Florida-registered non-profit corporation established to educate, coordinate and initiate for the preservation and restoration of the remaining two percent of America's pine rocklands found only in south Florida.

10.     Plaintiff South Florida Wildlands Association is a not-for-profit organization committed to aggressively defending what remains of one of our planets most unique natural areas, the greater Everglades.

11.     Plaintiffs and their members are interested in the conservation of imperiled species that would be destroyed by the Project, including but not limited to the Florida bonneted bat, Florida leafwing butterfly, Bartram's scrub-hairstreak butterfly, Florida brickell-bush, Carter's small-flowered flax, deltoid spurge, and tiny polygala, and the effective implementation of the environmental laws that protect them.

12.     Plaintiffs have members who have visited areas where these species are known to occur. Plaintiffs' members use these areas for observation of these species and other

wildlife, research, nature photography, aesthetic enjoyment, recreation, education, and other activities. Plaintiffs' members derive professional, aesthetic, spiritual, recreational, economic, informational, and educational benefits from these species and their habitat. These members have concrete plans to continue visiting and recreating in areas where they can observe these species and their habitat.

13.     Plaintiffs and their members' interests are adversely affected by the Service's failure to comply with the APA and NEPA. The Service's inactions are likely harming the prospects of recovery for these imperiled species and may be jeopardizing their ability to survive.

14.     The Plaintiffs and their members also have a procedural interest in seeing the Service comply with its legal obligations, and they suffer procedural injury from the Service's failure to do so.

15.     The injuries described above are actual, concrete injuries presently suffered by the Plaintiffs and their members, and the injuries will continue to occur unless this Court grants the requested relief.

16.     Defendant Ryan Zinke is the Secretary of the Interior. As Secretary of the Interior, Defendant Zinke has the ultimate responsibility to enforce and implement the provisions of the ESA. Defendant Zinke is sued in his official capacity.

17.     Defendant U.S. Department of Interior is an agency of the United States charged with administering the ESA for non-marine species.

18.     Defendant U.S. Fish and Wildlife Service is a federal agency within the Department of the Interior charged with implementing and ensuring compliance with the ESA through the APA and other federal laws.

19.     Defendant Greg Sheehan is the Principal Deputy Director of the U.S. Fish and Wildlife Service. As Principal Deputy Director, Defendant Sheehan is a federal official vested with responsibility for enforcing the ESA and its joint regulations. Defendant Sheehan is sued in his official capacity.

20.     Defendant Jim Kurth is the Acting Director of the U.S. Fish and Wildlife Service. As Acting Director, Defendant Kurth is a federal official vested with responsibility for

enforcing the ESA and its joint regulations. Defendant Kurth is sued in his official capacity.

21. Defendants Ryan Zinke, in his official as Secretary of the Interior; Department of the Interior; U.S. Fish and Wildlife Service; Greg Sheehan, in his official capacity; and Jim Kurth, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service, have waived sovereign immunity pursuant to 5 U.S.C. § 702.

22. The Service is an agency of the federal government, which may be named as a defendant and against which a writ in the nature of mandamus, a declaratory judgment, and injunctive relief may be entered pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65(a). The Service is a federal agency that may be sued under NEPA and the APA.

### III. JURISDICTION AND VENUE

23. Plaintiffs bring this action under NEPA, 42 U.S.C. §§ 4321-4370e, and the APA, 5 U.S.C. §§ 701-706.

24. This Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-706 (APA judicial review provisions); 28 U.S.C. § 2201 (Declaratory Judgment Act); 28 U.S.C. § 1361 (action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiffs). The relief requested is authorized by 28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); and 5 U.S.C. §§ 701-706.

25. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants federal district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

26. Plaintiffs have exhausted all available administrative remedies, the agency's actions are final and ripe for review, and Plaintiffs have standing to bring these claims.

27. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because the Service, an agency of the United States, has committed the unlawful conduct alleged herein from its Vero Beach office which is in Indian River County, Florida. The affected area is in Miami-Dade County, Florida.

28.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## IV. STATUTORY AND REGULATORY FRAMEWORKS

### A. NATIONAL ENVIRONMENTAL POLICY ACT

29.     NEPA is the Nation's charter for protection of the environment. 40 C.F.R. § 1500.1(a). Its central goals are "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321. The president, federal agencies, and courts share responsibility for enforcing NEPA and guaranteeing that high quality information is available to the public and analyzed by the federal agencies before the agencies make decisions and take actions. 40 C.F.R. § 1500.1(a).

30.     Congress designed NEPA to "insure that environmental information is available to public officials and citizens *before* decisions are made and actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences." *Id.* § 1500.1(b)-(c) (emphasis added).

31.     Pursuant to 42 U.S.C. § 4342, Congress created the Council on Environmental Quality (CEQ) to promulgate regulations applicable to all federal agencies consistent with the intent and purposes of NEPA. *See* 40 C.F.R. § 1500 *et seq.*

32.     Federal agencies must engage in NEPA review for any major federal agency action. "Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." *Id.* § 1508.18 (internal quotation marks omitted).

33.     To start the NEPA process, federal agencies are required either to prepare an Environmental Impact Statement (EIS) if it is apparent that the action will "significantly" affect the human environment, or if the action's effects are unclear, agencies may first prepare an Environmental Assessment (EA). EAs assess the action's environmental

6

impacts and determine whether they are significant to establish if a more extensive EIS analysis is required. Thus, while the purpose of an EA is generally to determine whether an EIS is required, preparation of an EA is not a necessary predicate to preparation of an EIS. *Id.* §§ 1501.4; 1508.9.

34.     If, after completing an EA, the agency concludes that an EIS is not required, it must issue a "finding of no significant impact" (FONSI). *Id*. §§ 1501.4(e), 1508.9(a)(1), 1508.13; 33 C.F.R. pt. 325, app. B, § 7. However, if an EA results in a finding that an action will likely significantly affect the human environment, then the agency must prepare an EIS. 40 C.F.R. § 1501.4.

35.     The "human environment" means "the natural and physical environment and the relationship of people with that environment." *Id.* § 1508.14. "Significantly," as used in NEPA, "requires considerations of both context and intensity." *Id*. § 1508.27. In the case of a site-specific action, "context" means "the effects in the locale rather than in the world as a whole" and "[b]oth short- and long-term effects are relevant." *Id.* § 1508.27(a). "Intensity" refers to "the severity of impact." *Id.* § 1508.27(b).

