## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; TROPICAL AUDUBON SOCIETY; MIAMI PINE ROCKLANDS COALITION; and SOUTH FLORIDA WILDLANDS ASSOCIATION, )))))) | |
| *Plaintiffs,* ) | CASE NO. 1:17cv2444 |
| ) | |
| v. ) | |
| ) | |
| RYAN ZINKE, in his official capacity as Secretary of the U.S. Department of Interior; U.S. DEPARTMENT OF THE INTERIOR; U.S. FISH AND WILDLIFE SERVICE; GREG SHEEHAN, in his official capacity as Principal Deputy Director of U.S. Fish and Wildlife Service; and JIM KURTH, in his official capacity as Deputy Director for Operations and Acting Director of U.S. Fish and Wildlife Service, )))))))))))) | |
| ) | |
| *Defendants.* ) | |

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION, SUPPORTING MEMORANDUM OF LAW, AND REQUEST FOR HEARING**

## MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Plaintiffs Center for Biological Diversity, Tropical Audubon, Miami Pine Rocklands Coalition, and South Florida Wildlands Association move for an temporary restraining order and/or preliminary injunction (TRO/PI) immediately staying the U.S. Fish and Wildlife Service's (Service) incidental take permit (ITP) for the Coral Reef Commons (the Project). This temporary restraining order (TRO) is needed because the Developers accelerated their construction schedule with three bulldozers that starting clearing land and knocking down trees late yesterday afternoon, December 8, 2017. Ex. 21, Valadares Dec. Plaintiffs request an Order directing the Service to suspend the effectiveness of the ITP immediately until the Court may rule on Plaintiffs' motion.

The ITP will allow more than 80 acres of some of the last unique habitats in South Florida to be lost forever. These pine rockland forests are home to wildlife and plants like the endangered Bartram's scrub-hairstreak butterfly and deltoid spurge, which are found nowhere else. *See* Ex. 1, ITP at 1; Ex. 5, EA at 70; Ex. 3, BO at 32, 129; Ex. 6, Comments by Roger L. Hammer at 2. The Project will consume 50+ acres of upland habitat and 30+ acres of pine rocklands, Ex. 4, HCP at 9, 135, rendering what remains uninhabitable for species. Since these species have few places left, destroying this habitat jeopardizes their very existence. Without emergency injunctive relief, Plaintiffs and the environment suffer irreparable harm.

Plaintiffs are likely succeed on the merits of their claims, which allege that Defendants U.S. Fish and Wildlife Service (Service); Department of the Interior; Ryan Zinke, in his official capacity as Secretary of the Interior; Gregory Sheehan, in his official capacity as Principal Deputy Director of the Service; and Jim Kurth, in his official capacity as Deputy Director for Operations and Acting Director for the Service have issued an unlawful Endangered Species Act (ESA) ITP and "biological opinion" in violation of Administrative Procedure Act (APA) and National Environmental Policy Act (NEPA). The public interest favors a TRO/PI to protect endangered species and the natural environment and to maintain the status quo until the Court resolves this motion. The public's interest in preventing such irreparable harm outweighs any inconvenience to Defendants or the Developers in suspending the ITP. Finally, Plaintiffs should not be ordered to post a bond pursuant to Fed. R. Civ. Pro. 65(c) as courts typically waive bonds in litigation such as this.

Plaintiffs respectfully request a hearing on this motion as the Court's calendar allows.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION

Pine rockland forests, found only in South Florida and the Bahamas, are some of the most imperiled ecosystems in the world, and home to rare plants and animals found nowhere else. Ex. 5, EA at 6. The Richmond pine rockland tract is the largest of such landscapes outside Everglades National Park, Ex. 5, EA at 6, supporting 260 native plants and rare species like the Bartram's scrub-hairstreak butterfly, Florida bonneted bat, rim rock crowned snake, and deltoid spurge.[1]

The Richmond pine rockland tract is the site of an 88-acre mega-development called Coral Reef Commons, which would clear this rare forest and replace it with a commercial supercenter, chain restaurants, and apartments. Ex. 4, HCP at 9; Ex. 6, Comments by Alexander Robillard at 1. The Project is slated to add more than 17,000 cars daily to congested roads, permanently destroy more than 82 acres of habitat, and degrade and fragment even more habitat with pollution, killing, injuring, and harming ESA-protected species in the process. The Project will intensify the impacts of climate change on these species by eliminating higher-elevation refugia from sea-level rise and storm surges.

This destruction has been permitted through a flawed permit issued by the Service and backed by a convoluted "conservation plan" that violates several environmental laws.

### FACTUAL BACKGROUND

On November 30, 2017, the Service issued a biological opinion (BO) for the Project, paving the way for its approval of the Coral Reef Commons Habitat Conservation Plan (HCP) and an incidental take permit (ITP) on December 5, 2017. Ex. 3, BO at 1; Ex. 1, ITP at 1. Plaintiffs were made aware of the ITP approval via an email from the Service's Public Affairs Officer at 3:13 p.m. on December 5, 2017. Ex. 7, Email from Ken Warren, entire. The BO covers rare and imperiled species like the Bartram's scrub hairstreak butterfly, eastern indigo snake, Florida bonneted bat, Florida leafwing butterfly, gopher tortoise, Miami tiger beetle, Rim Rock crowned snake, and white-crowned pigeon. Ex. 3, BO at v-vi. The BO also reviews impacts and conservation measures for 14 federal candidate, threatened, and endangered plant species, including the endangered tiny polygala and deltoid spurge. The HCP relies heavily on a "habitat valuation assessment."

---

[1] U.S. Fish and Wildlife Service, *Multi-Species Recovery Plan – Pine Rocklands*, 3-173 (July 23, 2014) https://www.fws.gov/verobeach/MSRPPDFs/Pinerock.pdf.

On December 4, 2017 the Service issued a statement of findings (SOF) on the HCP, ITP, and Environmental Assessment (EA) and decided to issue ITP. Ex. 2, SOF at 1. To date, the Service has not made publically available a "finding of no significant impact" (FONSI).

Plaintiffs promptly filed their complaint and the instant motion within 3 days of the Service announcing its decision, and within hours of learning that Permittees had commenced construction activities.

