**UNITED STATES DISTRICT COURT**
**SOUTHERN DIVISION OF FLORIDA**
**Miami Division**

CENTER FOR BIOLOGICAL DIVERSITY;
TROPICAL AUDUBON SOCIETY; MIAMI PINE
ROCKLANDS COALITION; and SOUTH
FLORIDA WILDLANDS ASSOCIATION,

      *Plaintiffs*,

      vs.                                      Case No. 1:17-cv-24444

RYAN ZINKE, in his official capacity as Secretary
of the U.S. Department of Interior; U.S.
DEPARTMENT OF THE INTERIOR; U.S. FISH
AND WILDLIFE SERVICE; GREG SHEEHAN, in
his official capacity as Principal Deputy Director of
the U.S. Fish and Wildlife Service; and JIM
KURTH, in his official capacity as Deputy Director
for Operations and Acting Director of U.S. Fish and
Wildlife Service.

      *Defendants*.

_____/

**INTERVENOR-DEFENDANTS, CORAL REEF RETAIL LLC, CORAL REEF RESI PH**
**1 LLC AND RAMDEV LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND/OR PRELIMINARY INJUNCTION**

### INTRODUCTION

Plaintiffs cannot meet their burden to demonstrate entitlement to the extraordinary relief of a preliminary injunction.  The Temporary Restraining Order ("TRO"), entered on December 8, 2017, Doc. 10, should not be extended.  Plaintiffs obtained emergency relief by suggesting that a project went forward without any thought whatsoever to the procedural and substantive requirements of the law[1] and that species would face imminent extinction.  Nothing could be further from the truth.

Plaintiffs seek to halt development of an environmentally conscious, economically viable, mixed-use development known as "Coral Reef Commons" (the "Project").  The potential impacts of the Project on endangered species and habitat were evaluated under a Habitat Conservation Plan ("HCP") submitted to the U.S. Fish and Wildlife Service ("Service") for its evaluation under the relevant laws.[2]  The HCP includes a functional assessment that evaluates the baseline conditions of the property, the effects the proposed development (and each of the alternatives) would have on the pine rockland habitat, and the ecological benefits of the restoration of the preserves.  The majority of the Project is designed to occur on previously developed areas and disturbed uplands, which are not pristine pine rockland habitat.  The remainder of the property will be preserves that are restored and maintained for the benefit of the Covered Species. The Service independently verified the net benefits of the Project to the Covered Species.

The challenged entitlements are the result of several years of close agency scrutiny and extensive public comment.  As a result, the Project has been consistently refined and improved, increasing environmental benefits and reducing impacts.  With a Conservation Program in place, the Project exceeds all environmental criteria, resulting in a net increase in pine rockland habitat.

---

[1] The environmental statutes at issue here are the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*

[2] The main challenged documents include the following: "Coral Reef Commons Habitat Conservation Plan" dated October 2017 (Ex. 1); "Set of Findings: Endangered Species Act permit application and National Environmental Policy Act findings for Coral Reef Retail LLC, Coral Reef Resi Ph I LLC, Ramdev LLC, and University of Miami's Coral Reef Commons Mixed Use Development for the Incidental Take of Eight Pine Rockland Species, TE15009C-O", dated December 4, 2017 (Ex. 2) (the "SOF"); the "Biological Opinion and Conference Opinion: Coral Reef Commons Project Incidental Take Permit TE15009C-O", dated November 30, 2017 (Ex. 3) (the "BiOP"); the "Environmental Assessment for the Coral Reef Commons Project Incidental Take Permit Application" dated November 2017 (Ex. 4) (the "EA"); and Incidental Take Permit No. TE15009C-0 (Ex. 5). The Incidental Take permit was issued to Coral Reef Retail LLC, Coral Reef RESI PH 1 LLC and RAMDEV LLC (collectively the "Permittees").  The remainder of the record (containing the extensive scientific studies and other materials) is voluminous and will be filed separately.

The decision documents are well reasoned and based on an extensive administrative record as interpreted by the expert agencies.[3]  Plaintiffs have been afforded and taken advantage of an opportunity to participate in this process.   In fact, they raise issues that have already been addressed by the Service over the past 3 ½ years.  Plaintiffs' motion attempts to draw the Court into an exercise of second guessing the science-based, objective conclusions of the expert agencies and selectively reweighing and interpreting evidence. However, it is the Service that is empowered and charged with the responsibility to evaluate the relative weight and credibility of the data and scientific evidence of the record and those decisions are entitled to substantial deference.

The Court should not assume that because this case involves impacts to the environment that irreparable harm is certain.  The Court must look at the totality of the action that Plaintiffs seek to enjoin.   The HCP focuses development to the areas of the property with the least ecological value and requires extensive restoration and future maintenance of habitat both on and off site, resulting in a net increase in pine rockland habitat. The Service has required periodic reviews of benchmarks to ensure compliance with imposed conditions.  In analyzing irreparable harm and public interest, the ecological benefits of the HCP must be considered in tandem with the development that Plaintiffs seek to halt.  These benefits also will not occur if the HCP is stayed.

On the other side of the balance is the significant harm if the injunction is granted. Foremost, the restoration of pine rocklands will not go forward without the HCP.  In turn, keeping the temporary injunction in place would have an immediate and devastating impact on Permittee, its employees, its contractors, the University of Miami, and the third party businesses that have leases for the Project.  Permittees alone have invested in excess of $40 million in the Project and justifiably seeks to protect this investment and avoid damages that are accruing daily since entry of the TRO.[4]  Finally, there is public interest in the economic development from the Project and the tax revenues it will generate.   These considerable factors far outweigh the speculative risk of environmental harm alleged by Plaintiffs.

1)      <u>History of the Project</u>

---

[3] Incredibly, Plaintiffs provided only select portions of key documents (such as the Set of Findings (Ex. 2)) while challenging their conclusions. *See* Doc. 4-8.

[4] The declaration of Kerry-Ann Wilson, filed contemporaneously in support of this memorandum, describes the harm to Permittees, (Wilson Dec. at ¶¶ 5-14), the permitted work to date, and compliance with the TRO.

The Permittees own approximately 137 acres (the "property") located in unincorporated Miami-Dade County, Florida, near SW 152 Street and SW 124 Avenue and adjacent to Zoo Miami.   (Ex. 1, HCP at 25).   The property is far from pristine.   From 1948 through 2012, a biomedical research facility was operated onsite conducting, among other experiments, polio and cancer research on monkeys.  (Ex. 1, HCP at 10, 29, 47).  In connection with the University's use of the property, large concrete slabs were poured for the construction of the University's Genetics Research Compound, more than half of the property was cleared of pine trees, and primate cages were constructed on the western portion of the property.  (Ex. 1, HCP at 9-10).