36.     Public controversy or uncertainty about the impacts of a federal action suggests that an action is significant and requires preparation of an EIS. *Id.* § 1508.27(b)(4), (5).

37.     Other factors an agency must consider in determining whether a project will have a significant impact include: the degree to which the proposed action affects public health or safety; the unique characteristics of the geographic area such as proximity to park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may adversely affect an endangered or threatened species or its critical habitat. *Id.*

38.     Likewise, agencies must include discussions of "indirect effects" and their significance in an EIS. *Id.* § 1502.16(b). Indirect effects are:

> caused by the action and are later in time or farther removed in distance,
> but are still reasonably foreseeable. Indirect effects may include growth
> inducing effects and other effects related to induced changes in the pattern

>of land use, population density or growth rate, and related effects on air
>
>and water and other natural systems, including ecosystems.

*Id.* § 1508.8(b).

39.     Possible impacts also include "ecological" effects, such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems, as well as aesthetic, historic, cultural, economic, social, or health" impacts. *Id.* § 1508.8.

40.     The term "cumulative impacts" means the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7. Cumulative impact analyses include private, state, and federal actions. *Id.* §§ 1508.7; 1508.25(a), (c).

41.     Neither NEPA nor its implementing regulations allow federal agencies to analyze effects of their actions in isolation. Rather, NEPA directs federal agencies to analyze the effects of proposed actions to the extent they are reasonably foreseeable consequences of the proposed action, regardless of where those impacts might occur. Agencies must analyze indirect effects, "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

42.     Furthermore, NEPA's implementing regulations require that the Service hold a public hearing "whenever appropriate" taking into account factors such as "substantial environmental controversy concerning the proposed action or substantial interest in holding hearing. *Id.* § 1506.6(c)(1).

43.     NEPA requires agencies to take a "hard look" at the environmental consequences of their actions. To meet NEPA's "hard look" requirement, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). This includes requiring that environmental effects are "discussed in sufficient detail to ensure that environmental

consequences have been fairly evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

44.      Therefore, "[t]he EA serves as the basis for determining whether implementation of the proposed action would constitute a major Federal action significantly affecting the quality of the human environment. If a positive finding is made, an EIS is required. If a negative finding is made, a FONSI is prepared and signed." 550 FW 3 Documenting and Implementing Decisions 3.3(B)(1).

45.      The FONSI must be made available to the affected public." 550 FW 3 Documenting and Implementing Decisions 3.3(B)(4)(a).

46.      The Service must make the FONSI available for public review, in accordance with 40 C.F.R. 1501.4(e)(2), if

>  (i) The proposal is a borderline case (i.e., there is a reasonable argument for preparation of an EIS).

>  (ii) The proposal is an unusual case, a new kind of action, or a precedent-setting case.

>  (iii) There is either scientific or public controversy over the proposal.

>  (iv) When the FONSI involves a proposal which is or is closely similar to one which normally requires preparation of an EIS.

550 FW 3 Documenting and Implementing Decisions 3.3(B)(4)(c)(i)-(iv); 40 C.F.R. 1501.4(e)(2), 1508.27.

47.      In summary, the purposes of NEPA are: to lead to better outcomes; to facilitate meaningful public engagement; to provide transparent, accountable, and informed government decisionmaking; to allow for consideration of reasonable alternatives that may not otherwise be identified; to identify mitigation alternatives and measures; and to encourage collaboration with interested parties.

**B. ADMINISTRATIVE PROCEDURE ACT**

48.      Pursuant to the APA, any person who has suffered legal wrong because of agency action or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof. 5 U.S.C. § 702.

49.     Under 5 U.S.C. § 706, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." The APA also requires a reviewing court to:

>    (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
>    (2) hold unlawful and set aside agency action, findings, and
>
>    conclusions found to be—
>
>>        (A) arbitrary, capricious, an abuse of discretion, or
>>
>>        otherwise not in accordance with law; [or]
>>
>>         . . .
>>
>>        (D) without observance of procedure required by
>>
>>        law . . . .

*Id.* § 706(1)-(2).

50.     Judicial review of claims arising under the APA is generally based "the whole record or those parts of it cited by a party . . . ." *Id.* § 706.

51.     The Service's EA, FONSI, and decision not to prepare an EIS under NEPA are final agency actions reviewable under the APA. *See id*. § 704.

52.     The Service's issuance of an ITP is a final agency action reviewable under the APA. *See id.* § 704.

53.     The Service's issuance of a BO is a final agency action reviewable under the APA. *See id.*

**C. ENDANGERED SPECIES ACT**

54.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). To that end, the ESA's purpose is to "provide a program for the conservation of . . . endangered species and threatened species" and "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The ESA requires that "all Federal departments and agencies . . . seek to conserve endangered species and threatened species and . . . utilize

their authorities in furtherance of the purposes" of the ESA. *Id.* §1531(c)(1). The Supreme Court has found through examination of the language, history, and structure of the ESA that "Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth.*, 437 at 174.

55.     Listed species are entitled to significant protections under the ESA, including a number of congressionally mandated measures designed to protect and restore their persistence in the wild. For example, under the ESA and its implementing regulations it is illegal for anyone to "take" an endangered or threatened animal. 16 U.S.C. § 1538(a)(1); 50 C.F.R. §§ 17.21, 17.31.

56.     To "take" an endangered or threatened animal means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" it, or "to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" includes significant habitat modification or degradation that results in death or injury to listed species "by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3. "Harass" is defined as intentional or negligent actions that create a likelihood of injury to listed species "to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." *Id.* Congress intended the term "take" to be defined in the "broadest possible manner to include every conceivable way" a person could harm or kill fish or wildlife. *See* S. Rep. No. 93-307, at 7 (1973), *as reprinted in* 1973 U.S.C.C.A.N. 2989, 2995.

57.     "Incidental take" is defined as take that is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 50 C.F.R. § 17.3.