## STANDARD AND SCOPE OF REVIEW

The Court should grant a TRO/PI because Plaintiffs show: (1) a substantial likelihood of success on the merits; (2) that they are suffering irreparable harm; (3) that this harm exceeds any harm suffered by the Service and Developers; and (4) that an injunction would serve the public interest. *Grizzle v. Kemp*, 634 F.3d 1314, 1320 (11th Cir. 2011); *Nat'l Wildlife Fed'n v. Marsh*, 721 F.2d 767, 770 (11th Cir. 1983); *S. Dade Land Corp. v. Sullivan*, 853 F. Supp. 404, 410 (S.D. Fla. 1993) (plaintiff seeking temporary injunctive relief must show "the elements required for issuance of a preliminary injunction"). The Court may issue a TRO without notice to the Service and Developers because: 1) "specific facts" set forth below "clearly show that immediate and irreparable injury, loss, or damage will result" before the Center can be heard in opposition; and 2) the Center's attorney has certified her efforts to give notice to Defendants Fed. R. Civ. P. 65(b)(1). The Court should also decline to enter an injunction bond. Fed. R. Civ. P. 65(c).

A TRO/PI will "preserve the status quo until the rights of the parties can be fairly and fully investigated and determined by strictly legal proof and according to the principles of equity." *Wash. Cnty., N.C. v. U.S. Dep't of the Navy*, 317 F. Supp. 2d 626, 631 (E.D.N.C. 2004) (quoting *Sinclair Refining Co. v. Midland Oil Co.*, 44 F.2d 42, 45 (4th Cir. 1932)); *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). Such relief "is not a final adjudication of the rights of the parties" but simply temporarily reserves the parties' rights. *Wash. Cnty.*, 317 F. Supp. at 631 (internal citation omitted); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 985 (11th Cir. 1995); *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1330 (M.D. Fla. 2009).[2]

---

[2] Given the exigency of this motion, Plaintiffs focus on specific claims which will allow the Court to enter preliminary injunctive relief until the case may be heard and after the Defendants produce an administrative record. Plaintiffs reserve their right to pursue all of the claims in their complaint at the summary judgment stage of the proceeding.

**ARGUMENT**

I.     **Plaintiffs will be irreparably harmed absent a temporary restraining order and preliminary injunction**

Plaintiffs are irreparably harmed in the absence of a TRO/PI. Upon information and belief, after the Service notified the public that it had approved the ITP, the Permittee began clearing the pine rocklands and surrounding habitat on the Project site yesterday at about 3:30 in the afternoon.[3] Once the permittees' bulldozers destroy the unique pine rocklands landscape, it will likely be impossible to restore it to its original state, and the threatened and endangered species that depend on it for survival will be lost, possibly forever.

a.     **The Project will irreparably destroy and degrade rare pine rockland habitat and harm threatened and endangered species**

For the Plaintiffs, "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). "An injury is irreparable if it cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (internal quotation marks omitted). This inquiry "does not focus on the significance of the injury," but rather on "whether the injury . . . is *irreparable*—that is, whether there is any adequate remedy at law . . . ." *Sierra Club v. Martin*, 71 F. Supp. 2d 1268, 1327 (N.D. Ga. 1996). Courts "readily find that an environmental injury is 'irreparable' because '[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.'" *U.S. v. Jenkins*, 714 F. Supp. 2d 1213, 1221-22 (S.D. Ga. 2008) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).

Destruction of rare pine rocklands and the threatened and endangered species that live at the Project site is per se irreparable. *See* Ex. 3, BO at 7. Many of these species are found only in small patches of some of their last remaining habitat, so bull-dozing the Project site may push these species beyond the point from which they can recover, or even survive, the threat of extinction. *See Alliance for the Wild Rockies*, 632 F.3d at 1135; *see also Nat'l Wildlife Fed'n v. Harvey*, 440 F. Supp. 2d 940, 958 (E.D. Ark. 2006) ("When an endangered species is allegedly jeopardized, the balance of hardships and public interest tip in favor of the protected species."); *Bensman v. U.S. Forest Serv.*, 984 F. Supp. 1242, 1249 (W.D. Mo. 1997) ("[D]eath is certainly an irreparable harm and the extinction of a species is 'incalculable.'").

---

[3] *See* Ex. 16, Jenny Staletovich, Federal wildlife managers clear way for Walmart in vanishing South Florida forest, Miami Herald (Dec. 2017), http://www.miamiherald.com/news/local/environment/article188236199.html.

Plaintiffs are also irreparably injured by the Service's violations of NEPA, as described below. An agency's failure "to comply with NEPA before reaching a determination" and prepare an EIS constitutes irreparable injury by "'add[ing] risk to the environment'" with decisions based on incomplete information. *Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1340-41 (S.D. Ala. 2002) (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 500-01 (1st Cir. 1989)); *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1361-62 (S.D. Fla. 2005). This injury is irreparable in a NEPA challenge where preliminary relief is necessary to "maintain the status quo pending review." *San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.*, 657 F. Supp. 2d 1233, 1240-42 (D. Colo. 2009).

### b.  Plaintiffs are suffering irreparable harm to their recreational and aesthetic interests

Plaintiffs are suffering harm to their recreational and aesthetic interests, Ex. 18, Clancy Dec.; Ex. 19, Sunshine Dec.; Ex. 20, Schwartz Dec.; Ex. 17, Greenwald Dec., which are well-established, legally cognizable injuries. *Fund for Wild Animals v. Lujan*, 962 F.2d 1391, 1397 (9th Cir. 1992) (citing *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972)). The Service issued the ITP on December 5, 2017, authorizing the Developers to destroy and develop pine rocklands and other habitat on the Project site.[4] These activities are occurring now. Ex. 18, Clancy Dec. ¶ 26. Harm to an individual's aesthetic and recreational interests in enjoying wildlife is irreparable because it cannot be undone. Thus, irreparable harm to Plaintiffs, pine rocklands, and protected species is "real and immediate"—indeed, it is occurring now. *See S.D. v. St. Johns Cty. Sch. Dist.*, 632 F. Supp. 2d 1085, 1095 (M.D. Fla. 2009) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).[5]