Prior to the University's use of the property, it was owned by the U.S. Navy.  (Ex. 1, HCP at 10).  During the Navy's use of the property, more than 60 acres were cleared of wooded vegetation and/or scraped.  *Id*.; (Ex. 4, EA at 27).  As a result of the use of the property and the absence of controlled burns or control over invasive vegetation,[5] at the time Permittees became the titleholder, the entire property had experienced degradation, with nearly all of the property having suffered from considerable or moderate degradation.  (Ex. 1, HCP at 31).

On October 3, 2012, after five public hearings over a one-year period, Miami-Dade County amended its Comprehensive Development Master Plan to allow for the future development of Coral Reef Commons. (Ex. 1, HCP at 15). A transportation analysis, which the Service incorporated into its Environmental Assessment, was submitted.  (Ex. 4, EA at 32).  In September 2013, the local Miami-Dade County zoning board re-zoned the property to allow for the development of Coral Reef Commons.  (Ex. 1, HCP at 15).  In July 2014, the County approved a Natural Forest Communities ("NFC") permit covering 39.64 acres of the Coral Reef Commons property, authorizing site clearing for the development area.  (Ex. 1, HCP at 16).[6]  At this point, Permittees were authorized to clear those areas without any additional permits.  *Id*.

2)    The Service's Review of the Habitat Conservation Plan

On July 15, 2014, the Service sent a letter to Permittees expressing "concern" that the Project should not be constructed without first securing an Incidental Take Permit pursuant to section 10 of the ESA, suggesting that endangered species may be present on the property or in the area. (Ex 1, HCP Appendix A).  At the time, the only species referenced in the letter actually on the endangered species list was the Florida bonneted bat. *Id*.  However, the Service also stated

---

[5] As explained *infra*, fire suppression is highly detrimental to the vitality of the pine rockland habitat.
[6] Additionally, pursuant to the NFC Permit, Permittees hosted a plant collection on its property whereby third parties were at liberty to remove from the property as many plant species as they wished.  (Ex. 1, HCP at 15).

that additional species that were candidates to be listed in future, might also be present on the property, such as the Florida leafwing butterfly, Bartram's scrub-hairstreak butterfly, and the Miami tiger beetle.  *Id*.  Additionally, the letter outlined the possible presence of listed plant species, although no permit is required to clear any species of plant.  *Id*.  The Service suggested that the Permittees refrain from work on the Project until receiving confirmation from the Service that the proposed project will not result in the "take" of federally listed species. Although the Permittees were lawfully permitted to clear the property under the existing permits, the Permittees voluntarily agreed to temporarily delay development activity to consult with the Service.[7]

Between July 2014 and October 2014, Permittees conducted surveys and other studies in coordination with the Service and analyzed the impact of the proposed development on the various species addressed in the Service's July 2014 letter.  (Ex. 1, HCP at 16, 19). During this time, Permittees met with many interested stakeholders including, among others, Plaintiff South Florida Wildlands Association, Plaintiff, Tropical Audubon Society, Fairchild Tropical Botanic Gardens, Zoo Miami, Institute for Regional Conservation, and local homeowners.  (*Id*. at 21-23).

In October 2014, Permittees provided the Service a Technical Submittal outlining the measures to avoid impact to the species identified in the July 2014 letter as well as the results of vegetation and species surveys, and a preliminary burn plan.  (Ex. 1, HCP at 16).   In December 2014, Permittees agreed to develop a HCP for minimizing and mitigating the incidental take of any species in connection with development and to apply for an incidental take permit.  (*Id*. at 3). Permittees engaged multiple consultants with a wide variety of expertise including: lead ecologist, Churchill Roberts; botanist Steve Woodmansee; archaeologist, Bob Carr; engineers from Kimley Horn, a national leader in community planning and engineering; Grant Steelman, a certified burn manager; and George and Cyndi Marks, the founders of Florida Bat Conservancy.

The Permittees had extensive discussions with the Service concerning project layout and alternatives.   The HCP analyzed 6 alternative development scenarios, (Ex 1, at 68-78), which were analyzed by the Service.   (Ex. 2, SOF at 3-4).  Although not required, Permittees published a draft HCP, including on the Miami-Herald's website.  (Ex. 1, HCP at 15).

For nearly a two-year period, from May 2015 until March 2017, the Service consulted

---

[7] The declaration of Churchill Roberts, filed contemporaneously in support of this memorandum, describes the baseline conditions and history of the HCP in detail.  (Roberts Dec. at ¶¶ 16- 38).

with Permittees, surveyed the property, evaluated the evidence, science, and statements made in the HCP, and engaged its own scientists to independently verify the plausibility and veracity of the conclusions reached in the HCP. Following the Service's comprehensive review and consultation, on March 23, 2017, the Service announced in the Federal Register that the HCP and draft EA were available to the public.  *See* 82 Fed. Reg. 14908 (Mar. 23, 2017). The Service allowed a 60-day public comment period, double the comment period required. *Id.* During the comment period, the Service received more than 3,000 comments, some in favor of the Project and some against.  (Ex. 2, SOF at 9). To further foster public involvement, the Service hosted a webinar where Permittees presented the HCP and anyone could make comments. (*Id.* at 8).

In addition, the Project includes the preservation and management of 50.96 acres of off-site property owned by the Permittees' co-applicant, the University of Miami.  (Ex. 1, HCP at 3). That off-site property is presently subject to a contingent conservation encumbrance (linked specifically to the listing status of the deltoid spurge) but lacks a requirement for prescribed burning frequent enough to maintain open herbaceous understory. (Ex. 3, BiOp at 170). The Project would significantly expand the scope and quality of conservation on the off-site property by implementing a management plan not tied to any one particular species.  (Ex. 2, SOF at 11). Additionally, the HCP would require monitoring and prescribed burns at more frequent intervals, which will result in increased benefits for the listed species.  *Id.*

The Service determined that the present state of the Development Areas provides "relatively low quality habitat for the pine rockland dependent" species at issue in this lawsuit. (Ex. 2, SOF at 2).  In contrast, the "Project is anticipated to result in the restoration and perpetual preservation of approximately 106.25 acres of upland wildlife habitat in on and off-site mitigation areas."  (Ex. 2, SOF at 4). The Service has concluded that the Project will result in a net conservation benefit that will "improve habitat in those managed areas" and allow for "movement and interaction of the Covered Species on-site with adjacent properties."  (Ex. 2, SOF at 4-5).