58.     Section 10 of the ESA provides an exception to the take prohibition by permitting the "incidental take" of a listed species where "such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." An incidental take permit (ITP) may not be granted unless the applicant submits a conservation plan to the Service, which must then determine that the "impact which will likely result from such taking," together with the "steps the applicant will take to minimize and mitigate such impacts," "will not appreciably reduce the likelihood of the survival and recovery of the species in

the wild." 16 U.S.C. § 1539(a)(2)(A)(i–iv). Before issuing an ITP, the Service must find that the conservation plan specifies that:

    a) The taking will be incidental;

    b) The applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;

    c) The applicant will ensure that adequate funding for the conservation plan and procedures to deal with unforeseen circumstances will be provided; [and]

    d) The taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild . . . .

50 C.F.R. §§ 17.22(b)(2)(i)(A)-(D), 17.32(b)(2)(i)(A)-(D).

59. Prior to issuing an ITP, the Service must also undergo "consultation" pursuant to Section 7 of the ESA and its implementing regulations, 50 C.F.R. Part 400, to ensure that granting the permit "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). To jeopardize the continued existence of the species is to engage in an activity that either, "directly or indirectly . . . reduces appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R § 402.02(d).

60. Consultation under Section 7 of the ESA also considers the impacts of the federal action to plants because Section 7 prohibits any action that jeopardizes any listed species, including plants. 16 U.S.C. § 1536(a)(2); *see also* 16 U.S.C. § 1532(16) ("The term 'species' includes an subspecies of fish or wildlife or plants . . . .").

61. The ESA's implementing regulations broadly define an "action" to mean "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02(d). ESA regulations further provide that "any request for formal consultation may encompass . . . a number of similar individual actions within a given geographical area" or "a segment of a comprehensive plan." *Id.* § 402.14(c).

62.     During consultation, the Service must analyze the effects of the proposed action on listed species and habitat, which includes the direct and indirect effects, "together with effects of other activities that are interrelated or interdependent with that action, [which] will be added to the environmental baseline." *Id.* § 402.02.

63.     The "environmental baseline" includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early Section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.*

64.     Indirect effects are "caused by the proposed action and [occur] later in time, but still are reasonably certain to occur." *Id.*

65.     Interrelated actions "are part of a larger action and depend on the larger action for their justification." *Id.*

66.     Interdependent actions "have no independent utility apart from the action under consideration." *Id.*

67.     The Service must also analyze the cumulative effects of "future State or private activities, not involving Federal activities that are reasonably certain to occur within the action area." *Id.*

68.     The Service's evaluation during consultation must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

69.     At the conclusion of the consultation process, the Service issues a "biological opinion" which "detail[s] how the agency action affects the species," *id.* § 1536(b)(3)(A), and sets forth the Service's opinion as to whether the action is "likely to jeopardize" the continued existence of a listed species. 50 C.F.R. § 402.14(h)(1)-(3).

70.     If the Service determines the project is not likely to cause jeopardy to the species or to destroy or adversely modify its habitat, the agency must provide a statement specifying the impact of the incidental take on the listed species, outlining "reasonable and prudent measures" (RPMs) that are necessary or appropriate to minimize the impact from incidental take, and setting forth any conditions the agency and applicant must

follow in accordance with the ITP. 16 U.S.C. § 1536(b)(4)(A)-(C); 50 C.F.R. § 402.14(i)(1)(ii).

71.     If the Service determines that the agency action is likely to jeopardize the continued existence of a listed species or result in adverse modification of critical habitat, the biological opinion must suggest "reasonable and prudent alternatives" (RPAs) that would reduce action-related impacts such that the agency action may avoid jeopardizing listed species. 16 U.S.C. § 1536(b)(3)(A).

72.     If the agency action is expected to cause "take," the Service must also include an incidental take statement (ITS) in its biological opinion. 50 C.F.R. § 402.14(i). The ITS must, wherever practicable, quantify the amount of take allowed for each species, thereby creating a meaningful "trigger" to reinitiate consultation when an allowable level of take is exceeded. *Id.* § 402.14(i)(1)(i). The Service may use a reasonable surrogate, or proxy, for take in the ITS only where it: (1) demonstrates that it cannot express anticipated take in numerical form; (2) articulates a causal connection between the surrogate and the anticipated take; and (3) "sets a clear standard for determining when authorized take has been exceeded." *Id.*

73.     Compliance with a biological opinion and its ITS protects federal agencies, and others acting under or consistent with the biological opinion, from enforcement action under Section 9's prohibition against take. 16 U.S.C. §§ 1536(o)(2), 1538(a); 50 C.F.R. § 17.31(a). However, take that is not in compliance with a biological opinion or absent a valid ITS or ITP violates Section 9 of the ESA.

74.     Under the terms of Section 7(b)(4) and Section 7(o)(2), take that is incidental to and not intended as part of an agency action, may be permitted only if such taking complies with the terms and conditions of an ITS issued as part of a biological opinion. 16 U.S.C. § 1536(b)(4), (o)(2).

75.     Even after the Service issues a biological opinion, the ultimate duty to ensure that the action will not jeopardize a listed species lies with the action agency, here, also the Service. 50 C.F.R. § 402.15. An agency cannot rely on an inadequate, incomplete, or flawed biological opinion to satisfy its duty to avoid jeopardy.

76.    An agency must reinitiate consultation with the Service if any of the following circumstances occur:

    (a) If the amount or extent of take specified in the ITS is exceeded;

    (b) If new information reveals effects of the action that may affect a listed species in a manner or to an extent not previously considered;

    (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that not considered in the biological opinion; or

    (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

*Id*. § 402.16(a)-(d).

## V. FACTUAL AND PROCEDURAL BACKGROUND

77.    The Richmond pine rocklands are characterized by limestone outcrops, a canopy composed solely of Florida slash pine, and a diverse understory of scrubs and herbs. They are also the site of the proposed Coral Reef Commons, a mixed-use development proposal with 900 apartments, a commercial supercenter (like Walmart), and additional retail.

78.    On July 15, 2014, the Service notified the developer of Coral Reef Commons that such a project could result in the "take" of numerous endangered and threatened species that are protected under the ESA, and thus, that the developer could be liable for violating federal law.

79.    In November 2014, the developer announced it would submit a Section 10 ITP and HCP application to the Vero Beach office of the Service to authorize the take of ESA-listed species, potentially including the Florida bonneted bat (*Eumops floridanus*), Florida leafwing butterfly (*Anaea troglodyta*), Bartram's scrub-hairstreak butterfly (*Strymon acis bartrami*), Florida brickell-bush (*Brickellia mosieri*), Carter's small-flowered flax (*Linum carteri var. carteri*), deltoid spurge (*Chamaesyce deltoidea ssp. deltoidea*), and tiny polygala (*Polygala smallii*) associated with the destruction of irreplaceable and endangered pine rockland habitat.