## II.    Plaintiffs have standing to bring this case

Plaintiffs are non-profit environmental and conservation organizations representing concerned citizens of Miami-Dade County and south Florida. Plaintiffs' members have standing to bring these claims, as they live and recreate in the region. They use public and private lands nearby for hiking, birdwatching, wildlife viewing, quiet and spiritual contemplation, and nature photography. By its very nature, "environmental injury, . . . is often permanent or at least of long

---

[4] *See* Ex. 16, Jenny Staletovich, Federal wildlife managers clear way for Walmart in vanishing South Florida forest, Miami Herald (Dec. 2017),
http://www.miamiherald.com/news/local/environment/article188236199.html.
[5] Indeed, the terms "environmental" and "irreparable" are essentially interchangeable modifiers of "harm." *See Fla. Key Deer v. Brown*, 386 F. Supp. 2d 1281, 1286 (S.D. Fla. 2005), *aff'd sub nom. Fla. Key Deer v. Paulison*, 522 F.2d at 1133 (11th Cir. 2008).

duration, *i.e.*, irreparable." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted); *see also Central Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012). Plaintiffs' members' interests are harmed by the Service's approval of the ITP and those harms would be redressed by a Court order requiring the agency to reevaluate and further review it. The interests Plaintiffs seek to protect are germane to their organizational purposes, and this case does not require their individual members to participate.

**III.     Plaintiffs are substantially likely to prevail on the merits of their claims**

Plaintiffs have enough evidence to establish a "substantial likelihood of success on the merits," and hence the Court "need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss*, 51 F.3d at 985. Here, Plaintiffs present evidence that Defendants are likely violating NEPA and the APA. 5 U.S.C. § 706; *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002). Thus the Court should enjoin the effectiveness of the ITP as it was approved following a process and analyses that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

**a.   The Service violated the APA.**

**i.   The Service arbitrarily and capriciously relied on an unprecedented and scientifically unsupported "habitat functional assessment" to measure species impacts and associated mitigation in approving the BO.**

To survive review, the Service must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Veh. Mfrs. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). It also must base its conclusions on the best available science "to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997). Yet here the Service approved an HCP entirely based on a novel "habitat functional assessment" that has no link to the affected species and ignores the best available science. Thus, the Service failed to consider the best scientific information relevant to each species' conservation needs and failed to draw a rational connection between the facts found and the findings made in its habitat value assessment. The Service erred in the following four ways.

First, rather than consider the individual habitat needs of each listed species when determining the effects of the action and potential mitigation, the Service created a haphazard "habitat functional assessment" that purportedly measured the habitat value for all species based

on six generic factors. Ex. 4, HCP at 82.[6] This one-size-fits-all approach was arbitrary and capricious because it fails to account for the listed species' specific habitat needs. Approving a conservation plan that is predicated on a habitat functional assessment and biological opinion that fail to accurately account for and mitigate impacts to species is arbitrary and capricious. It renders conservation goals unattainable. *Home Builders Ass'n v. U.S. Fish & Wildlife Serv.*, No. Civ. S-05-0629 WBS-GGH, 2006 U.S. Dist. LEXIS 80255, at *58-59 (E.D. Cal. Nov. 1, 2006). Because habitat characteristics can be fundamental to one species but not another, the Service must assess *each* species' precise needs. By relying on a vague habitat value assessment that conflates the needs of all affected species, the Service failed to evaluate the impacts to each species or ensure that these impacts will be adequately mitigated in the HCP.

Second, neither the BO nor the HCP contain any explanation of how the Developers delineated or scored the polygons that were applied to assess habitat values at the Project site, leading to apparently arbitrary assessments. For instance, it is unclear how the permittee concluded that polygons that will in fact become *more* isolated and fragmented after development will experience an *increase* in the valuation score for "habitat connectivity." *See, e.g.*, Ex. 4, HCP at 74.

Third, the habitat value assessment and the HCP rely on the wholly speculative assumption that prescribed fire will be possible, despite the weight of science indicating construction of the Project will *inhibit* prescribed burns. *See* Ex. 6, Comments by Roger L. Hammer at 2-3; Ex. 6, Comments by Julie Milstid at 2-3; Ex. 6, Comments by Jennifer Possley at 4. The best available scientific evidence dictates that "as residential and commercial developments have expanded" around the Project site, "the fire regimen has been reduced or eliminated" and indeed, after Coral Reef Commons project is constructed, "further restrictions will be placed upon the fire programs." Ex. 4, HCP App B. Given the construction of 900 residential units, retail, and a school in such a small area, it is extraordinarily optimistic to assume that prescribed burns would be possible without threatening property. It also defies past agency practice, *see* Ex. 4, HCP App. B, to assume that prescribed burning will be a viable land management tool once construction of the Project is complete.

---

[6] These factors include: open canopy, native herbaceous plants, exposed limestone substrate, fire frequency, low-levels of invasive plants, and habitat connectivity. Ex. 4, HCP at 82.

Finally, the habitat value assessment allows "double accrediting" for removal of exotic vegetation, which is often directly related to the percent native vegetation cover, and *vice versa*, so that polygons that score high for percent native vegetation cover also score high for removal of non-native vegetation, making the distinction between the two meaningless except to artificially inflate the value of some polygons. Ex. 4, HCP at 82. Further tipping the scale are the non-native vegetation and the native vegetation values that have the greatest weighted values. Ex. 4, HCP at 82.

### ii. The Service arbitrarily and capriciously relied on the off-site mitigation area, which is owned by a third party and subject to land-use restrictions.

The Service had to find that the Developers "will, to the maximum extent practicable, minimize and mitigate the impacts" of taking threatened or endangered species for the Project. 50 C.F.R. §§ 17.22(b)(2)(i)(B), 17.32(b)(2)(i)(B). Yet the Service arbitrarily relied on conservation activities proposed at an off-site mitigation area that is: 1) owned and controlled by a third party that is not bound by the ITP's terms; and 2) subject to protections already. This undermines any claim of their conservation value. In addition, the Service ignored any analysis of off-site mitigation area on a species-by-species basis that would even have allowed it to draw a connection between impacts and how they might be offset, let alone a rational connection.