On December 5, 2017, the Service issued the Incidental Take Permit, Biological Opinion and Set of Findings.  Collectively, these are detailed documents that address the Service's obligations under the ESA and NEPA.  The Biological Opinion concludes that the issuance of the incidental take permit is not likely to jeopardize the continued existence of any listed species. (Ex. 3, BiOp at 36).  The Biological Opinion goes into extensive detail on the status of the

species and calculates the anticipated extent of incidental take.  (*Id*. at 37-40).  The final EA addresses all the relevant considerations under NEPA including a project description; the affected environment; alternatives; cumulative effects and climate change. (Ex. 4, EA at Table of Contents).   The Set of Findings provides the Service's analysis of the Section 10 criteria, (Ex. 2, SOF 1-7) and also serves as the Finding of No Significant Impact under NEPA.[8]  (*Id*. at 37). Importantly, the SOF also addresses public comments, (*id*. at 8-36), a section that Plaintiffs largely omit from their Motion.

## ARGUMENT

An injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  Indeed, "there is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction."[9]  A plaintiff seeking a preliminary injunction bears the burden of establishing that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter*, at 20.   An injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" on all four factors.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).   Opposing parties bear no burden of presenting a case against an injunction.[10]

## I.   PLAINTIFFS CANNOT SHOW A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs' challenges are reviewed under the APA to determine whether agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[11] The reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[12]   Agency decisions can

---

[8] The Service concluded that the Permit "would not result in permanent and irreversible changes to the current state of the physical and biological environmental infrastructure, societal issues, economics, aesthetics, or public health and safety to the human environment."  (Ex. 2, SOF at 37).

[9] *Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.*, 280 F.3d 1364, 1371 (11th Cir. 2002), vacated on other grounds and remanded for further proceedings, 541 U.S. 95 (2004) (citation omitted).

[10] *See, e.g., Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 443 (1974) ("The burden was on the employers [seeking an injunction] to show that they were entitled to a preliminary injunction, not on the Union [against whom the injunction was sought] to show that they were not").

[11] 5 U.S.C. § 706(2)(A); *Bennett v. Spear*, 520 U.S. 154, 174 (1997).

[12] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

be set aside only under the narrow circumstance where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[13]  In applying the arbitrary and capricious standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.[14]   Courts must give substantial deference to the agency's decisions as to "what evidence to find credible" and "drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue."[15]  A party challenging an agency's decision must have already raised its concerns to the agency during the comment period in order to allow the agency to address those concerns.[16]

**A)  Plaintiffs Will Fail on their ESA Claims**

Plaintiffs' challenge to the approval of the HCP are unlikely to prevail.   Their disagreements with the decisions of the expert agency are insufficient to set aside the well-supported judgements of the Service, which are entitled to substantial deference.

The standard of review for ESA challenges is "exceedingly deferential" to the Service. *See Van Antwerp*, 526 F.3d at 1360. "The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action." *Fund for Animals v. Rice*, 85 F.3d 535, 542 (11th Cir. 1996).

Section 9 of the ESA makes it unlawful for any person to "take" (*i.e.* harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect) an endangered species without a permit.  16 U.S.C. § 1538(a).[17]  Under ESA Section 10, the Service may authorize "take" of species provided that "such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  16 U.S.C. § 1539(a).[18]  In order to obtain a permit, the applicant

---

[13] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[14] *Pres. Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996).

[15] *Sierra Club v. Van Antwerp*, 526 F. 3d 1353, 1361 (11th Cir. 2008).

[16] *Vermont Yankee Nuclear Power v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978).

[17] "Harm" is defined to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.  In turn, "harass" is defined as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  *Id.*

[18] Because there is no other federal permit required, applying for incidental take coverage "is not mandatory."  *See Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783 (9th Cir. 1995).  Yet, the regulatory

must submit a HCP that specifies the impact of the take, the steps to be taken to "minimize and mitigate such impacts," the funding available, "what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized," and such other measures as the Service requires.  16 U.S.C. § 1539(a)(2)(A)(i)-(iv).  The Service then reviews the HCP for consistency with the four statutory factors: (1) the taking will be incidental; (2) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (3) the applicant will ensure that adequate funding is provided; and (4) the taking will "not appreciably reduce the likelihood of the survival and recovery of the species in the wild."  *Id.* § 1539(a)(2)(B)(i)-(v).  The Service must also produce a "biological opinion" that reviews issuance of the incidental take permit to ensure that approval of the HCP "is not likely to jeopardize" any endangered species or result in the destruction or adverse modification of critical habitat.  *Id.* § 1536(a)(2).  The Service published a detailed Set of Findings, (Ex. 2), and Biological Opinion, (Ex. 3), that evaluate the HCP and address the relevant factors of the ESA.

      1)    <u>The functional assessment is a valid tool for analyzing impacts</u>

The permittee worked with the Service to develop a "habitat functional assessment" to classify the quality of habitats on-site, assist in minimization of impacts, and to quantify impacts and mitigation requirements.  (Ex. 1, HCP § 5).  Plaintiffs allege four errors with the habitat functional assessment, Doc 4 at 7-9, all of which have been addressed by the Service or lack legal support.  Foremost, use of habitat loss as a surrogate for "take" of species is hardly "novel."  Rather, it is a well-established methodology that is codified in the ESA rules.  50 C.F.R. § 402.14(i)(1)(i) (four factors for use of "habitat or ecological conditions" in lieu of "take" of individual species).[19]

The HCP describes the functional assessment, and explains that loss of habitat is being used as a surrogate for individual takes because it is impractical to detect or monitor individual species and they are heavily dependent on the occurrence of a specific biological feature.  (Ex. 1, HCP § 5).  The functional assessment was based on specific characteristics of pine rockland habitat and was used to determine the functional score (referred to as Habitat Value Units) for

---

certainty that the Section 10 process offers landowners provides the "adequate assurances" and "sufficient incentives" for the private sector to participate in the exceedingly costly and time consuming process of voluntarily preparing and implementing a HCP. *See* H.R. Rep. No. 97-835, 97th Cong., 2d Sess., at 31 (1982), *reprinted in,* 1982 U.S.C.C.A.N. 2860, 2872.