80.     In May 2015, Coral Reef Retail LLC, Coral Reef Resi PH I LLC, and Ramdev LLC (collectively "RAM Coral Reef"), and the University of Miami (collectively "Permittees") applied to the Service for an ITP for 30 years to develop and operate Coral Reef Commons while causing incidental take of the seven ESA-listed species, as well as the Miami tiger beetle, eastern indigo snake, rim rock crowned snake, gopher tortoise, and white-crowned pigeon.

81.     According to the May 2015 application, the Project would include 137.90 acres of mitigation, including 55.29 acres of on-site mitigation and 50.96 acres of off-site mitigation. The on-site mitigation or "conservation areas" would be owned by RAM Coral Reef and include 23.92 acres in what is being called the "west preserve," 21.61 acres in the "east preserve," 2.16 acres in the "southern corridor," 3.72 acres of rockland hammock, and 3.88 acres of "stepping stones."

82.     RAM Coral Reef intends to destroy 82.61 acres of endangered and threatened species habitat in connection with the Project.

83.     On March 23, 2017, the Service announced the availability of the proposed HCP and a draft EA for public review and comment.

84.     More than 3,000 people, including experts in the species and habitats at issue, submitted comments on the proposal. An overwhelming majority of these comments were in opposition to the Project and in favor of science-based species protections.

85.     On December 5, 2017, the Service announced via a press release that it had approved the Coral Reef Commons Habitat Conservation Plan and issued an ITP for the Project.

86.     The Service does not appear to have published or made available to the public a FONSI explaining its decision to issue the ITP.

**A. PINEROCKLANDS AND PROTECTED PLANTS AND ANIMALS**

87.     The pine rockland community is one of the most endangered habitats in North America. Pine rocklands provide critical foraging and nesting habitat for a diverse array of wildlife, including many federally listed species. They also provide cover and roosting sites to a variety of wildlife species. Pine rockland ecosystems contain a rich herbaceous

flora with many plants and animals found nowhere else. These once-extensive communities have been plagued by development in the region and are now greatly reduced and divided into many smaller fragments.

88.     Pine rocklands are found in three areas of southern Florida: the Miami Rock Ridge of southeastern peninsular Florida, the Lower Florida Keys, and the southern Big Cypress pinelands. The Miami Rock Ridge is characterized by a very diverse shrub layer dominated by hardwoods, and an equally diverse herbaceous layer containing 35 taxa endemic to southern Florida, including several species listed by the federal government as threatened or endangered. Like pine rocklands throughout Florida, habitat on the Miami Rock Ridge has been fragmented and degraded by past land use practices.

89.     The north-south distribution of pine rocklands along the Miami Rock Ridge has already been reduced by over 12 miles. The Service's ultimate goal for this area is to restore the pine rocklands by maintaining the function, structure, and ecological processes of pine rocklands, and preventing any further loss, degradation, or fragmentation, of this imperiled South Florida community.

90.     In Miami-Dade County, the remaining pine rockland habitat is highly fragmented, with the majority of fragments being less than 50 ha in size and embedded in an urban landscape.

91.     The Richmond tract of pine rocklands in Miami-Dade County, where Coral Reef Commons is proposed, is protected by Miami-Dade County ordinances through its Natural Forest Community (NFC) designations. NFC designations are intended to protect forests that meet certain criteria for inclusion, and forests that become degraded may lose NFC designation. Once designated, NFCs are subject to development limits and permitting for any impacts to trees, shrubs, or groundcover plans to minimize impacts and ensure that remaining NFC areas are preserved and managed. On the Coral Reef Commons property, 44.94 acres of pine rocklands and 3.72 acres of rockland hammock were designated as NFCs.

92.     The Richmond tract of pine rocklands contains 260 taxa of native plants, many of which are endangered or threatened. The Service identifies acquiring lands that are

threatened with development, such as the pine rocklands at the proposed Coral Reef Commons site, as the main tool in preventing further destruction or degradation of those lands.

93.     Coral Reef Commons will impact eight imperiled animals, including five federally listed species (Bartram's scrub-hairstreak butterfly, Florida leafwing butterfly, Florida bonneted bat, eastern indigo snake, and Miami tiger beetle); one candidate species (gopher tortoise); and two state-listed threatened species (Rim Rock crowned snake[1] and white-crowned pigeon). It also purports to provide conservation measures for 14 plant species, including 13 federally listed species (tiny polygala, deltoid spurge, crenulate lead-plant, Florida brickell-bush, Garber's spurge, Small's milkpea, sand flax, Carter's small-flowered flax, Blodgett's silver bush, Florida bristle fern, Everglades bully, Florida pineland crabgrass, and Florida prairie clover; and one state-listed endangered species (clamshell orchid). Neither the HCP nor the EA address impacts to, nor did the Permittees seek incidental take authorization for, the federally threatened pineland sandmat.[2]

94.     No species-specific surveys were conducted on or off-site for several of the listed species, including the federally listed pineland sandmat (*Chamaesyce deltoidea, ssp. pinetorum*), even though the site is wholly within the species current range, and despite the Service's finding that the pineland sandmat may occur within the Richmond Area.

***Bartram's scrub-hairstreak butterfly & Florida leafwing butterfly***

95.     Bartram's scrub-hairstreak butterfly (Bartram's) and Florida leafwing butterfly are entirely dependent on pine rockland habitat. In 2014, the Service listed and designated critical habitat for these species due to loss of pineland habitat, mismanagement of existing habitat, and pesticides. Bartram's have been observed on the

---

[1] The Rim Rock crowned snake is also under consideration for federal ESA protections.

[2] The Service listed the Everglades bully, Florida pineland crabgrass, and pineland sandmat as threatened and the Florida prairie clover as endangered on October 5, 2017. 82 Fed. Reg. 46691 (Oct. 5, 2017). The Florida prairie clover, pinelands sandmat, and Everglades bully have been candidates for federal protection for more than a decade.

Project site, and the site contains 90.2 acres (nearly a quarter) of the 359 acres of Florida leafwing critical habitat.