The HCP is intended to cover incidental take associated with "the construction of mixed-use development within 86.49 acres and all activities associated with such development." Ex. 4, HCP at 79. The 86.49 acres—and associated development activities—are under the control of the primary Developer: Ram Coral Reef. Ex. 4, HCP at 1, 5-6. The HCP relies on an off-site mitigation area to offset species impacts from the Project. Ex. 4, HCP at 79, 119-21. This property is part of the University of Miami Richmond campus and owned by the University of Miami (UM), Ex. 4, HCP at 5, 119, which is wholly unassociated with the Project. UM is termed "Applicant" in the HCP, but without an interest in mitigation, UM is not bound to follow the HCP or ITP. Thus, while termed an "Applicant," UM is simply a third party without an interest in the covered action. 50 C.F.R. § 402.02 (defining "applicant" as someone "who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action").

An applicant for an HCP cannot receive mitigation credit for mitigation performed by a third party. 16 U.S.C. § 1539(a)(2)(B)(ii) (requiring the Service to find "*the applicant* will . . . minimize and mitigate the impacts of [species take]" (emphasis added)); *see Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1050 (N.D. Cal.

2015); *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1282 (S.D. Ala. 1998). Because UM is not an applicant for the purposes of the HCP, the Service acted arbitrarily and capriciously in approving mitigation to be provided by a non-party to mitigate Ram Coral Reef's activities.

Even if the "off-site mitigation area" were not owned by an uninterested third party, it is already subject to land-use restrictions and thus cannot be considered new or additional commitment of resources to mitigate the Project impacts of take permitted under the ITP. This is double-dipping that contravenes Section 10's mandate that the Service find that the *applicant* "will, to the maximum extent practicable, minimize and mitigate the impacts of taking," 16 U.S.C. § 1539(a)(2)(B)(ii) (emphasis added), resulting in an added conservation benefit. *See Pacificans for a Scenic Coast v. Cal. DOT*, 204 F. Supp. 3d 1075, 1088 (N.D. Cal. 2016) (holding the approval of a transit project invalid where the Service accepted as mitigation for species impacts a proposal to preserve a 5.14-acre site that had already been preserved); *see also Gerber v. Norton*, 294 F.3d 173, 183 (D.C. Cir. 2002) (discussing the "problem" that "an open-space covenant already existed on the mitigation site, thus drawing into question whether placing a conservation easement on the site added anything to existing protections"). Here, 39.64 acres of pine rockland Natural Forest Community and 3.72 acres of hardwood hammock Natural Forest Community must already be "preserved in natural condition" with g controlled burns and exotic plant removal, pursuant to a covenant that runs with the land. HCP App. B. UM and the Developers cannot then also count those acres toward mitigation of the Project's impacts.

Last, Mitigation must be "rationally related to the level of take [authorized] under the plan." *Nat'l Wildlife Fed'n v. Norton*, 306 F. Supp. 2d 920, 928-29 (E.D. Cal. 2004). Yet there are no surveys for the property, and thus no basis for the Service's conclusion that the off-site mitigation area will, in fact, offset impacts to the listed species from the Project. As the HCP lacks a species-specific, rational connection between the off-site mitigation and the authorized impacts, the Service's approval of the proposed off-site mitigation was arbitrary and capricious.

### iii. The Service failed to ensure adequate funding for the conservation plan.

The Service had to find that the Developers will adequately fund the conservation fund. 50 C.F.R. §§ 17.22(b)(2)(i)(C), 17.32(b)(2)(i)(C); *Sw. Ctr. for Biological Diversity v. Bartel*, 457 F. Supp. 2d 1070, 1105 (S.D. Cal. 2006) (citing *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1281-82 (S.D. Ala. 1998)) ("applicant cannot rely on speculative future actions of others"). Yet

the Service relied on speculative funding sources based on the actions of third parties not bound by the ITP, rendering its conclusion that the HCP is adequately funded arbitrary and capricious.

The Developers claimed that perpetual maintenance costs will be funded through a Coral Reef Commons Master Property Owners Association (Association), to be established for the Project,[7] which will raise funds for maintenance. Ex. 4, HCP at 144-45, Appendix M. As a contingent assurance, the Developer claimed a dormant "Special Taxing District" "will be recorded"[8] and may be re-activated to raise funds should the Association dissolve; re-activation condition precedent aside, the Special Taxing District can be easily dissolved through a petition to Miami-Dade County that the Board of County Commissioners approves. Ex. 4, HCP at 145-46.

The Service's reliance on Developers' "financial assurances" is arbitrary and capricious. Funding is wholly dependent on the construction and success of the mixed-use residential development at the Project, and hence there will be no funding if the development fails. Likewise, the financial responsibility for maintaining the mitigation areas falls on the Association, which is not a party to the ITP, meaning the Service has no way to enforce the Developers' funding commitments. Any assurance found in the Special Taxing District is unreliable because Miami-Dade County can simply dissolve based on a petition, even if the Service objects. Because the Developers' funding commitments are speculative, contingent on third-party actors, and unenforceable by the Service, the Service arbitrarily and capriciously found that there is "adequate funding" for the HCP. *See Sw. Ctr. for Biological Diversity*, 457 F. Supp. 2d at 1105-06 (reliance on speculative future actions by unnamed parties for the majority of money needed to implement a conservation plan was arbitrary and capricious); *Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1295 (E.D. Cal. 2000) (a cost-shifting mechanism under which funding depends on the participation of a third party requires the Applicant's guarantee to "ensure" funding).

### iv.  The Service failed to specify take and unlawfully used a surrogate measure in the biological opinion.

When the Service anticipates take of listed species, it must issue an "incidental take statement" (ITS) that specifies "the amount or extent of . . . incidental taking of a listed species."

---

[7] The HCP states that "the Master Association established for the CRC Property" is described in "Section 11.5.2 of the HCP," Ex. 4, HCP at 144, but such section does not exist.
[8] The Special Taxing District and CRC Master Association are conditions of the ITP. Ex. 4, HCP at 145-146.