[19] The Service has developed habitat functional assessments for numerous listed species, including the Florida panther and wood stork and several butterflies. (Ex. 1, HCP at 81).  Mr. Roberts explains the functional assessment methodology in more detail.  (Roberts Dec. at ¶¶ 41-49).

existing and future conditions. (*Id.* at 81-89). The Service clearly explained that specific surveys for all species were not required given that the applicants used a habitat based approach that assumes that species are "reasonably certain to be present in the HCP area and likely to sustain take incidental to the proposed action." (Ex. 2, SOF at 15).[20] "This approach <u>errs on the side of the species</u> in our analysis of the extent to which a species would be adversely affected by the proposed action <u>and likely overestimates</u> the amount of occupied habitat." *Id.* [21] The functional assessment "evaluates the effects of the action in a quantifiable manner and provides a means to evaluate the extent to which the Applicants' proposed Conservation Program will offset the impacts of the take of Covered Species." (Ex. 2, SOF at 17). The Service concluded that the HCP "provided a reasonable basis for evaluating the extent of the impacts from development and planning conservation on the Project site." (*Id.* at 4, 17-20). By establishing a link between the habitat loss and the taking of species, the HCP presents a viable "surrogate" for "take".[22]

Plaintiffs' other attacks on the habitat functional assessment are contradicted by the HCP and the Service's careful review, which directly answers Plaintiffs' criticism. (Ex. 2, SOF at 17-20) (Ex. 3, BiOp at 170). For example, Plaintiffs assert that prescribed burning on the site is "wholly speculative" given the "weight of science indicating construction of the Project will inhibit prescribed burns." Doc. 4 at 8. The Service acknowledged "the challenges to implementing prescribed burns in urban environments" but explained how the permittee will overcome such obstacles. (Ex. 2, SOF at 31-32). Mr. Roberts points out that burning in urban settings is achievable and currently ongoing, including in the Richmond Area. (Roberts Dec. ¶¶ 58-59). Moreover, "[i]f prescribed burning becomes impractical in the future . . . the HCP provides alternative measures to achieve vegetation management objectives." (*Id.* at 35). Plaintiffs' attempt to reweigh the scientific evidence relied upon by the Service is improper.[23] Courts "must defer to the informed discretion of the responsible federal agencies," and "[w]hen examining this kind of scientific determination . . . a reviewing court must generally be at its

---

[20] Mr. Roberts notes that there were surveys for certain species such as the Florida bonneted bat, the Bartram's scrub hair-streak butterfly as well as plant surveys. (Roberts Dec. at ¶ 40).

[21] Hence, rather than try to argue whether or not the species were present, Permittees assumed they were present, which was the conservative choice. Indeed, if Permittees decided to survey for species presence, they (1) likely would not have found the species and (2) might have been able to reduce the mitigation.

[22] *See Arizona Cattle Growers' Ass'n v. USFWS*, 273 F.3d 1229, 1249-50 (9th Cir. 2001).

[23] *See Endangered Areas of Cobb's History*, 87 F.3d at 1246 ("role of the court is not to conduct its own investigation and substitute its own judgment for the administrative agency's decision").

most deferential."[24]   The ESA requires the Service's decision to be based on the best "available" science in the record. 50 C.F.R. § 402.14(d).   While the Service must consider the best available science, it does not have to agree with comments it receives.   Plaintiffs do not deny the importance of prescribed burning (nor the fact that without the HCP no burning will occur), but want the agency to give their views more weight.   A court is to defer to an agency's reasonable interpretation of the evidence and reliance on its own qualified experts, even if as an original matter, a court might find contrary views more persuasive.   *Marsh*, 490 U.S. at 378.

   2)   <u>The restoration of the off-site mitigation area will provide additional benefits to the species and regional ecosystem.</u>

   Plaintiffs' assertion that the Service erroneously "relied on conservation activities proposed at an off-site mitigation area that is: 1) owned and controlled by a third party that is not bound by the ITP's terms; and 2) subject to protections already," (Doc. 4 at 9), misconstrues the status of that property, which is owned by a permittee, the University.   The Service undertook its duty to determine whether the applicant "will to the maximum extent practicable, minimize and mitigate the impacts of the taking," 16 U.S.C. § 1539(a)(2)(B)(i)-(v), which is entitled to substantial deference.   The HCP demonstrates that that all impacts are fully offset by the mitigation activities within the 51.41 acres of On-site Preserves. (Ex. 1, HCP at 88).   However, the Service "recommended additional off-site compensatory conservation to improve the conservation lift of the HCP." (Ex. 2, SOF at 4-5).[25]   The Permittees will be responsible for managing the Off-site Mitigation Area to the identified success criteria for the full permit length. (Ex. 2, SOF at 14).

   Plaintiffs fail to recognize that while there is a deed restriction on the off-site Preserve, "the burning is not frequent enough to maintain open herbaceous understory." (Ex. 3, BiOp at 170).[26]   Hence, the Service concluded "that permanently protecting the property and improving management actions would result in increased benefits for the listed species."   (Ex. 2, SOF at

---

[24] *Marsh*, 490 U.S. at 377 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976), and *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983)(internal quotations omitted)).   Indeed, the courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Nat'l Ass'n of Home Builders v. Def. of Wildlife*, 551 U.S. 644, 658 (2007) (citation omitted).

[25] Plaintiffs take issue with the fact that University of Miami is an applicant to the permit.   Doc. 4 at 9.   Contrary to their assertion, the University is not an "uninterested third-party" – the University has a vested interest (ownership) in the mitigation and as a permittee is bound to follow the HCP requirements for the off-site property.   (Roberts Dec. at ¶ 60-64).This is addressed in the Set of Findings.  (Ex. 2, SOF at 10).

[26] The off-site preserve "does not receive fire on the 3–7 year return interval that is most effective at maintaining pine rocklands."  (Ex. 3, BiOp at 29); (Ex. 2, SOF at 11) (noting that the current encumbrance could be lifted).

11).   Moreover, even if certain mitigation measures were already "on the books," that does not preclude memorializing them into the HCP as part of the mitigation package. *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 120 F.Supp.2d 1005, 1021 (M.D. Fla. 2000).

Plaintiffs assert that because "there are no surveys for the property" there is no basis for the Service's conclusions that the off-site mitigation area will benefit the species.   Doc. 4 at 10.  This is untrue.   (Roberts Dec. at ¶ 40). "Covered Species are reasonably certain to occur on or have been documented on the property via surveys (e.g., Miami tiger beetle, deltoid spurge)." (Ex. 2, SOF at 15).[27]   In turn, prescribed fire will enhance these properties to support more robust species populations.   *Id.*

3) There is adequate funding for the Conservation Program

Plaintiffs allege that the Service failed to ensure adequate funding for the conservation plan under the theory that there will be no funding if the development fails. Doc. 4 at 10-11.  The Service found that the applicant will ensure that adequate funding will be provided. 16 U.S.C. § 1539(a)(2)(B)(iii). (Ex. 2, SOF at 3).  The HCP estimates costs and the applicant provides initial funding (5 years) with an escrow account and a letter of credit.  (Ex. 1, HCP at 144).  This will be replaced with the establishment of a master association, with a special taxing district as a backup.   *Id.*   The Service confirmed that these entities could be used to fund the long-term management requirements.   (Ex. 2, SOF at 14). *See Nat'l Wildlife Fed'n v. Norton*, 306 F.Supp.2d 920, 926 (E.D. Cal. 2004) (homeowner's association may impose supplemental fees on already developed parcels and dissolution of the association requires approval of the Service).