96.     Bartram's and Florida leafwing critical habitat overlaps entirely within the proposed 90.2 acres of the Project site. The Project would result in the loss of 39.47 acres of critical habitat for the butterflies. Of the 86.49 acres development footprint, 33 acres support pineland croton—Bartram's and leafwing's host plant—and potentially immature and adult Bartram's. This loss of habitat has the potential to kill or injure any immature butterflies that occur within the 33 acres. The Project would also destroy an additional 53 acres that support adult Bartram's by providing nectaring plants.

97.     Every acre of upland critical habitat is vital to these butterflies, whose lower elevation sites are imminently threatened with sea-level rise.

*Miami tiger beetle*

98.     The Miami tiger beetle is found only in pine rockland habitat along the Miami Rock Ridge and Richmond Area. The Service listed the Miami tiger beetle as endangered in October 2016, and while it has not been documented on the Project site, the Project site includes suitable habitat for the beetle and the species has been documented on properties north, east, and south of the proposed development. Neither the Service nor Permittees have conducted comprehensive studies or surveys for Miami tiger beetles on the Project site; however, the Project site contains suitable habitat for the species and it is expected to occur there.

99.     Coral Reef Commons would develop 86.49 acres of habitat suitable to the Miami tiger beetle, including 32.91 acres of pine rockland habitat and 53.58 acres[3] of disturbed land. This habitat loss has the potential to injure or kill adults and larvae during construction and lead to further loss through the increased chance for collection. Already

---

[3] The EA states that 53.58 acres of disturbed land will be developed, while the HCP states that 53.62 acres of disturbed land will be developed. *Compare* EA at 96 *with* HCP at 10. There is no apparent explanation for the discrepancy between the EA and HCP.

there have been multiple instances of the Miami tiger beetle ending up in trade and given that it will use human-made pathways, further exposing them to overexploitation.

***Florida bonneted bat***

100.    The Florida bonneted bat has been detected on the Project site, with acoustic equipment detecting clutter, commute, and feeding calls at all 25 stations within the Project site. The Service listed the Florida bonneted bat as an endangered species under the ESA in 2013. It is found in longleaf pine trees and is dependent on forested areas for roosting; however, the species has also been found roosting in palm trees. The greatest threats to the survival of the bonneted bat are mainly human-caused, such as habitat destruction, fragmentation, and degradation closely linked to various types of development and agriculture. It is anticipated that climate change and sea level rise will further negatively impact the species, which is already suffering from limited suitable habitat.

101.    The Project would permanently destroy 86.35 acres of land that is likely used by the bat, including 73.84 acres of habitat that could be used for bat roosting and foraging. The EA expressly provides for the demolition of bat roost sites and that the removal of a roost site would be harassment and harm. Likewise, the EA concedes that no research has been done on the effect of fire management on bats. The Service also failed to explain how the loss of habitat for the bat will not appreciably reduce the survival or recover of the species, especially given the importance of upland habitat.

***Eastern indigo snake***

102.    Historically, the eastern indigo snake was found throughout Florida, Georgia, Alabama, and portions of Mississippi; however, the species is now only found within Georgia and Florida. Eastern indigo snakes are more often found in pinelands, tropical hardwood hammocks, and mangrove forests, as they are more inclined to upland habitats and ecosystems. The indigo snake most frequently inhabits pine flatwoods, scrubby flatwoods, dry prairie, tropical hardwood hammocks, edges of freshwater marshes, agricultural fields, coastal dunes, and human-altered habitat; however, the species needs a

20

variety of these habitats to complete its life cycle. The snake has not been found on the Project site, but the site provides suitable habitat.

103.    The Service listed the eastern indigo snake as threatened under the ESA in 1978 as the result of several threats including habitat destruction and fragmentation, over-collecting for the pet trade, and mortality from gassing gopher tortoise burrows to collect rattlesnakes. The species remains vulnerable to habitat destruction and fragmentation associated with residential and commercial construction, agriculture, and timbering.

104.    On July 18, 2016, Krysko et al. published a peer-reviewed article identifying a new, previously undocumented species of indigo snake in the United States, the Gulf Coast indigo snake (*Drymarchon kolpobasileus*). The study distinguishes the new species from the federally threatened eastern indigo snake (*Drymarchon couperi*) using morphological and molecular analyses, and it identifies new distributions for each discrete species based on observed morphological and genetic differences. This study has several implications for the conservation of the species: it takes an already rare and imperiled species of snake and effectively splits it into two separate species that each inhabit even smaller ranges.

***Gopher tortoise***

105.    The gopher tortoise is federally listed as threatened throughout its range, except in Florida where the Service considers it a "candidate" for listing under the ESA.[4] The gopher tortoise is a highly valuable "keystone species" that benefits and ensures the survival of other species in its ecosystem. This tortoise is known to benefit more than 350 different species, including eastern indigo snakes, foxes, skunks, and lizards, which use gopher tortoise burrows for shelter and for various parts of their lifecycles. The gopher tortoise is generally found in longleaf pine or oak sandhill ecosystems but may also be

---

4 Candidate species are species that he Service has sufficient information on biological vulnerability and threats to support listing, but listing is precluded by other listing actions.

found in other dry, upland habitats within its historic range. The gopher tortoise has not been documented on site or on the off-site area but is present within the Richmond Area.

106.     The greatest threat to the gopher tortoise is habitat destruction, including habitat fragmentation and degradation, caused by urban development, agricultural conversion, forestry, and mining. Habitat fragmentation can lead to reproductive isolation, increased predation due to exposed habitat edges, and mortality resulting from vehicular collisions.

***Florida brickell-bush & Carter's small-flowered flax***

107.     The Service listed the Florida brickell-bush and Carter's small-flowered flax as endangered in 2014 and designated 104.06 acres of critical habitat that overlaps entirely within the proposed Coral Reef Commons. The plants are only found in Miami-Dade pine rocklands in open, well-lit subcanopy with exposed limestone and minimal organic material. It is estimated only 1,550 Florida brickell-bush plants remain. The Project would result in the loss of 52.85 acres of critical habitat.