50 C.F.R. § 402.14(i)(l)(i). An ITS may lawfully allow take of a listed species "as long as the statement sets a 'trigger' for further consultation" when "allowed incidental take is exceeded, a point at which there is a risk of jeopardizing the species." *Miccosukee Tribe of Indians v. U.S.*, 566 F.3d 1257, 1271-72 (11th Cir. 2009). This trigger "alert[s] the agency when the allowed incidental take has been exceeded" and hence can avert jeopardy to the species. *Id.* at 1272.

Thus Service must: (1) set a numerical "cap" or, in some circumstances, a rational surrogate on take; and (2) specify monitoring provisions to assess actual take and effectuate the trigger. *Id.* at 1275. Congress has declared a preference for a numerical expression of take, *Miccosukee Tribe of Indians*, 566 F.3d at 1274, though the Service may use a surrogate *if* the BO: (1) "explains why it is not practical to express the amount or extent of anticipated take . . . in terms of individuals"; (2) "[d]escribes the causal link between the surrogate and take of the listed species"; and (3) "sets a clear standard for determining when . . . take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). The Service has not met any of these requirements here.

The BO contains no "incidental take statement," but instead references the HCP. Ex. 3, BO at 172-173.[9] Thus, the Service does not set take numerically for *any* of the affected species. Likewise, although the Service observes that a habitat surrogate can be applied "[to] situations where it is impractical to detect or monitor take of individual species," Ex. 4, HCP at 81, it does not explain why it is impracticable to express take numerically for affected species here.[10]

**b.  The Service is violating NEPA**

NEPA is the Nation's charter for protection of the environment. 40 C.F.R. § 1500.1(a). Congress designed NEPA to "insure that environmental information is available to public officials and citizens *before* decisions are made and actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences." *Id.* § 1500.1(b)-(c) (emphasis added).

**i.  The Service has not made its FONSI available for public review for 30 days**

In May 2015, RAM Coral Reef and UM applied to the Service for a 30-year ITP to develop Coral Reef Commons, thereby causing incidental take of listed species. With irreversible destruction of some of the last pine rocklands, the ITP would permit take of these species. On

---

[9] "The amount or extent of incidental take anticipated under the proposed CRC HCP, associated reporting requirements, and provisions for disposition of dead or injured animals are as described in the HCP and its accompanying section 10(a)(1)(B) permit(s)." Ex. 3, BO at 172-173.
[10] This is true even though several of the species are capable of detection and have received numeric take limits for other federal projects.

March 23, 2017, the Service announced the proposed HCP and a draft EA for public review and comment. More than 3,000 people, including experts in the species and habitats at issue, submitted comments in opposition to the proposal. Ex. 2, SOF at 7. Most of these comments opposed the Project and favored science-based species protection.

The EA determines whether the proposed action is a "major Federal action significantly affecting the quality of the human environment" and if so, an EIS is required. If not, a FONSI must be prepared and signed. 550 FW 3 Documenting and Implementing Decisions 3.3(B)(1). Service policy also "dictates that the FONSI must be made available to the affected public." 550 FW 3 Documenting and Implementing Decisions 3.3(B)(4)(a). Moreover, the Service must make the FONSI available for a 30-day public review, in accordance with 40 C.F.R. 1501.4(e)(2), if:

> (i) The proposal is a borderline case (i.e., there is a reasonable argument for preparation of an EIS).
>
> (ii) The proposal is an unusual case, a new kind of action, or a precedent-setting case.
>
> (iii) There is either scientific or public controversy over the proposal.
>
> (iv) When the FONSI involves a proposal which is or is closely similar to one which normally requires preparation of an EIS.

550 FW 3 Documenting and Implementing Decisions 3.3(B)(4)(c)(i)-(iv); 40 C.F.R. 1501.4(e)(2), 1508.27.

On December 5, 2017, the Service announced it had approved the HCP and issued an ITP for the Project. The Service did not apparently publish or otherwise make available to the public a FONSI for its decision to issue the ITP. Thus, it has failed to give the public 30 days to review its determination that the project will not significantly impact the human environment.

### ii. The Service did not consider a reasonable range of alternatives in the EA and HCP

NEPA requires a "detailed statement" of "alternatives to the proposed action." 42 U.S.C. § 4332(2)(c). The statement must compare impacts of the proposal and the alternatives, "sharply defining the issues and providing a clear basis for the choice among options by the decisionmaker and the public." 40 C.F.R. §§ 1502.14, 1508.9(b) (providing an EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."). It must therefore "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). To that end, courts have insisted that

agencies "consider such alternatives to the proposed action as may partially or completely meet the proposal's goal." *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F 2d 79, 93 (2d Cir. 1975). Failure to examine a viable alternative renders an EIS or EA inadequate. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999).

The EA lacks a range of reasonable alternatives here. Aside from the no-action alternative (Alternative 1), there is just: a "redevelopment option" of 25.4 developed acres (Alternative 2); three alternatives consisting of 92-100 developed acres (Alternatives 3-5); and a preferred alternative of more than 86 developed acres (Alternative 6). Ex. 5, EA at 41. The Service rejected the "redevelopment alternative" for not being an "environmentally conscious" or "economically viable" development. Ex. 4, HCP at 69. Yet because the redevelopment alternative included mixed-use development and impacted significantly fewer acres of rare pine rocklands, the issue appears to be economic viability; even so, the EA lacks any financial analysis to support the Developers' claim that it is not economically viable. *See* Ex. 5, EA at 42; Ex. 4, HCP at 69.