Finally, Plaintiffs assert that the Service failed to specify the amount of "take" and that the Biological Opinion "contains no 'incidental take statement.'"  Doc. 4 at 12.  As stated above, the use of habitat loss as a surrogate for "take" is scientifically supported and adequately explained.[28]  Section 16 of the Biological Opinion has an explicit "Incidental Take Statement", which is based on the "anticipated impacts to affected species likely to result from the proposed taking and the measures that are necessary and appropriate to minimize those impacts" as set

---

[27] The Service also explained that the best available science standard does not empower the agency to require surveys. (Ex. 2, SOF at 15). *See Southwest Center for Biological Diversity v. Babbitt,* 215 F.3d 58, 60-61 (9th Cir. 2000); Habitat Conservation Planning and Incidental Take Permit Processing Handbook (2017) at 3.1.2 available at https://www.fws.gov/midwest/endangered/permits/hcp/hcphandbook.html

[28] *See Coop. v. Brown*, 822 F. Supp. 1479, 1510 (D. Or. 1993) (Plaintiffs' claim that the incidental take statements are facially invalid for failing to identify an anticipated number of listed species to be harvested is belied by clear legislative history which demonstrates that Congress fully anticipated that there would be occasions when impacts would have to be estimated."), aff'd 38 F.3d 1058 (9th Cir. 1994)).

forth in the HCP. (Ex. 3, BiOp at 172-73).  The Service concluded the functional assessment "enabled the Applicants to evaluate the baseline conditions of the property, effects the proposed development (and each of the Alternatives) would have on the pine rockland habitat, and benefits of the management actions on the On-site Preserves."  (Ex. 2, SOF at 17).  Just as it is permissible for the Service to express incidental take in terms of a surrogate, it follows that the "trigger" set forth in an incidental take statement (that, when exceeded, results in an unacceptable level of incidental take, thereby requiring the parties to reinitiate consultation) need not be a specific number but rather be based on the specific conditions of the permit. *See* 50 C.F.R. § 402.16; *Arizona Cattle Growers*, 273 F.3d at 1249-50.  The "cap" of the incidental take will be exceeded (requiring "reinitiation" of consultation) if the applicant fails to comply with any of the terms and conditions of the HCP or Incidental Take Permit.  (Ex. 3, BiOp at 173). (Roberts Dec. at ¶ 65).

**B)    Plaintiff Will Fail on Their NEPA Claims**

Under the APA, an agency meets "its 'hard look' requirement if it has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"[29]  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."[30] Plaintiffs' NEPA criticisms were clearly and sufficiently addressed by the Service in the Environmental Assessment, (Ex. 4), and Set of Findings, (Ex. 2).[31]

1)    The Service was not Required to Subject the FONSI to a 30-Day Public Review

Plaintiffs acknowledge that the Service made the proposed HCP and the draft EA available for public review and comment, resulting in thousands of comments.  *See* Doc. 4 at 13. Plaintiffs go on to claim, however, that the Service violated NEPA by not making the final Finding of No Significant Impact statement ("FONSI") available to the public for a 30-day public review. *Id.*

Plaintiffs' acknowledge that an agency must subject a FONSI to a 30-day public review only in "limited circumstances."  *Id.* (citing 40 C.F.R. § 1501.4(e)(2)(i)-(ii)). Yet, Plaintiffs fail

---

[29] *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d at 1216.
[30] *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1540 (11th Cir. 1990).
[31] The purpose of an EA is to provide the agency with sufficient evidence and analysis for determining whether to prepare an EIS or issue a FONSI and includes a "brief" discussion of alternatives. 40 C.F.R. § 1508.9.

to articulate why the FONSI for the Project fits within the "limited circumstances" of the rule. The Service's analysis of the effects of the Project and need for yet additional comment is entitled to substantial deference. *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 270–71 (D.N.H. 2008), *aff'd,* 555 F.3d 21 (1st Cir. 2009).

    2)    The Service Considered a Reasonable Range of Alternatives

Plaintiffs criticize the range of alternatives analyzed by the Service, claiming that Alternatives 3-5 are "substantially identical." Doc. 4 at 14. Even accepting for the sake of argument Plaintiffs' contention that Alternatives 3-5 amount to a single alternative, in that scenario the Service would still have analyzed four distinct alternatives, which is more than sufficient. *See North Idaho Community Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1154 (9th Cir. 2008) (two alternatives considered). "[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); 40 C.F.R. §1508.9. The Service's duty to analyze alternatives is bounded by notions of reasonability, feasibility, and common sense.[32] Accordingly, regardless of whether the Service is deemed to have evaluated six or four alternatives, the Service considered a sufficient range of reasonable alternatives.

Plaintiffs claim that the Service "blindly" accepted the applicant's economic rationale to reject Alternative 2. Doc. 4 at 14. Alternative 2 would develop fewer acres and thus support only 80,000 sq. ft. of commercial space and 250 residential units, compared to the 289,000 sq. ft. of commercial space and 900 residential units provided by the preferred alternative. (Ex. 4, EA at 42). The Service rejected Alternative 2 due to its "likely adverse effects to protected species" and its "inability to meet the Applicant's project purpose to construct a mixed-use development anchored by a large commercial retailer that is visible from SW 152nd Street." *Id.* The EA describes the importance of the anchor tenant and impact on revenue of that alternative. *Id.* Courts have consistently upheld agencies' common-sense economic evaluations of alternatives.[33]

    3)    The Service Was Not Required to Conduct an EIS

Plaintiffs argue that the Service should have prepared an EIS rather than an EA under the theory that the Project will significantly affect the quality of the environment. Doc. 4 at 15. The Service carefully reviewed all of these criticisms during the public comment process and

---

[32] *See Vermont Yankee*, 435 U.S. at 551.

[33] *See, e.g., Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 313, n. 51 (D.D.C. 2016); *Roosevelt Campobello Int'l Park Comm'n v. U.S. E.P.A.,* 684 F.2d 1041, 1046–47 (1st Cir. 1982).

responded to them at length.  Under NEPA, the court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec Co.*, 462 U.S. at 97-98.  The Service's findings are entitled to deference.