***Tiny polygala & deltoid spurge***

108.     The Service listed the tiny polygala and deltoid spurge as endangered in 1985 but has never designated critical habitat for these two plants. Surveys conducted by the Permittees report two populations of tiny polygala, including one population of nine plants within pine rockland slated to be developed. Surveys detected deltoid spurge at three NFC parcels on the Coral Reef Commons site. Surveys have not been done at the off-site mitigation area, but the deed restrictions for the off-site mitigation area indicate that deltoid spurge have been observed there. HCP at 61.

***Pineland sandmat, Everglades bully, Florida pineland crabgrass, and Florida prairie-clover***

**109.**     The Service listed the pineland sandmat, Everglades bully, and Florida pineland crabgrass as threated, and the Florida prairie-clover as endangered, on November 6, 2017, but has yet to designate critical habitat for these plants. Historical declines for each of these plants are partially attributed to fire suppression, inadequate fire management and resulting habitat loss. Indeed, the Service noted in its final listing rule for the plants that threats from urban development and lack of adequate fire management warranted listing,

specifically citing the Permittees' plans to develop the Richmond Pine Rocklands with a shopping center and residential construction, as well as the Zoo Miami amusement park expansion. The Service's position is that these development projects may preclude future recovery options for the four plants (for example, by compromising the land managers' ability to burn within Richmond Pine Rocklands).

**110.**     Sea level rise compounds the habitat loss threat to these plants because the majority of these plant populations occur below two meters of sea level and are thus susceptible to inundation. Decades prior to sustained inundation, upland forest habitats will begin the transition to saline wetland habitats through irreversible changes in vegetation composition. These saline habitats are unsuitable for the pineland sandmat, Everglades bully, Florida pineland crabgrass and Florida prairie-clover, making the loss of one of the few remaining higher elevation pine rockland habitats that much more preclusive of future recovery options.

## B. HABITAT CONSERVATION PLAN & ENVIRONMENTAL ASSESSMENT

111.     The Permittees submitted a draft EA for the HCP and ITP that purports to provide a net benefit to the listed species in the area.

112.     The draft HCP identified six alternatives.  These alternatives include:

> Alternative 1- No Action Alternative;
>
> Alternative 2- Redevelopment Only/No Restoration;
>
> Alternative 3- Maximum Build-out;
>
> Alternative 4- County Approved Zoning in 2013;
>
> Alternative 5- County Approved Zoning/Stepping Stones and Southern Corridor; and
>
> Alternative 6- Reduced Commercial/Increased Preserve (Preferred Alternative).

113.     Aside from the "no-action" alternative, there is a redevelopment option of 25.4 developed acres, three alternatives consisting of 92-100 developed acres, and a preferred alternative of more than 86 developed acres.

114.     The Permittees summarily rejected the redevelopment alternative, stating that it is not "an environmentally conscious, economically viable, mixed-use development." As

the redevelopment alternative would permit mixed uses and impact significantly fewer acres of pine rockland habitat than the preferred alternative, the developers' resistance to adopt the redevelopment alternative actually appears to be one of economic viability. The Permittees claim the Project would not be commercially viable because there is not room for a large anchor tenant, but there is no financial analysis apparent in the HCP that would support this claim.

115.    Alternatives 3, 4, and 5 have the same amount of commercial development. Alternatives 4 and 5 also have the same number of residential units. All three alternatives differ only by a matter of a few acres in the total amount of developed property and are essentially all maximum build out or near-build out scenarios.

116.    The draft HCP includes no consideration of alternatives that fall between the 25.4-acre redevelopment only alternative and the more than 86-acre preferred alternative.

117.    The Permittees' characterization that no restoration will occur under the no-action alternative ignores the existing obligations the Permittees are already under, and likely in violation of, to properly manage the land as an NFC.

118.    Much of the HCP is based on a "habitat functional assessment" developed by the Permittees in consultation with the Service. According to the HCP, this assessment was used to classify the quality of habitats on site, assist in the minimization of impacts, and quantify impacts and mitigation requirements.

119.    The habitat functional assessment is not based on a standardized methodology. It will lead to varying degrees of impacts and mitigation and regulatory uncertainty with no safeguards in place to ensure this Project or future actions will not jeopardize a species.

120.    The HCP's assessment does not link various land cover types to the specific species and their needs, nor is there any indication that this valuation system has been peer reviewed. There is no base ratio that provides for the protection of a sufficient acreage of habitat for a particular species. It does not take into account how much habitat has been preserved, nor does it take into account its quality, function, or location, nor how much more habitat needs to be protected and how much is available It does not take into account the rate of yearly loss of habitat (from development) across a broad

geographic region, nor does it identify the location of developed habitat. There is no analysis of what is necessary to offset impacts to individual species populations, and no consideration of the ratio of conservation lands to impacted lands necessary to support each species or the amount of acreage needed to support a particular population.

121.    The HCP relies on the assumption that one characteristic, for example fire, is going to be used to improve other characteristics, like removing invasive plants, restoring ground cover, and improving soil conditions. This assumption leads to high conservation value rankings for lands proposed for preservation and enhancement.

122.    However, given the construction of 900 apartment units, retail, and a school, it seems extraordinarily optimistic, and in fact flies in the face of common sense and past practice that prescribed burning will be a viable land management tool.

123.    Nearly all of the proposed restoration that serves as mitigation for the Project depends on fire management. It appears the property has not been fire managed in the past. Fire management will become even more difficult and perhaps pose human health risks with the addition of 900 residential units, retail, and a school.

124.    There appears to be a double accrediting of the removal of exotics which is often times directly related to percent native vegetation cover, and *vice versa*. Because Coral Reef Commons receives conservation credit for the removal of exotics and the percent native vegetation cover, which reflect the same purported ecosystem benefits, it is essentially double dipping on only one purported ecosystem benefit. Both the non-native vegetation and the native vegetation values enjoy the highest weighted value of 0.20.

125.    The post-construction valuation for removal of invasive exotic plants, native cover, and pine rockland herbaceous cover are all were awarded the aspirational, and likely overly optimistic value of 1.0.

126.    The HCP contains no explanation of how the Permittees delineated the polygons they used to measure ecosystem value in their habitat functional assessment.

127.    The Permittees state that the operation of the residential and commercial units will fund the conservation elements of the HCP. At the same time, the Permittees provide no

effective financial assurances should the operation of the residential and commercial unites fail to yield the financial resources necessary to fund such conservation.