The Service simply cannot blindly adopt an applicant's hollow economic rationale as determinative. *Sw. Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1158 (S.D. Cal. 2006); *see also* CEQ, Forty Most Asked Questions Guidelines Concerning CEQ's NEPA Regulations, Question 2a (Mar. 23, 1981). Such a "cursory dismissal . . . , unsupported by agency analysis" simply cannot satisfy the Service's "duty" to consider a range of alternatives. *Envt'l Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 Fed. Appx. 440, 443, 2007 WL 1417163 (9th Cir. 2007). Also, NEPA does not allow an agency to eliminate "whole range of alternatives" because "they would achieve only some" of the project's purposes. *Town of Matthews v. U.S. Dep't of Transp.*, 527 F. Supp. 1055 (W.D. N.C. 1981).[11]

Indeed, Alternatives 3, 4, and 5 are essentially the same alternative, differing only by a few acres. All three involve the same amount of commercial development, and Alternatives 4 and 5 have the same amount of residential units. Ex. 5, EA at 41. By summarily rejecting the redevelopment alternative and presenting three substantially identical "alternatives," the Applicant has not provided "a clear basis for choice among options by the decisionmaker and the

---

[11] *See also N. Buckhead Civic Assoc. v. Skinner*, 903 F.2d 1533, 1542 (11th Cir. 1990) (explaining "a discussion of alternatives that would only partly meet the goals of the project may allow the decision maker to conclude that meeting part of the goal with less environmental impact may be worth the tradeoff with a preferred alternative that has greater environmental impact").

public" as NEPA requires. 40 C.F.R. § 1502.14; *see also Muckleshoot Indian Tribe*, 177 F.3d at 813 (rejecting environmental impact statement that failed to provide a true range of alternatives); *Curry v. U.S. Forest Serv.*, 988 F. Supp. 541 (W.D. Penn 1997) (same).[12]

### iii.   The Service failed to Prepare an Environmental Impact Statement

NEPA requires agencies to complete an Environmental Impact Statement (EIS) for proposed actions that may significantly affect the quality of the environment. 42 U.S.C. 4332(C). While an EA, as completed here, should "briefly provide[] sufficient evidence and analysis for determining whether to prepare an EIS" and "facilitate[] preparation of an EIS when one is necessary," CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, at 36a (Mar. 23, 1981), an EIS should provide "all the information on environmental impacts and alternatives that the decisionmaker and the public need . . . to . . . . deci[de]" and "to ascertain . . . every significant factor . . . ." *Id.* at 25a; *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1215 (11th Cir. 2002); 40 C.F.R. §§ 1502.1, 1508.9, 1508.11.

To determine whether a project's effects are significant, and thus whether a detailed EIS is required, an agency must consider both context and intensity. 40 C.F.R. § 1508.27. For a site-specific action, "context" means "the effects in the locale" (not the world as a whole) and "[b]oth short- and long-term effects are relevant." *Id.* § 1508.27(a). Intensity means "the severity of the impact" and requires consideration of numerous factors at play here. *Id.* § 1508.27(b). Public controversy surrounding the potential impacts of a federal action on the human environment strongly suggests that an EIS is required. *Id.* § 1508.27(b)(4), (5). The presence of just one intensity factor can require an EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1125 (9th Cir. 2004).

The Service was required to prepare an EIS for the Project because the action is "significant" in several ways. Locally, it will destroy approximately 86.5 acres in the Richmond pine rockland, an exceptionally rare habitat inhabited by many protected species that cannot live anywhere else. *See* Ex. 5, EA at 1, 7, 21-26. Regionally, it will destroy even more of a unique habitat that has already been reduced by 98 percent outside of Everglades National Park. *See* Ex. 5, EA at 5-6. For many species, the Project site is the last of very few places left where they *can* survive. *See, e.g.*, Ex. 4, HCP at 43-44, 51, 55-56. *See* Ex. 6, Comments by Jennifer Possley at 2-

---

[12] It is unclear whether any other less damaging alternatives were considered. The draft HCP simply states, "other alternatives were considered and rejected earlier in the process, and therefore, not brought forward for in-depth consideration." Ex. 4, HCP at 68.

4. The Project will have permanent consequences for habitat and perhaps the very existence of these species. The Project satisfies several intensity factors; it would put human development in direct proximity to areas planned for prescribed burns, Ex. 4, HCP at 128-129, affecting air quality and public safety. Ex. 4, HCP App. J at 4.[13]

In light of all of the above, it cannot be disputed that the Project will be "significant," particularly when one considers the loss of 86.49 acres and fragmentation of some of the last remaining habitat of its kind, and the killing, injuring, and harming eight protected wildlife species and 14 protected plants. Ex. 4, HCP at 7-9. Even assuming it would benefit the environment, which Plaintiffs would not stipulate, it is significant. *See* 40 C.F.R. § 1508.27(b)(1).

Likewise, the Project is located in an ecologically critical area. Most of the habitat within the Project area is pine rocklands, Ex. 5, EA at 1, a rare, declining habitat characterized by limestone substrate and South Florida slash pine that has diminished from approximately 185,000 acres to just 22,790 acres (an 88 percent loss) in Miami-Dade County alone. *Compare* Ex. 5, EA at 6 *with* Ex. 4, HCP at 2. Miami-Dade County has designated and protected 39.64 acres of the property as a pine rockland Natural Forest Community (NFC) and 3.72 acres of hardwood hammock NFC. Ex. 4, HCP at 16. The Project's effects on protected species and their habitat could involve devastating consequences; namely because: 1) siting development so close to conservation land is incompatible and will lead to either public safety risks or failure to implement prescribed burns; and 2) the unprecedented use of the "habitat functional assessment" (which conflates the analysis of the affected species) and "habitat value units" will not mitigate harm to listed species.[14]

---

[13] The school—which is hardly mentioned at all in any of the Service's or Permittees' documents—falls within a "no school zone" due to other "health and safety concerns," i.e., from building schools in close proximity to airports. Ex. 5, EA at 17.

[14] The unprecedented use of a habitat functional assessment and system of habitat value units to "mitigate" the Project's impacts on many federally listed species with unique recovery needs, Ex. 4, HCP at 81-88, is likely establish a precedent for future actions with similar effects on rare habitat where it cannot be conserved acre-for-acre in a least 2:1 ratio. Specifically, it could set a precedent for a related action directly adjacent called Miami Wilds, leading to cumulatively significant impacts to species and habitat both locally and universally. *See, e.g.*, Ex. 9, Camila Cepero, Miami Wilds theme park zoo lease talks continue (Dec. 20, 2016), http://www.miamitodaynews.com/2016/12/20/miami-wilds-theme-park-zoo-lease-talks-continue; Ex. 10, Jenny Staletovich, Tiger beetle could be next challenger to Miami Wilds and Walmart, Miami Herald (Dec. 18, 2015), http://www.miamiherald.com/news/local/environment/article50558240.html.