First, Plaintiffs argue that the Project's impacts to pine rockland and endangered species automatically renders the Project "significant". Doc. 5 at 14.  Plaintiffs' criticism ignores the degraded condition of those resources and that NEPA allows parties to mitigate below the "significance" threshold.  *See, e.g. C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1575 (11th Cir. 1988) (mitigation measures can push project below the "threshold level of 'significant impacts'"); *Sierra Club v. U.S. Army Corps*, 295 F.3d at 1220–21.  As discussed above, the Conservation Program will offset the impacts to the degraded Development Areas.   (Roberts Dec. at ¶ 39).

Second, Plaintiffs claim that the HCP's proposal to use prescribed burning to control invasive species "could involve devastating consequences" by leading to "public safety risks or failure to implement prescribed burns." Doc. 4 at 15.  As noted above, the Service considered and rejected Plaintiffs' concerns.  (Ex. 2, SOF at 31-32; 35); (Ex. 1, HCP at 101-04).[34]  The "hard look" the Service took under the EA is all that is required.  *See Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F.Supp.3d 1260, 1295-1299 (M.D. Fla. 2017) (affirming that mitigation obviates the need for an EIS despite impacts to "ecologically sensitive areas" and endangered species).

Plaintiffs assert that because the Project received "3,000 public comments and extensive media coverage" it is "highly controversial", warranting an EIS.  Doc. 4 at 17. However, the "highly controversial" significance factor is triggered only when there is "a substantial dispute about the size, nature or effect of a federal action," not merely "the existence of opposition to a use." *Nat. Res. Def. Council*, 250 F.Supp.3d at 1297. A well-orchestrated "NIMBY" exercise does not necessitate an EIS.  *Id.* (65,000 comments received did not trigger an EIS).

Finally, Plaintiffs claim that the Service's use of the habitat functional assessment could "set a precedent" for an unrelated nearby project called Miami Wilds.  *See* Doc. 4 at 15, n. 14. First, the Service noted that this specific functional assessment will have "narrow applicability." (Ex. 2, SOF at 4).   Second, the Miami Wilds project is speculative and therefore is not

---

[34] Mr. Roberts explains the measures to ensure success and safety.  (Roberts Dec. at ¶¶ 58-59)

"reasonably foreseeable" under NEPA.  (Ex. 1, HCP at 133-34). *City of Oxford, Ga. v. FAA*, 428 F.3d 1346 (11th Cir 2005) (the "rule of reason" controls what is reasonably foreseeable). [35]

4)    The Service's Draft EA and HCP allowed for meaningful public comment

Plaintiffs baselessly claim that the public was denied the ability to meaningfully participate in the notice and comment process by flyspecking certain aspects of the EA.  *See* Doc. 4 at 17.   The HCP, EA and all supporting materials were subject to 60-day notice and comment and the Service also set up a webinar where the public could ask questions. (Ex. 2, SOF at 8).  The underlying documents were sufficiently detailed for the public to understand the environmental consequences of the agency action and to participate in the process.[36]

## II.    CONTINUED WORK AUTHORIZED UNDER THE HCP WILL NOT LEAD TO IRREPARABLE HARM

In this Circuit, "preventing irreparable harm in the future is 'the *sine qua non* of injunctive relief.'"[37]  A preliminary injunction may not be entered "based only on a 'possibility' of irreparable harm."[38] Rather, Plaintiffs have the burden of demonstrating that they are likely to suffer irreparable harm before a decision on the merits can be heard.  *Id.* at 22.  "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."[39]

Plaintiffs claim that destruction of "rare pine rocklands and the threatened and endangered species that live at the Project site is *per se* irreparable," and go so far as to make the incredible assertion that land clearing activities at the site will lead to "extinction" of endangered species. *See* Doc. 4 at 5.  Plaintiffs also assert that the failure to comply with NEPA's procedural

---

[35] Similarly, in *Nat. Res. Def. Council*, the agency explained that its decision was not precedent setting as it would independently evaluate any requests for future exploration, which at this point are speculative, 250 F.Supp.3d at 1298.

[36] *See Ctr. For Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (Rule of reason standard determines when EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences."); *Vermont Pub. Interest Research Group v. U.S. Fish and Wildlife Serv.*, 247 F.Supp.2d 495, 524 (D. Vt. 2002) (while Service could have expanded its discussion to "aid[] public digestion of the technical issues," it did not frustrate NEPA's goal of ensuring that relevant information is available to the wider audience participating in agency decision-making.")

[37] *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005).

[38] *Winter* at 21-22. *See also Ne. Fla. Chap. of Ass'n of Gen. Contractors of Am v. City of Jackson*, 896 F.2d 1283, 1285 (11th Cir. 1990) (The harm must be "actual and imminent" and not "remote nor speculative") *Church v. Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (requiring "real and immediate "as "conjectural or hypothetical" threat of future injury).

[39] *Tropical Fruit Trading, Inc. v. AgroFarms, LLC,* No. 16-cv-21735, 2016 WL 4376747, at *2 (S.D. Fla, Oct. 17, 2016) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

requirements risks the environment by making decisions with incomplete information.  *Id.* at 6.

Cases dealing with alleged violations of environmental laws are not subject to a lower standard of proof of irreparable injury. [40]  With regard to their ESA allegations, Plaintiffs have the burden of showing not just that the future activities will result in harm to individual species but rather that it will have a "species level" impact.[41]  Hence, even if Plaintiffs could show that future activity would lead to "take" of these species, that would be insufficient as a matter of law and irrational.  *See Defenders of Wildlife v. Salazar*, 812 F.Supp.2d 1205, 1209 (D. Mont. 2009) ("to consider any taking of a listed species as irreparable harm would produce an irrational result.")  Additionally, when evaluating whether harm is irreparable, courts must view the anticipated harm in light of any proffered mitigation measures to ameliorate such harm.[42]

Plaintiffs fail to demonstrate that the implementation of the HCP by the Permittees during the pendency of this case would cause irreparable harm.  In fact, the opposite is true.   Plaintiffs seek to enjoin the entire HCP.   Hence, the Conservation Program embodied in that plan is relevant to the inquiry on irreparable harm.   The injunction of the HCP would prevent implementation of the Conservation Program, which will not occur but for the HCP. (Roberts Dec. at ¶ 68-70).