128.    Appendix L is merely a form of letter of credit with no details and no amounts, and Appendix N (the Draft Conservation Encumbrance – On Site CRC) is missing the essential details.

129.    A transportation analysis conducted by Permittees estimates an additional 17,774 daily external trips will be generated once development is complete. The closest Florida Department of Transportation two-way portable traffic monitoring site, located on Coral Reef Drive .35 miles west of 117th Ave., saw average daily traffic of 60,500 for the year 2016. Neither the HCP nor the EA address the impacts that an increase in traffic by nearly a third will have on species either on or off-site, or on the surrounding human environment.

130.    The transportation analysis conducted by the Permittees does not account for the increase in traffic that would result from the development of the adjacent property planned for the Zoo Miami complex expansion known as Miami Wilds. Neither the HCP nor the EA address the cumulative impacts brought by this Project, nor the cumulative impacts of the increase in traffic from both Coral Reef Commons and Miami Wilds.

131.    As evidenced by the thousands of letters and comments in opposition to this Project, the Project is highly controversial.

132.    The use of a habitat functional assessment, particularly the one developed here, may establish a precedent for future actions, especially considering the proposed Miami Wilds project that will be on adjacent, similar habitat.

133.    The Permittees state that they conducted 16 surveys from Sept. 2014 through Jan. 2015, describing the conditions as mostly cloudy, with one exception of "light rain to mostly cloudy." Some of the surveys were for specific species, others were not. According to the Permittees, the general species surveys were conducted "in conjunction with other surveying efforts and included qualitatively recording observed flora and fauna."

134.    No species-specific surveys for eastern indigo snake were conducted on or off-site, despite the fact that it "would likely have historically been found in the Richmond Area." Likewise no species-specific surveys for rim rock crowned snake were conducted on or off-site, despite the fact that it was documented in 2009 within the Zoo Miami area.

135.    Bartram's was surveyed using pineland croton as a proxy on Sept. 12, 22, 24, 26, Oct. 3, 6, and 7 2014, but the HCP does not state whether the entire Coral Reef Commons Project site or off-site preservation were surveyed for Bartram's.

136.    Florida bonneted bat surveys were conducted in September 2014 at 25 sites in forested areas of the Coral Reef Commons site. It is not clear from the HCP why the western and southwestern portions of the Project were not surveyed.

137.    The off-site mitigation area appears to not have been surveyed for any of the species at all.

**D. THE BIOLOGICAL OPINION**

138.    On November 30, 2017, the Service issued a biological opinion and conference opinion (BO) for Incidental Take Permit Number TE15009C-0 purporting to review 22 affected species' statuses, baseline conditions, effects of the action, and cumulative effects.

139.    The BO concludes that the Project is not likely to jeopardize the species' continued existence or destroy or adversely modify their critical habitat.

140.    The BO authorizes take of the Bartram's scrub-hairstreak butterfly, eastern indigo snake, Florida bonneted bat, Florida leafwing butterfly, and Miami tiger beetle.

141.    The BO also evaluates the effects of the action on 14 plant species.

142.    The conference opinion addresses the gopher tortoise and rim rock crowned snake.

143.    The BO evaluates "conservation measures" that are intended to reduce the impacts of construction, including preconstruction surveys, construction worker education, best management practices, and building and landscaping design elements.

144.    The BO evaluates other measures intended to reduce the impacts of operation of the Project, including community practices, measures to facilitate prescribed burning, and pest control management practices.

145.    The BO acknowledges that most of the species considered in the BO are associated primarily or exclusively with pine rockland habitats and that only about one percent of the Miami Rock Ridge pine rocklands remain outside of Everglades National Park.

146.    It also acknowledges that "[t]he challenges of managing smoke and ensuring public safety that are associated with prescribed fire severely constrain its application in urban environments."

147.    The BO finds that Project construction would eliminate Bartram's from the development footprint (over 50 acres) and that it would reduce the habitat available to Bartram's and the Florida leafwing, yet it found that the Project is not likely to destroy or adversely modify designated critical habitat for the Bartram's or Florida leafwing.

148.    The BO acknowledges the site has not been surveyed for Miami tiger beetles, that four contiguous properties support small populations of Miami tiger beetles. And that the tiger beetle is especially vulnerable to extinction.

149.    The BO estimates the permanent loss of more than 20 acres of habitat for the tiger beetle, and may harm two or three eastern indigo snakes.

150.    The BO found that the Project would convert 67 acres of vegetating foraging habitat into impervious surface, decreasing prey abundance.

151.    The ITS refers back to the HCP and ITP with no further explanation or attempt to quantify or express by proxy the amount of take anticipated.

152.    The HCP itself also does not express take numerically for listed species, nor does it explain why it is impracticable to do so or attempt to express take by proxy.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(The Service's Violations of the National Environmental Policy Act and the Administrative Procedure Act)**

153.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

154.    The Service performed a major federal action for the purpose of NEPA by issuing Permit Number TE15009C-0. This action was a final agency action under the APA, 5 U.S.C. § 704.

155.    The Service violated NEPA and its implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2), in its actions as they relate to the Coral Reef Commons EA and decision to not produce an EIS.

156.    Specifically, the Service failed to adequately addresses serious environmental issues raised by the Service's decisions to issue the ITP for listed species, including by:

(a)    Failing to take a hard look at the significant direct, indirect, and cumulative environmental effects of its actions in permitting Coral Reef Commons, including by failing to meaningfully assess the environmental impacts of its action as it relates to other permit applications, both pending and reasonably foreseeable, including the Zoo Miami complex expansion known as Miami Wilds, and failing to meaningfully assess the environmental impacts of its action as it relates to ongoing and reasonably foreseeable activities in Miami-Dade County;

(b)    Failing to properly identify and assess the basic and overall purpose and need for the Project;

(c)    Improperly narrowing the analyses performed through the EA;

(d)    Failing to properly identify and assess reasonable alternatives to the action, and avoid, minimize, or mitigate the adverse effects of these actions on the quality of the human environment;

(e)     Failing to take a hard look at the significant harm to threatened and endangered species and their critical habitat from the action, including by failing to conduct any meaningful analysis of the substantial adverse impacts that will result from the activity through reduced opportunities for viewing wildlife;

(f)     Relying on an arbitrary and capricious "habitat functional assessment" when considering the environmental impacts of and purported mitigation associated with the Project.