This Project and all of its impacts are also highly controversial, as documented by the more than 3,000 public comments and extensive media coverage.[15] Ex. 2, SOF at 7. Indeed, the Service conceded that "the proposed Project has generated controversy in the County community." Ex. 2, SOF at 34. *See NRDC v. Nat'l Park Serv.*, No. 2:16-cv-585-FtM-99CM, 2017 U.S. Dist. LEXIS 61428, at *68-69 (M.D. Fla. Apr. 24, 2017); *Ctr. for Biological Diversity v. Animal & Plant Health Inspection Serv.*, No. 10-14175-CIV, 2011 U.S. Dist. LEXIS 115905, at *17 (S.D. Fla. Oct. 6, 2011); *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1358 (S.D. Fla. 2005).

Thus the Service seems to acknowledge there are significant impacts, but rather than prepare an EIS, the Service blithely claims that "[w]e have no regulatory control over the effects of the Project except to the extent they are causally related to the take of species." Ex. 2, SOF at 34. Likewise, in direct contrast to its finding in the BO that the Project would result in the permanent loss of habitat, Ex. 3, BO at 7; in the EA, the Service made the spurious claim that the ITP "would [somehow] *not* result in permanent and irreversible changes to the current state of the physical and biological environment, infrastructure, societal issues, economics, aesthetics, or public health and safety to the human environment." Ex. 2, SOF at 37 (emphasis added).

Consequently, the Project development meets several of the intensity factors and is significant in both local and more global contexts and requires an EIS. The Service's failure to prepare an EIS is arbitrary and capricious and violates NEPA.

---

[15] *See, e.g.*, Ex. 11, Jenny Staletovich, Feds ask developer to stop work on Walmart in rare Miami-Dade forest, Miami Herald (July 17, 2014), http://www.miamiherald.com/news/local/community/miami-dade/article1975937.html; Ex. 12, Trevor Bach, Thousands Sign Petition Against Walmart Development on Endangered Pine Rockland, Miami New Times (July 29, 2014), http://www.miaminewtimes.com/news/thousands-sign-petitions-against-walmart-development-on-endangered-pine-rockland-6553826; Ex. 13, Grant Stern, Outraged Miami Residents Confront Walmart Developer in Kendall, HuffPost (Sept. 12, 2014), http://www.huffingtonpost.com/grant-stern/outraged-miami-residents-_b_5808574.html; Ex. 14, Trevor Bach, Environmentalists Plan Protest Against Walmart, Theme Park Threatening Endangered Pine Rocklands, Miami New Times (Jan. 16, 2015), http://www.miaminewtimes.com/news/environmentalists-plan-protest-against-walmart-theme-park-threatening-endangered-pine-rocklands-6560653; Ex. 15, Kate Stein, Environmentalists Ask for Intervention to Preserve Rare Pine Rockland Forest in Southern Miami-Dade, WLRN (May 19, 2017), http://wlrn.org/post/environmentalists-ask-intervention-preserve-rare-pine-rockland-forest-southern-miami-dade.

### iv.  The Service thwarted meaningful public participation in the environmental analysis and approval of the Project

Agencies must make high quality information available to officials and citizens before decisions are made so "public officials make decisions that are based on understanding of environmental consequences." 50 C.F.R. § 1500.1(a)-(c). Agencies must "use all practicable means" to assure a safe, healthy environment and preserve the nation's natural heritage. *Id.* § 1502.2(d); 42 U.S.C. § 4331(b). "'[C]itizen participation is a vital ingredient in the success of NEPA'" and the "'opportunity for local citizens or other interested parties to participate in the preparation of the environmental analysis is *mandatory*.'" *Town of Golden Beach v. U.S. Army Corps of Eng'rs*, No. 94-1816 CIV, 1994 U.S. Dist. LEXIS 15832, *18-19 (S.D. Fla. Sept. 22, 1994) (citation omitted) (emphasis in original); 40 C.F.R. § 1500.1(b).

Here, the Service thwarted meaningful public participation by failing to make high quality information available. For example, the Service summarily rejected the "redevelopment alternative" purportedly because it is not an "environmentally conscious, economically viable, mixed-use development"; but the EA has no analysis to support the Developers' assertions that it would not be commercially viable. *See* Ex. 5, EA at 42; Ex. 4, HCP at 69. The Service also failed to provide and explain the factors and assumptions underlying its habitat functional assessment, which underpins all environmental and species impact analyses in the EA and HCP. Ex. 4, HCP at 81-88; Ex. 5, EA at 58-72. For example, the Service failed to link its habitat functional assessment to species' specific habitat needs, making it unclear whether the conservation plan will result in a conservation benefit for each species. The Service also failed to explain how certain parcels could receive functional lift in habitat value for "habitat connectivity" post-construction, at which point the Project would fragment habitat. *See, e.g.*, Ex. 4, HCP at 74. The Service also failed to resolve apparent defects in the habitat functional assessment, such as the apparent double conservation accreditation given to the Applicant for "native plant cover" and "low presence of invasive species," Ex. 4, HCP at 82, which are inversely related habitat qualities. By failing to provide all necessary information to assess whether the HCP and EA are rational and based on the best available science, the Service deprived the public of a meaningful opportunity to engage in the NEPA process, as required by the statute itself.

## IV.   The balance of the harms favors issuance of a temporary restraining order and preliminary injunction

Plaintiffs have demonstrated above that severe, irreparable harm to endangered species and the environment is likely if the Service's approval of the Project is not enjoined. By contrast, the Service will not suffer any harm from having its approval stayed pending the resolution of this case. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 399 F. Supp. 2d 1335, 1348 (M.D. Fla. 2005), *vacated on other grounds*, 464 F. Supp. 2d 1171 (M.D. Fla. 2006); *Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1341 (S.D. Ala. 2002).

Likewise, harm to the Applicant, if any, would be minimal and would not outweigh the irreparable harm to Plaintiffs that will occur absent a preliminary injunction. Also, costs the Applicant has incurred for permitting, or from permitting-related delays, should not be considered because they are "sunk" costs and are not "directly affected by the agency's challenged action or by the court's order." *Norton*, 207 F. Supp. 2d at 1341.