Plaintiffs mischaracterize the condition of the Developed Areas and the potential for HCP activities to harm species. The 83 Development Acres are not "rare, unique habitat." Development Areas are concentrated within and around previously developed areas adjacent to the "spine road" and in areas that have low habitat value. (Ex. 1, HCP at 92-92).   Areas that were at one point pine rocklands have been "subjected to a variety of historic impacts, such as scraping, lack of vegetation management, or fire suppression." (Ex. 2, SOF at 2). "In their current state, these areas provide relatively low quality habitat for the pine rockland-dependent Covered

---

[40] If no appreciable harm threatens the environment, then the violation of a statute designed to protect the environment is not necessarily an irreparable injury. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 541-42 (1987).  "NEPA does not prohibit the undertaking of federal projects patently destructive of the environment; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992).

[41] *See Winter* at 21-22. *See also Alabama v. U.S. Army Corps of Eng'r*, 441 F.Supp.2d 1123, 1135 (N.D. Ala. 2006)("the court must consider the effect of the alleged take on the species as a whole").

[42] *See Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, No. 15-cv-01582, 2016 WL 420470 at *10 (D.C. Cir. Jan. 22, 2016) (finding that the impact from a gravel mining operation, "when combined with required mitigation measures, is not sufficiently great to permit the court to grant the extraordinary [injunctive] relief requested."); *Western Watersheds Project v. U.S. Bureau of Land Mgmt.*, No. 3:11-cv-00053, 2011 WL 1630789 at *5 (D. Nev. Apr. 28, 2011)(finding it "unlikely the sage grouse population will suffer irreparable harm if the injunction is denied" in light of developer's "commitment to enhancing existing habitat").

Species, but this could be improved with restoration." (Ex. 2, SOF at 2). Moreover, only four of the Covered Species are dependent on pine rockland habitat. *Id.*[43] The Service concluded "that establishment and maintenance of the proposed on-site preserves would improve habitat in those managed areas." (Ex. 2, SOF at 4). The Service's determination regarding the quality of the habitat and conclusion that the mitigation offsets impacts are entitled to deference.

The functional assessment predicted how HCP implementation (development and habitat management) would change the value of the pine rockland habitats on the property. (Ex. 3, BiOp at 28). Sections 6.0 and 7.0 of the HCP set forth a detailed description of the Conservation Program goals and requirements. (Ex. 1, HCP at 90-121).[44] Having analyzed the direct, indirect and cumulative impacts on the species (measured against the baseline conditions), the Service concluded that the Project is not likely to jeopardize any species or destroy or adversely modify designated habitat. (Ex. 3, BiOp at 6). In fact, the Service concluded that the HCP activities "would cause a net increase in conservation value" of the Property "because the habitat improvements in the Preserves exceed the losses in the CRC development area," (Ex. 3, BiOp at 172), and that net improvements in habitat quality would increase species abundance. (Ex. 3, BiOp at 29).[45] The court must consider the fact that absent the HCP, these enhancements will not occur. Moreover, Plaintiffs undercut their own arguments on irreparable harm by agreeing that the property could be restored.[46]

When considering whether irreparable harm is likely to occur, "the harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits." *Lambert*, 695 F.2d at 540. Hence, the clearing activities that have already taken place under the valid permits cannot support a

---

[43] Given conclusions of the Biological Opinion and the robust mitigation package, there is no support for Plaintiffs' alarmist suggestion of the potential for extinction.

[44] As explained by Mr. Roberts, the 51.41 acres of On-site Preserves are designed to maximize habitat functional values for the Covered Species, allow for connectivity to adjacent offsite pine rocklands, and minimize potential effects of habitat fragmentation. On-site Preserves include the largest contiguous portions of pine rocklands on property, which occur along the eastern and western sides. The "stepping stones" and Southern Corridor are expected to minimize impacts from the internal fragmentation from existing development and the proposed development. There are success criteria and monitoring requirements. The HCP includes several measures designed to minimize construction impacts (*e.g.* bat surveys, worker education, and BMPs), and impacts from the community (*e.g.* speed limits, pet restrictions, lighting, "Firewise"). (Roberts Dec. at ¶¶ 28—29).

[45] For example, under the HCP prescribed burning will be used to manage the on-site and off-site preserves. The Service considers fire as "the optimum management tool to improve the health of pine rockland habitat" as it enhances the capability of such areas to support a more robust population of species. (Ex. 2, SOF at 15).

[46] *See United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983) (while the continued filling of wetlands would make restoration "more difficult, more expensive, and more uncertain" that evidence is insufficient in and of itself to require a finding of irreparable harm that overcomes the equities against an injunction").

preliminary injunction.[47] Similarly, harm that would not occur until after the court renders a final ruling in the case should not be considered. Here, Permittees have already lawfully completed most of the land clearing work for the Project and therefore those clearing activities are outside the scope of harms to be considered by this Court for purposes of preliminary injunction.[48] Plaintiffs also allege harms such as increased road congestion from the finished Project. Doc. 4 at 2. Such harm is not likely to occur until well after this Court will have ruled on the merits of the case and therefore are outside the range of harms to be considered in the preliminary injunction context.

Plaintiffs erroneously suggest that a failure to comply with NEPA constitutes a *per se* irreparable injury. Doc. 4 at 5. Notably, the cases Plaintiffs cite preceded the Supreme Court's decision in *Winter*, which reconfirmed the notion that violations of environmental statutes may not be presumed to lead to irreparable harm.[49] In *Winter*, the Supreme Court explained that NEPA imposes only procedural requirements and does not mandate particular results. *Winter* at 23. The harm that NEPA seeks to prevent in requiring an EIS is that without one there may be little information on prospective environmental harms and potential mitigation measures. *Id*. Consequently, even if Plaintiffs could demonstrate that additional NEPA review was needed, they would still need to independently demonstrate the likelihood of irreparable harm. *Id*. Despite Plaintiffs attempts to muddy the record, the full scope of environmental effects is analyzed under the Environmental Assessment. (Ex. 4). Moreover, it "is pertinent that this is not a case in which the defendant is conducting a new type of activity with completely unknown effects on the environment." *Winter* at 23. Here, Plaintiffs seek to enjoin land clearing and development activities that are common in the region.

Finally, Plaintiffs allege harm to their recreational and aesthetic interests, alleging that this harm "is irreparable because it cannot be undone." Doc. 4 at 6. Aside from being a circular argument, there is no support for the notion that Plaintiffs members can recreate on Permittees' private property much less irreparably lose those interests during the pendency of this case.

Relying solely on presumptions and speculation, Plaintiffs cannot meet their burden of demonstrating that an injunction is warranted based on irreparable harm from the HCP activities.