(g)     Failing to conduct any NEPA review on the action's impacts to the federally threatened pineland sandmat;

(h)     Failing to prepare an environmental impact statement for the Coral Reef Commons ITP;

(i)     Failing to encourage and facilitate public involvement in these decisions, which are of substantial environmental controversy, including, but not limited to, by failing to adequately respond to requests that the agency hold public hearings, as requested by several interested parties—including Plaintiffs, and failing to hold such hearings;

(j)     Failing to assess the impact of the addition of 17,000 vehicle trips daily; and

(k)     Otherwise disregarding the requirements of NEPA and its implementing regulations, including, but not limited to, failing to follow procedural requirements related to its FONSI decision.

157.    As a result of these errors, the Service failed to promote efforts that will prevent or eliminate damage to the environment; failed to use all practicable means to foster and promote the general welfare; failed to avoid preventable risk to the public health and safety; and failed to create and maintain conditions under which humans and nature can exist in productive harmony.

158.    The Service also failed to make its FONSI available to the public for 30 days prior to taking any action.

159.    The NEPA review conducted by the Service in connection with its decision to issue Permit Number TE15009C-0 is inadequate and flawed, and the Service's reliance on it was and is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.

## SECOND CLAIM FOR RELIEF

### (The Service's Violations of the Administrative Procedure Act)

160.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

161.    The Service's biological opinion is arbitrary and capricious, and contrary to its administrative consultation requirements of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14, and is thus violation of the APA, 5 U.S.C. § 706(2)(A).

162.    Specifically, the Service failed to: (1) review all relevant information; (2) properly consider the direct and indirect effects of the action; (3) adequately assess the cumulative effects on the listed species; and (4) specify the level of take that may occur with a meaningful trigger to reinitiate consultation.

163.    The Service's biological opinion is contrary to the consultation requirements of Section 7(a)(2) of the ESA and therefore violates the APA because it:

   (a)    Improperly restricts the action area and inaccurately describes the environmental baseline;

   (b)    Improperly limits the scope of the agency action and subsequent analysis of the effects of the agency action to develop the pine rocklands;

   (c)    Fails to consider all relevant information or information otherwise available;

   (d)    Fails to analyze the cumulative impacts on listed species in the action area;

   (e)    Fails to specify the level of take that may occur and provide an adequate trigger for re-initiation of consultation;

   (f)    Relies on an arbitrary and capricious "habitat functional assessment" when considering species and habitat impacts associated with the Project; and

   (f)    Relies on insufficient, unspecified, and unproven mitigation measures.

164.    The Service's proffered Reasonable and Prudent Measures are also inadequate to minimize the incidental take of species at the Project site.

165.    The biological opinion's Reasonable and Prudent Measures do not contain mitigation measures with specific defined conservation goals, action measures, or an implementation schedule to ensure that species conservation measures are met.

166.    The Service failed to specify the amount or extent of take that will occur or provide a surrogate ecological condition that has some connection to the taking of the species, as the ESA requires.

167.    The Service failed to provide a meaningful trigger for the reinitiation of consultation.

168.    The Service failed to acknowledge that the eastern indigo snake is actually two genetically distinct species, and that the species located in the action area is the Gulf coast indigo snake (*Drymarchon kolpobasileus*).

169.    The Service failed to initiate consultation regarding potential effects to the pineland sandmat.

170.    The Service's failure to "meaningfully analyze" the risks to these species is arbitrary and capricious.

171.    The Service violated the APA, 5 U.S.C. § 706(2)(A), in finding that Coral Reef Commons is not likely to adversely affect the species.

172.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter Judgment for Plaintiffs and provide the following relief:

(1)    Declare that the Service's decisions to issue an incidental take permit for Coral Reef Commons, Permit Number TE15009C-0, violated NEPA and the APA;

(2)    Declare that the Service's biological opinion is arbitrary, capricious, and contrary to ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14, and therefore are in violation of the APA, 5 U.S.C. § 706(2)(A);

(3)     Declare that the Service's reliance on its biological opinion is arbitrary and capricious and violates section 7(a)(2) of the ESA;

(4)     Declare that the NEPA review conducted by the Service in approving Permit Number TE15009C-0 is arbitrary, capricious, and in violation of the law;

(5)     Order the Service to rescind Permit Number TE15009C-0;

(6)     Order the Service to withdraw the biological opinion, rescind its incidental take statement, and prepare a biological opinion that complies with the mandates of the ESA;

(7)     Preliminarily and permanently enjoin the Service from authorizing any further action under Permit Number TE15009C-0 until it fully complies with the requirements of NEPA and the APA, including providing an opportunity for public hearing;

(8)     Award plaintiffs their costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and Fed. R. Civ. P. 54(d); and

(9)     Award plaintiffs any other relief that is just and proper.


**DATED:**  December 8, 2017


                                Respectfully submitted,


                                __/s/ Jaclyn Lopez_____
                                JACLYN LOPEZ, Trial Counsel
                                FL Bar No. 96445
                                Center for Biological Diversity
                                P.O. Box 2155
                                St. Petersburg, FL 33731
                                Tel: (727) 490-9190
                                Fax: (520) 623-9797
                                jlopez@biologicaldiversity.org

    /s/ Elise Pautler Bennett
ELISE PAUTLER BENNETT
FL Bar No. 106573
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 755-6950
Fax: (520) 623-9797
ebennett@biologicaldiversity.org

    /s/ John Peter Rose
JOHN PETER ROSE
CA Bar No. 285819 (*special admission
pending*)
Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
Tel: (213) 785-5406
Fax: (213) 785-5748
jrose@biologicaldiversity.org

    /s/ Paul J. Schwiep
Paul J. Schwiep
FL Bar No. 823244
2601 South Bayshore Drive, P1
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 495-3833
pschwiep@coffeyburlington.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2017, I electronically filed the foregoing Form A Notice of Conventional Filing with the Clerk of the Court by using the CM/ECF system, which served all counsel of record registered with CM/ECF system for this case.

       */s/ Jaclyn Lopez*
JACLYN LOPEZ, FL Bar No. 96445
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190
Fax: (520) 623-9797
jlopez@biologicaldiversity.org
*Attorney for Plaintiffs*
*Center for Biological Diversity, et al.*