## V.   Public interest favors a temporary restraining order and preliminary injunction to preserve the status quo

Moreover, any conflict with economic interests "is outweighed by the public interest in preserving vital aspects of the environment." *Martin*, 71 F. Supp. 2d at 1329; *see also Sierra Club*, 645 F.3d at 997-98. The public interest in preserving the status quo—this unique parcel of South Florida's remaining pine rocklands and, possibly, the very existence of threatened and endangered species—is overwhelming. The public interest in "informed agency decision-making," *Norton*, 207 F. Supp. 2d at 1342, "requires careful consideration of environmental impacts before major federal projects may go forward," *S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009); *id*. A TRO/PI "is necessary to defend this court's ability to enter meaningful and effective relief." *Norton*, 207 F. Supp. 2d at 1340.; *Nat'l Wildlife Fed'n*, 721 F.2d at 786.

## VI.   The Court should grant the TRO/PI without notice to the Service or its attorney

The Court may issue the TRO/PI without written or oral notice to the Service or its attorney when: "specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition"; and 2) "the movant's attorney certifies in writing any efforts to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). These factors are met here.

18

The Service issued the ITP on December 5, 2017, and the Developers began the first phase of construction on December 7, 2017. Witnessing this devastation, Plaintiffs are suffering immediate and irreparable injury to their recreational, aesthetic, scientific, spiritual, and economic interests from habitat destruction and knowing of the resulting species harm. Ex. 18, Clancy Dec.; Ex. 17, Greenwald Dec.; Ex. 20, Schwartz Dec.; Ex. 19, Sunshine Dec. This harm will continue before the Service or Developers can be heard in opposition.[16]

## VII.    The Court should not require Plaintiffs to post a bond

Plaintiffs respectfully request that the Court decline to require a bond to grant this motion, or a nominal bond. It is well within the Court's discretion not to require a bond, *see BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005), Defendants will not suffer substantial losses if the TRO/PI is granted, as there is no "reason to believe that defendants will incur costs and damages . . . ." *GOS Operator, LLC v. Sebelius*, No. 12-0035-WS-N, 2012 WL 175056, at *6 (S.D. Ala. Jan. 20, 2012); *see Hospice Savannah, Inc. v. Burwell*, No. 4:15-cv-00253-JRH-GRS, 2015 WL 8488432, at *2 (S.D. Ga. Sept. 21, 2015) (waiving bond where defendants "will not suffer any harm"). Plaintiffs have shown a likelihood of success on the merits, which also weighs in favor of waiving any bond, *TracFone Wireless, Inc. v. Washington*, 978 F. Supp. 2d 1225, 1235 (M.D. Fla. 2013), and "it is customary to waive bonds in public interest litigation such as this," where Plaintiffs have no financial interest at stake. *Sierra Club*, 2011 WL 2887956, at *2 (requiring no bond); *Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (setting no bond for an environmental non-profit "to ensure access to the courts . . . where Congress has provided for private enforcement of a statute"); *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, No. 3:12-CV-00682-TBR, 2013 WL 5278236, at *5 (W.D. Ky. Sept. 18, 2013) (imposing no bond because "Plaintiffs seek to vindicate the public interest served by NEPA"). For all of these reasons, the Court should not require an injunction bond here.[17]

---

[16] Counsel for Plaintiffs has met its obligations under Rule 65. *See* Ex. 22, Atwood Dec; Ex. 23, Attachment to Atwood Dec.

[17] If the Court does require a bond, a nominal bond is appropriate because a TRO/PI is in the public interest and a substantial bond requirement could chill non-profit entities "from obtaining meaningful judicial review or appropriate relief." *Sierra Club v. Norton*, 207 F. Supp. 2d 1342, 1343 (S.D. Ala. 2002); *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) ("Ordinarily, where a party is seeking to vindicate the public interest served by NEPA, a minimal bond amount should be considered."); *Ala. ex rel. Baxley v. Corps of Eng'rs*, 411 F. Supp. 1261, 1276 (N.D. Ala. 1976) (setting nominal bond of $1.00 for non-profit environmental plaintiffs); *Nat.*

## REQUEST FOR HEARING AND CONCLUSION

For all of the foregoing reasons set forth herein, Plaintiffs respectfully request this Court grant the requested TRO/PI, order the Service to suspend the effectiveness of the ITP for the Coral Reef Commons Project, and enjoin the Service from authorizing any further ground-clearing activities at the Project site pending adjudication of the merits of this motion. A proposed order is attached.

Plaintiffs respectfully request a hearing on this Motion, and estimate that a hearing would last 1 hour, with 30 minutes for each side's arguments.

DATED this 8th day of December, 2017.

Respectfully submitted,

_/s/ Jaclyn Lopez_
JACLYN LOPEZ, Trial Counsel
FL Bar No. 96445
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190
Fax: (520) 623-9797
jlopez@biologicaldiversity.org

_/s/ Elise Pautler Bennett_
ELISE PAUTLER BENNETT
FL Bar No. 106573
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 755-6950
Fax: (520) 623-9797
ebennett@biologicaldiversity.org

_/s/ John Peter Rose_
JOHN PETER ROSE
CA Bar No. 285819 (_special admission_)

---

_Res. Def. Council v. Morton_, 337 F. Supp. 167, 169 (D.D.C. 1971) (concluding that a substantial bond would "stifle the intent" of NEPA by precluding citizen enforcement, and setting bond at $100).

Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
Tel: (213) 785-5406
Fax: (213) 785-7150
jrose@biologicaldiversity.org


   */s/ Paul J. Schwiep*   
Paul J. Schwiep
FL Bar No. 823244
2601 South Bayshore Drive, P1
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 495-3833
pschwiep@coffeyburlington.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2017, I electronically filed the foregoing Form A Notice of Conventional Filing with the Clerk of the Court by using the CM/ECF system, which served all counsel of record registered with CM/ECF system for this case.

_/s/ Jaclyn Lopez_
JACLYN LOPEZ, FL Bar No. 96445
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190
Fax: (520) 623-9797
jlopez@biologicaldiversity.org
*Attorney for Plaintiffs*
*Center for Biological Diversity, et al.*