---

[47] *Alabama v. Army Corps*, 424 F.3d at 1133-34 ("Where the harm to the movant's interests has already occurred, that harm is neither imminent nor irreparable at law and is not the appropriate subject matter for injunctive relief.")
[48] (Wilson Dec. at ¶¶ 15-21).
[49] *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982) (injunctions should not be presumed given that there are other ways of ensuring compliance).

To the contrary, preventing the restoration activities will have a negative impact on the environment.

## III.   AN INJUNCTION WILL CAUSE SUBSTANTIAL HARM

If the TRO is extended, several parties will be substantially injured.  The environmental and economic injury that a preliminary injunction would inflict outweighs the fictional injury to the environment conjured by Plaintiffs. Doc. 4 at 19.

Since 2011, Permittees have invested over $40 million in the Project and are incurring costs on a daily basis since the entry of the TRO.   (Wilson Dec. at ¶¶ 5-14).[50]   This investment includes the purchase of the property, interest on loans, consultant fees, and the other expenses in bringing the Project to fruition.  *See id*.  The Court must consider the impact an injunction would have on Permittee, on its employees, on its contractors, and on the third party tenants that have leases for space in the Project. *Valley Cmty. Pres. Com'n v. Mineta*, 373 F.3d 1078, 1087 (10th Cir. 2004) (financial harm to defendants was a proper consideration in analyzing the balancing of the harms.)   In addition, the Court must weigh the environmental harm to the area, as an injunction will halt the prescribed burning and other restoration activities on-site and off-site.[51]

The balance tips against injunction when the harm that the injunction will cause Permittees outweighs unsupported, speculative environmental injuries.  *Sierra Club, Inc. v. Bostick*, 539 Fed. Appx. 885, 889–90 (10th Cir. 2013)(denying injunction, where minimal impact on the environment did not outweigh the significant economic harm if an injunction were granted).  In light of Plaintiffs' inability to demonstrate "irreparable" harm, it would result in a substantial injustice to allow such injuries from the injunction.[52]

## IV.   THE PUBLIC INTEREST WILL NOT BE FURTHERED BY AN INJUNCTION

The Court must also give weight to the public interest.  In so doing, the courts ought to "tailor its relief to fit each particular case, balancing the environmental concerns . . . against the larger interests of society that might be adversely affected by an overly broad injunction . . . ."[53]

Plaintiffs' argument rests on the supposed benefit of preserving the status quo. Doc. 4 at

---

[50] Contrary to Plaintiffs' assertions past investments are not "sunk" costs that may be sacrificed by injunction.  Doc. 4 at 19.  *See Amoco*, 480 U.S. at 545 (noting that approximately $70 million of project expenses was at risk).

[51] If prescribed burning does not occur this winter, critical mitigation and conservation efforts will needlessly be delayed for another year. (Roberts Dec. at ¶ 69).

[52] *Fla. Wildlife Fed'n v. Goldschmidt*, 506 F. Supp. 350, 371 (S.D. Fla. 1981) (plaintiffs were not entitled to preliminary injunction because defendants would experience millions of dollars of losses from contractual delay damages, additional startup costs, and carrying costs).

[53] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 1005-06 (5th Cir. 1981).

19.  As described *supra*, however, maintaining the status quo will cause a net negative impact to pine rockland habitat by halting the HCP restoration activities. Even with regard to the clearing, Plaintiffs can point to no evidence that the HCP will result in an environmental injury that cannot be remedied.  In turn, there is a valid public interest in the economic development of the area from the Project.[54]  An injunction that would provide questionable environmental benefit, but that would cause economic harm to the public, cannot be condoned.[55]

The vast majority of the property has already been cleared pursuant to valid permits.  The public interest requires that the federal government consistently apply its laws.  Equal application of the law instills confidence in the public that any member of the public who properly engages with the government through prescribed procedures will receive a fair result.  *Cf. Alion Sci. & Tech. Corp. v. U.S.,* 74 Fed. Cl. 372, 376 (2006); *see also In re Katrina Canal Breaches Litig.,* 696 F.3d 436, 450 (5th Cir. 2012) (NEPA gives outside influences more "information with which to put pressure on that agency, but the original agency retains substantive decision-making power regardless.").  A permittee must be able to reasonably rely on the extensive scrutiny of a project by the expert agencies, and the permit should not be stayed without very serious consideration.

Finally, under the relevant environmental laws the Service's role is to balance the need for the Project, as defined by the applicant, against the environmental harm.  The Supreme Court has determined that the expert agency is in the best position to determine which impacts are relevant to performing the balance.[56]  Plaintiffs are improperly asking the Court to usurp that role from the Service and render a different decision on the public's interest in the Project.

## CONCLUSION

Based on the foregoing, Permittees respectfully request that the Court lift the TRO and DENY Plaintiffs' Motion for Preliminary Injunction.

---

[54] *Louisiana v. Lee*, 635 F. Supp. 1107, 1126 (E.D. La. 1986) (noting that the shell dredging companies "represent the public's interest in preventing the demise of the shell dredging industry, the loss of jobs, the loss of capital investments and other adverse ramifications associated with the immediate cessation of shell dredging operations.")
[55] *Sierra Club v. Georgia Power*, 180 F.3d 1309-10 (11th Cir. 1999) (finding that killing of fish is outweighed by impact on power generation, thereby affecting pubic interest).
[56] *Kleppe*, 427 U.S. at 414.

Respectfully submitted,

/s/ Martin J. Alexander                          /s/ George S. LeMieux

Martin J. Alexander                              George S. LeMieux, FBN 16403
Rafe Petersen (Pro Hac Vice application          Luna E. Phillips, FBN 63673
pending)                                         Jonathan H Kaskel, FBN 52718
HOLLAND & KNIGHT LLP                             GUNSTER
701 Brickell Ave #3300                           600 Brickell Avenue, Suite 3500
Miami, FL 33131                                  Miami, Florida 33131
(305) 374-8500                                   305-376-6000
Martin.alexander@hklaw.com                       glemieux@gunster.com
Rafe.petersen@hklaw.com                          lphillips@gunster.com
*Attorneys for Intervenor Defendants*            jkaskel@gunster.com
*Coral Reef Retail LLC, Coral Reef*              *Attorneys for Intervenor Defendants*
*RESI PH 1 LLC and RAMDEV LLC*                   *Coral Reef Retail LLC, Coral Reef*
                                                 *RESI PH 1 LLC and RAMDEV LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Intervenor-Defendants, Coral Reef Retail LLC, Coral Reef RESI PH 1 LLC, and RAMDEV LLC's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction was served by using CM/ECF System, which served all counsel of record registered with CM/ECF System for this case on December 13, 2017.

/s/ Jonathan H Kaskel

21