# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 1:17-cv-24444-UU

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

      *Plaintiffs,*

          v.

RYAN ZINKE, in his official capacity as Secretary of the U.S. Department of the Interior; *et al.*,

      *Defendants,*

and

CORAL REEF RETAIL, LLC, *et al.*,

      *Intervenor Defendants.*

## PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

# TABLE OF CONTENTS

Page

TABLE OF CITATIONS .................................................................................................... iii

I.   STANDARD OF REVIEW ........................................................................................2

II.  ARGUMENT ............................................................................................................3

III. THE R&R DISREGARDS THE WELL-ESTABLISHED APPLICABLE LEGAL
     STANDARD AND FACTS TO DETERMINE WHETHER THE SERVICE'S
     INCIDENTAL TAKE STATEMENT WAS LAWFUL .....................................................4

     A.  The R&R Fundamentally Misapprehends the Endangered Species Act, Which
         Provides the Foundation for Plaintiffs' Administrative Procedure Act Claims .......... 4

     B.  The R&R Contains Errors of Law and Fact Relating to the Service's Arbitrary and
         Capricious Failure to Meet its Procedural Obligation Under ESA Section 7 to
         Specify Take in its Incidental Take Statement ........................................................ 5

         1.  It Is Indisputable that the Service Must Specify Take in an Incidental Take
             Statement in its Biological Opinion .................................................................. 6

         2.  The Service Has Not Established that a Numerical Take Statement Was
             Impractical, Which the ESA Requires to Use a Surrogate ................................. 7

         3.  The HFA Is Not a Lawful Surrogate Because It Does Not Alert the Service
             When the Developer Has Exceeded the Authorized Amount of Take ................. 8

     C.  The R&R Contains an Error of Law Relating to the Service's Separate Procedural
         Obligations Under ESA Sections 7 and 10 ............................................................. 9

IV.  THE R&R DETERMINES, WITHOUT AN ANALYSIS OF THE RELEVANT
     RECORDS, THAT THE SERVICE'S RELIANCE ON THE HABITAT FUNCTIONAL
     ASSESSMENT IN ISSUING THE INCIDENTAL TAKE PERMIT AND BIOLOGICAL
     OPINION WAS LAWFUL ......................................................................................10

V.   THE R&R IGNORES RECORD EVIDENCE AND RELEVANT CASELAW IN
     CONCLUDING THAT THE SERVICE'S RELIANCE ON ALREADY CONSERVED
     OFF-SITE MITIGATION WAS LAWFUL ................................................................13

VI.  THE R&R RECITES DEFENDANTS' POSITION WITHOUT INDEPENDENTLY
     ANALYZING PLAINTIFFS' ARGUMENTS WITH RESPECT TO THE SERVICE'S
     FAILURE TO PRODUCE AN ENVIRONMENTAL IMPACT STATEMENTOR
     MAKE ITS FINDING OF NO SIGNIFICANT IMPACT AVAILABLE
     FOR 30 DAYS .......................................................................................................15

     A.  The Service Erred in Finding that the Project Would Not Significantly Impact the
         Human Environment .......................................................................................... 15

         1.  The geographic area has unique characteristics ................................................. 15

         2.  The effects of the project are highly controversial ............................................ 16

         3.  The action may adversely affect listed species and their habitat....................... 16

i

B.   The Service has not met its Obligation to Independently Conclude that the Developers Will Minimize and Mitigate the Impact of the Taking............................ 18

C.   The Service Unlawfully Failed to Make the FONSI Available to the Public for 30 Days Prior to Taking Action ...................................................................................... 19

VII.   CONCLUSION ......................................................................................................... 19

Case No. 1:17-cv-24444-UU

# <u>TABLE OF CITATIONS</u>

<u>Page</u>

**Cases**

*Sierra Club v. Babbitt,*
  15 F. Supp. 2d 1274 (S.D. Ala. 1998) ................................................................. 18

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife,*
  Serv., 273 F.3d 1229 (9th Cir. 2001) ..................................................................... 8

*Canal Auth. of Fla. v. Callaway,*
  489 F.2d 567 (5th Cir. 1974) ............................................................................... 3, 4

*Fund for Animals v. Rice,*
  85 F.3d 535 (11th Cir. 1996) .................................................................................. 8

*Gerber v. Norton,*
  294 F.3d 173 (D.C. Cir. 2002) ............................................................................. 14

*Grizzle v. Kemp,*
  634 F.3d 1314 (11th Cir. 2011) .............................................................................. 3

*LoConte v. Dugger,*
  847 F.2d 745 (11th Cir. 1988) ................................................................................ 2

*Miccosukee Tribe of Indians of Fla. v. United States,*
  697 F. Supp. 2d 1324 (S.D. Fla. 2010) ................................................................. 8

*Miccosukee Tribe of Indians v. United States,*
  566 F.3d 1257 (11th Cir. 2009) .................................................................... 6, 7, 8, 9

*Or. Nat. Res. Council v. Allen,*
  476 F.3d 1031 .......................................................................................................... 8

*Pacificans for a Scenic Coast v. California Department of Transportation,*
  204 F. Supp. 3d 1075 (N.D. Cal. 2016) ........................................................ 14, 15

*Scott v. Roberts,*
  612 F.3d 1279 (11th Cir. 2010) .............................................................................. 3

*Motor Veh. Mfrs. v. State Farm Mut. Auto. Ins.,*
  463 U.S. 29 (1983) .......................................................................................... 11, 12

*Sierra Club v. Norton,*
  207 F. Supp. 2d 1310 (S.D. Ala. 2002) ....................................................... passim

*Sinclair Refining Co. v. Midland Oil Co.,*
  44 F.2d 42 (4th Cir. 1932) ...................................................................................... 3

iii

*Wash. Cnty., N.C. v. U.S. Dep't of the Navy*,
   317 F. Supp. 2d 626 (E.D.N.C. 2004) ........................................................................... 3

*Winter v. NRDC*,
   555 U.S. 7 (2008) ........................................................................................................... 3

**Statutes**

5 U.S.C. § 706 ................................................................................................................. 11, 12

5 U.S.C. § 706(A)(2) ............................................................................................................. 1

16 U.S.C. 1533 ..................................................................................................................... 17

16 U.S.C. § 1536(a)(2) ........................................................................................................... 4

16 U.S.C. § 1536(b)(4)(C)(i)-(iv) ........................................................................................... 6

16 U.S.C. § 1539(a)(1)(b) ....................................................................................................... 4

16 U.S.C. § 1539(a)(2)(B)(ii) ..................................................................................... 2, 14, 15

16 U.S.C. §§ 1536(a)(2) and (b)(4)(C) ................................................................................... 3

16 U.S.C. §§ 1538-1540 ......................................................................................................... 4

16 U.S.C §§ 1539(a)(2) ........................................................................................................... 9

28 U.S.C. § 636(b)(1)(C) ........................................................................................................ 2

42 U.S.C. § 4332(C) .............................................................................................................. 15

**Rules**

Fed. R. Civ. P. 10(c) ............................................................................................................... 1

Federal Rule of Civil Procedure 72(b) .................................................................................... 1

**Regulations**

40 C.F.R. 1508.27(b) ............................................................................................................. 16

40 C.F.R. § 1501.4(a)(1) ....................................................................................................... 19

40 C.F.R. 1508.27 ................................................................................................................. 15

40 C.F.R. §§ 1501.4(e)(2)(i), 1508.27(b)(4) ........................................................................ 19

50 C.F.R. § 17.22(b)(2) ......................................................................................................... 18

Case No. 1:17-cv-24444-UU

50 C.F.R. § 402.14 ................................................................................................................. 5

50 C.F.R. § 402.14(h)-(i) ...................................................................................................... 9

50 C.F.R. § 402.14(i)(1) ........................................................................................................ 6

50 C.F.R. § 402.14(i)(1)(i) ................................................................................................. 7, 8

50 C.F.R. § 402.14(i)(l)(i) ...................................................................................................... 5

50 C.F.R. § 402.16 ................................................................................................................. 3

50 C.F.R. § 402.17(g)(3) ...................................................................................................... 11

50 C.F.R. §§ 17.22(b)(2)(i)(B), 17.32(b)(2)(i)(B) ............................................................. 13

50 C.F.R. §§ 402.12, 402.02 ................................................................................................. 5

ESA Section 10 .................................................................................................................... 13

**Other Authorities**

80 Fed. Reg. 26832 (May 11, 2015) .................................................................................... 10

Plaintiffs moved for a temporary restraining order and preliminary injunction, ECF 4, because the Incidental Take Permit (ITP) at issue in this case, which was issued by the Defendant U.S. Fish and Wildlife Service (Service), will allow for the complete destruction of nearly 87 acres of unique forest which serves as habitat for a wide variety of endangered plants and species including the Bartram scrub-hairstreak butterfly, deltoid spurge, Miami tiger beetle, and Florida bonneted bat. Plaintiffs' motion, which Plaintiffs incorporate here under Fed. R. Civ. P. 10(c), demonstrated that issuance of a preliminary injunction was appropriate to preserve the status quo while this Court resolves this case—which is a record review case that will be adjudicated on cross summary judgment motions—on its merits. Pursuant to Federal Rule of Civil Procedure 72(b) and S.D. Fla. Magistrate Judge Rule 4(b), Plaintiffs hereby object to the Magistrate Judge's report and recommendation (R&R), ECF 80, recommending denial of preliminary injunctive relief. The R&R erred in recommending denial by:

- Disregarding well-established legal standards and facts of record to find the Service's Incidental Take Statement (ITS) was lawful;

- Determining, without an analysis of the relevant records, that the Service's reliance on the Developers' Habitat Functional Assessment (HFA) in issuing ITP and Biological Opinion (BO) was not arbitrary and capricious;

- Ignoring record evidence and relevant caselaw in concluding that the Service's reliance on already conserved off-site mitigation was not arbitrary and capricious; and

- Reciting Defendants' position without independently analyzing Plaintiffs' arguments with respect to the Service's failure to produce an Environmental Impact Statement (EIS) or make its Finding of No Significant Impact (FONSI) available for 30 days prior to taking action.

Accordingly, the Court should not adopt the R&R, and instead should grant Plaintiffs' motion for a preliminary injunction.

Plaintiffs have proven the four factors necessary for a preliminary injunction; most relevant in the context of the R&R, they are likely to succeed on the merits of their claims. While the Service has not yet made an administrative record available, the exhibits filed with this Court in connection with Plaintiffs' motion show that Plaintiffs are likely to prevail on their claims that: (1) the Service's BO, ECF 36-3, is arbitrary and capricious, contrary to the Endangered Species Act (ESA), and must be set aside under the Administrative Procedure Act (APA), 5

U.S.C. § 706(A)(2), because the ITS in the BO lacks a numerical trigger or an adequate surrogate; (2) the Service's approval of the Habitat Conservation Plan (HCP) and its issuance of the ITP, ECF 36-1, was arbitrary and capricious because, among other reasons, the HCP, BO, and Environmental Assessment (EA) rely on an unsound and unprecedented HFA and lacks measures that will minimize and mitigate take to the "maximum extent practicable," 16 U.S.C. § 1539(a)(2)(B)(ii);[1] and (3) the Service unlawfully found that the Project will not have a significant impact on the human environment and failed to produce an EIS, even though the Project's is highly controversial and will kill and displace nearly two dozen sensitive species.

Without a preliminary injunction, the Defendant-Intervenors (Developers) will immediately resume leveling forest, and then move on to building apartments, big-box stores, parking lots, and roads—in the process reducing or entirely foreclosing alternatives to restore habitat should the Court ultimately grant Plaintiffs' motion for summary judgment on the merits.[2] These activities will irreparably harm protected species and habitat in the remaining forested areas that lie in the Developers' path.

Therefore, Plaintiffs respectfully request an Order: (1) converting the Temporary Restraining Order to a Preliminary Injunction; (2) ordering the Service to suspend the ITP; and (3) ordering the Developers to cease all activities in connection with the Project until the Court may rule on Parties' cross-motions for summary judgment, which Plaintiffs submit can be resolved on an accelerated schedule to allow for an expeditious resolution on the merits.

## I.  STANDARD OF REVIEW

This Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). On de novo review, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* "As the use of the phrase de novo implies, the district court's consideration . . . must be independent and based upon the [record] before the court." *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988). The

---

[1] Plaintiffs reserve their right to pursue all of the claims in their complaint at the summary judgment stage of the proceeding.
[2] The term "Developers" herein refers specifically to Defendant-Intervenors Coral Reef Retail LLC, Coral Reef RESI Ph 1 LLC, and Ramdev LLC. The term "Permittees" means the recipients of the Service's ITP: the Developers and the University of Miami.

court may "receive further evidence, recall witnesses, or recommit the matter to the Magistrate Judge with instructions." S.D. Mag. J. R. 4(b).

## II.    ARGUMENT

Plaintiffs respectfully object to the R&R's finding that they are not likely to succeed on the merits in this case. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010).[3] A preliminary injunction is meant to "preserve the status quo until the rights of the parties can be fairly and fully investigated and determined by strictly legal proof and according to the principles of equity" *Wash. Cnty., N.C. v. U.S. Dep't of the Navy*, 317 F. Supp. 2d 626, 631 (E.D.N.C. 2004) (quoting *Sinclair Refining Co. v. Midland Oil Co.*, 44 F.2d 42, 45 (4th Cir. 1932)), and "to preserve the court's ability to render a meaningful decision" on the merits. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Because the R&R only analyzed the first factor,[4] Plaintiffs devote the majority of this Objection to addressing errors in the R&R's findings and recommendation with respect to Plaintiffs' likelihood of success on the merits; however, Plaintiffs point this Court toward previous submissions that support the other three factors. ECF 1 (Complaint); ECF 4 (Motion for PI/TRO); ECF 53 (Reply).

Plaintiffs are likely to prevail on the merits of each of their claims. First, Plaintiffs are likely to prove the Service violated the requirements of the APA when it prepared the BO and ITS, pursuant to ESA subsections 7(a)(2) and 7(b)(4), 16 U.S.C. §§ 1536(a)(2) and (b)(4)(C), because: (1) the BO lacks a lawful ITS; (2) the HCP that the Service refers to in its BO lacks a numerical limit on take; (3) the Service has not explained why using a numerical limit is impractical; (4) the Service has not articulated an adequate nexus between the purported surrogate in the HCP and take of species; and (5) the purported surrogate for numerical take in the HCP fails to trigger reinitiation of consultation. 50 C.F.R. § 402.16. Second, Plaintiffs are also likely to succeed in their APA challenge to the Service's arbitrary and capricious approval of the HCP and issuance of the ITP because the HCP relies on a scientifically unsupported and unprecedented "habitat functional assessment," and fails to incorporate meaningful mitigation measures that will minimize and mitigate incidental take "to the maximum extent practicable."

---

[3] Plaintiffs are likely to prevail on the merits of their claims pursuant to the applicable test as set forth by the Supreme Court in *Winter v. NRDC*, 555 U.S. 7 (2008). Indeed, Plaintiffs are "substantially" likely to prevail. *Grizzle v. Kemp*, 634 F.3d 1314, 1320 (11th Cir. 2011).

[4] The R&R found that Plaintiffs are not likely to succeed on the merits of their case and declined to make findings on the remaining three factors. *See* ECF 80 (R&R) at 22-23.

Finally, Plaintiffs are also likely to prevail on the merits of their claim that the Service violated NEPA by failing to prepare an EIS and determining that the Project will not significantly impact the human environment.

## III. THE R&R DISREGARDS THE WELL-ESTABLISHED APPLICABLE LEGAL STANDARD AND FACTS TO DETERMINE WHETHER THE SERVICE'S INCIDENTAL TAKE STATEMENT WAS LAWFUL

### A. The R&R Fundamentally Misapprehends the Endangered Species Act, Which Provides the Foundation for Plaintiffs' Administrative Procedure Act Claims

The R&R misstates and appears to misapprehend the procedural requirements of Sections 7 and 10 of the Endangered Species Act, two distinct statutory sections that provide the foundation for many of Plaintiffs' APA claims. This is illustrated in several of the R&R's findings. First, the R&R conflates two distinct sets of legal requirements under Sections 7 and 10 of the ESA by stating: "[T]o comply with § 7(a)(2) of the ESA, the Developers prepared an HCP and initiated formal consultation with the FWS."[5] ECF 80 (R&R) at 4. In fact, "formal consultation" only happens between the Service and other federal agencies (commonly known as "Section 7 consultation") when there is a federal agency action that may affect ESA-listed species; non-federal entities, like the Developer here, do not engage in consultation. 16 U.S.C. § 1536(a)(2) (explaining that "[e]ach *federal agency* shall" consult with the Service (emphasis added)); *see also* ECF 1 (Complaint) at 12-15 (explaining ESA Section 7); ECF 77-2 (Transcript) at 32, lines 11-19 (explaining that Section 7 applies to federal agencies). Instead, when non-federal entities' actions may "take" listed species, Section 10 of the ESA requires non-federal entities to obtain an incidental take permit and prepare an HCP before taking such species, or face civil and criminal penalties.[6,7] 16 U.S.C. §§ 1538-1540; *see also* ECF 1 (Complaint) at 11-12 (explaining ESA Section 10); ECF 77-2 (Transcript) at 31-32, 96

---

[5] This statement is also factually incorrect. It is undisputed that the Developers submitted an HCP to the Service, ECF 36-3 at 8, and the Service entered into formal, intra-agency consultation with itself. *Id.*

[6] Thus, the Developers did not altruistically "agree" to secure an incidental take permit, ECF 80 (R&R) at 4, but rather were legally obligated to do so under federal law.

[7] The R&R also characterizes the requirements of ESA Section 7 and then states, "Notwithstanding, the ESA allows for the taking of species that is incidental to activities not intended to kill or injure protected species. 16 U.S.C. § 1539(a)(1)(b)." ECF 80 (R&R) at 6. To the extent the R&R implies Section 10 provides an exception to Section 7, Plaintiffs object. *See Infra* Section II(C).

(explaining that private entities must obtain take permits to be exempt from civil and criminal liability for take under the ESA).

The R&R also betrays a misunderstanding of the Service's separate roles as the "action agency" and "consulting agency" under ESA Section 7 with the R&R's conclusion that "[t]he BA must discuss the effects of the action on the affected species and the [Service's] opinion as to *whether the action is likely to jeopardize [species]*." ECF 80 (R&R) at 7 (emphasis added). Here, the Service engaged in consultation with itself for the federal action of issuing a take permit. ECF 77-2 at 32. As the "action agency," the Service may, but did not here, prepare a biological assessment if it believes its action may affect an endangered or threatened species. *See* 50 C.F.R. §§ 402.12, 402.02. Meanwhile, as the "consulting agency", the Service prepared a biological opinion to determine whether the agency action is likely to jeopardize the continued existence of the species. *See* 50 C.F.R. § 402.14. Thus, the Service's opinion regarding jeopardy, given as the consulting agency, should be in its biological opinion, not a biological assessment.

These examples, coupled with the R&R's lack of analysis, and frequent lack of conclusions, *see, e.g.*, ECF 80 (R&R) at 15 (mentioning arguments from opposing sides regarding the scoring of habitat polygons but failing to state a conclusion of law or facts regarding them), show that the R&R lacks clear understanding of the legal requirements necessary to determine the Service's multiple obligations or to ascertain which records are relevant to determining whether the Service met them.

**B.    The R&R Contains Errors of Law and Fact Relating to the Service's Arbitrary and Capricious Failure to Meet its Procedural Obligation Under ESA Section 7 to Specify Take in its Incidental Take Statement**

The ESA authorizes the Service to permit the take of listed species in exceedingly rare circumstances.[8] When the Service approves the take of listed species, it must issue an incidental take statement (ITS) that "specifies . . . the amount or extent of . . . incidental taking of a listed species." 50 C.F.R. § 402.14(i)(l)(i). An ITS may lawfully allow take of a threatened or endangered species "as long as the statement sets a 'trigger' for further consultation at the point where the allowed incidental take is exceeded, a point at which there is a risk of jeopardizing the

---

[8] The Service may authorize take "for scientific purposes," "to enhance the propagation or survival of the affected species," and when it is "incidental to, and not the purpose of, . . . an otherwise lawful activity," subject to legal requirements set forth in ESA Section 10 and its implementing regulations. *Id.* § 1539(a)(1)(A)-(B).

species." *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1271-72 (11th Cir. 2009). The purpose of this trigger is to "alert the agency when the allowed incidental take has been exceeded," and thus prevent irreversible harm to the species. *Id.* at 1272. The Service must establish a trigger by: (1) setting a numerical "cap" or, in limited circumstances, a rational surrogate to limit take; and (2) specifying monitoring provisions to assess actual take and effectuate the trigger. *Id.* at 1275. Here, the Service failed to include a lawful ITS in its BO, failed to provide a numerical standard for take or explain why such a standard was not practical, and failed to provide a surrogate that would allow it to know when the Developers have exceeded the take authorized.

Yet, the R&R finds that the Service's incidental take statement lawfully specified take because the Developer's "HCP sets forth that loss of habitat is being used as a surrogate for individual take[] because it is not practical to detect or monitor individual species." ECF 80 (R&R) at 17-18. This finding is rife with erroneous legal and factual conclusions. Specifically, it (1) erroneously cites the HCP, a document prepared by the Developers, as evidence that the Service met its obligation to specify take in its BO; (2) incorrectly concludes that using a surrogate measure of take is lawful despite the absence of evidence showing the Service met the prerequisite findings to do so; and (3) assumes the HFA contains a lawful surrogate measure of take without analyzing it.

### 1. It Is Indisputable that the Service Must Specify Take in an Incidental Take Statement in its Biological Opinion

First, the R&R incorrectly points to the Developers' HCP to find that the Service fulfilled its obligation to specify take in its BO.[9] *See id.* Because the taking of even one individual of a species can result in the jeopardy of entire species, Congress requires the Service to set a limit on the take that it authorizes and provide a clear standard for determining when that amount of take is exceeded. 16 U.S.C. § 1536(b)(4)(C)(i)-(iv) (requiring the Service to set forth the specific impact of take on the species in a "written statement"). The Service must provide this written statement, known as an incidental take statement or ITS, within its BO. 50 C.F.R. § 402.14(i)(1) ("[T]he Service will provide *with* the biological opinion a *statement* concerning incidental take.") (emphasis added). Here, Defendants do not refute that the BO does not contain a numerical cap

---

[9] This error may be due, in part, to the R&R's misunderstanding of the difference between Section 7 and Section 10 of the ESA, explained in above. *See supra* Section I(A).

or surrogate that specifies the amount or extent of take permitted and a "trigger" with a clear method for estimating when take has been exceeded. ECF 32 (Fed. Defs.' Opp. Br.) at 12-13 ("[I]t is unnecessary for FWS to quantify incidental take in the manner suggested by Plaintiffs."); *see also* ECF 4 (Pl.'s Mot. for TRO/PI) at 12 (citing *Miccosukee Tribe*, 566 F.3d at 1273.[10]

Instead of providing an ITS in its BO, the Service refers to the Developers' entire HCP and "associated reporting requirements" for the "impacts to affected species likely to result from the proposed taking." ECF 36-3 (BO) at 180-181. However, to merely refer to the entire HCP does not fulfill the Service's duty to specify take in its own biological opinion,[11] which wholly fails to either specify take numerically or explain why a surrogate measure is impracticable, describe a causal link between a surrogate measure and take, and set a clear standard for determining when take has been exceeded. *See* ECF 36-3 (BO) at 180-181; *see also* ECF 4 (Motion for PI/TRO) at 11-12; ECF 53 (Reply) at 6-7; ECF 77-2 at 43-47. Even if the Developers' findings in their HCP were relevant to the legal violation at issue—which they are not—the HCP simply does not specify take numerically, nor does it explain why it is impractical to do so for species on the Project site; rather, it generically recites the "impracticability" standard set out in the Service's regulations. *Compare* ECF 36-4 (HCP) at 91 *with* ECF 80 (R&R) at 17-18.

### 2. *The Service Has Not Established that a Numerical Take Statement Was Impractical, Which the ESA Requires to Use a Surrogate*

The R&R also errs in concluding that the use of a surrogate measure of take is appropriate in the instant case, as the Service has failed to make the three requisite findings necessary to do so. *See* ECF 80 at 17-18. While Congress has declared a preference for a numerical expression of take, the Service may use a surrogate measure but, only *if* the Service: (1) "explains why it is not practical to express the amount or extent of anticipated take . . . in terms of individuals"; (2) "[d]escribes the causal link between the surrogate and take of the listed species"; and (3) "sets a clear standard for determining when . . . take has been exceeded." 50

---

[10] However, the Service takes a conflicting position in its Set of Findings (SOF), stating that "although FWS considers HVA a useful tool we don't rely on it as basis for BO" ECF 36-2 (SOF) at 20. This contradiction underscores just how arbitrary and capricious the Service's decision making has been in connection with this ITP.

[11] The R&R's subsequent citations to law appear to conflict with its reliance on the Developers' explanation for using the HFA as a surrogate. *See* ECF 80 at 18-19 (stating that "*the agency* must show that it was not possible to use a numerical population count" (emphasis added)).

C.F.R. § 402.14(i)(1)(i); *Miccosukee Tribe*, 566 F.3d at 1274; *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, at 1041 (ITS failed to "explain[] why such a limit is impracticable to obtain and employ").[12] The Service has not met *any* of these requirements, yet the R&R concluded that the Service's use of a surrogate measure was appropriate here. Notably, the R&R mentioned that in *Fund for Animals v. Rice*, 85 F.3d 535, 540 n.8 (11th Cir. 1996), the Service found it was practicable to specify take numerically for the eastern indigo snake. ECF 80 at 18-19. Yet for the permit at issue here, the R&R concludes that it is impracticable to specify take numerically for the same species despite the lack of any record evidence supporting such a conclusion.

Moreover, while the R&R sets out factors for determining practicability of specifying take numerically, including the availability and quality of actual or estimated population figures and the ability to measure incidental take, *see* ECF 80 at 19 (citing *Miccosukee Tribe of Indians of Fla. v. United States*, 697 F. Supp. 2d 1324, 1331 (S.D. Fla. 2010)), it wholly ignores the record evidence that shows that the Service *was* able to specify take numerically for the covered species. *See, e.g.*, ECF 36-3 at 44-45 (estimating the number of Bartram's scrub-hairstreak butterfly and identifying pineland croton as a closely-tied surrogate for monitoring the butterfly's presence); *Id.* at 99-100 (estimating the number of eastern indigo snakes on the site). Accordingly, the R&R's reliance on the irrelevant representations of the Developers, *See* ECF 80 (R&R) at 17-18 (finding that the "HCP sets forth that loss of habitat is being used as a surrogate for individual take[] because it is not practical to detect or monitor individual species"), over the Service's own findings in its biological opinion when determining it was impracticable to specify take numerically reflects a clear error in judgment.

### 3. The HFA Is Not a Lawful Surrogate Because It Does Not Alert the Service When the Developer Has Exceeded the Authorized Amount of Take

To the extent the R&R accepts Developers' arguments that the HFA is an adequate surrogate, *see* ECF 80 (R&R) at 17-18, such a conclusion is in error and contrary to the

---

[12] The R&R cites only two prerequisites for using a surrogate: that "(1) 'no such numerical value could be practically obtained,' and (2) that the 'use of ecological conditions as a surrogate for defining incidental take ... [is] linked to the take of the protected species.'" ECF 8- at 18 (citing *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1250 (9th Cir. 2001)). *Arizona Cattle Growers*' omission of the third factor is likely due to the fact that the case was decided prior to—and, in part, inspired and informed—the Service's ultimate amended regulations. *See* 80 Fed. Reg. 26832 (May 11, 2015). The Service should be bound by its current regulations, which require the three factors described in 50 C.F.R. § 402.14(i)(1)(i).

applicable law. The Service has not attempted to describe in its ITS what the numerical take is for any of the species, nor what the surrogate for such take might be. *See* ECF 36-3 (BO) at 180-81.  In fact, as described below, the HFA itself is deeply flawed, and the Service's reliance upon it is arbitrary and capricious. *See infra* Section II. Further, the HFA does not set a clear standard—*e.g.*, a certain number of species taken or a certain amount of important microhabitat damaged—for the Service to determine when the Developers have exceeded the authorized take. *See Miccosukee Tribe*, 566 F.3d at 1271-72.

Defendants have not identified any specific triggers for reinitiation of formal consultation in the BO, ITS, HCP, or ITP. Indeed, these documents do not supply even so much as a "habitat marker" as an estimate, as the Service did in *Miccosukee Tribe*, 566 F.3d at 1271-72 (ITS "may lawfully authorize harm to an endangered species as long as the statement sets a 'trigger' for further consultation at the point where the allowed incidental take is exceeded" and "a point at which there is a risk of jeopardizing the species").

### C.    The R&R Contains an Error of Law Relating to the Service's Separate Procedural Obligations Under ESA Sections 7 and 10

Finally, the R&R commits a clear error of law by adopting the Federal Defendants' argument that "there is no separate obligation to quantify incidental take or have a trigger for reinitiating consultation in the BO because the incidental take comes from § 10, not the § 7 of the ESA."[13] ECF 80 (R&R) at 19. Sections 7 and 10 of the ESA, and their implementing regulations, impart distinct—and each independently legally required—obligations on the Service. *See* 16 U.S.C §§ 1539(a)(2) (setting forth the Service's duties relating to permitting incidental take caused by private entities), 1536(a)(2) (setting forth the Service's duties relating to consulting with federal agencies on federal actions that may impact endangered or threatened species). Here, the procedural requirements outlined in Section 7's implementing regulations require the Service to consult with itself regarding its own federal action, in this case issuing a Section 10 incidental take permit to the Developers, and issue a biological opinion that quantifies the amount of take anticipated to result from issuing that permit. *See* 50 C.F.R. § 402.14(h)-(i). Neither the statute nor the implementing regulations provide an exception for federal actions that involve permitting take under Section 10. Plaintiffs explained the legal and logical fallacies of

---

[13] The R&R attributes this argument to "the Developers"; however, Federal Defendants raised this argument in their response to Plaintiffs' motion for temporary restraining order and preliminary injunction. *See* ECF 32 at 12-13.

Federal Defendants' unprecedented, post hoc arguments in detail in their reply brief and at the preliminary injunction hearing, citing relevant law and the Service's own guidance documents, *see* ECF 53 (Reply) at 7-8; ECF 77-2 (Transcript) at 47-51; whereas Federal Defendants presented no legal precedent, either in briefing or at the hearing, to support their novel legal theory. *See* ECF 32 at 12-13. Consequently, the R&R's adoption of Federal Defendants' argument is unsupported by statute, regulation, and caselaw precedent in this and all other jurisdictions, and thus is in clear error.

## IV.      THE R&R DETERMINES, WITHOUT AN ANALYSIS OF THE RELEVANT RECORDS, THAT THE SERVICE'S RELIANCE ON THE HABITAT FUNCTIONAL ASSESSMENT IN ISSUING THE INCIDENTAL TAKE PERMIT AND BIOLOGICAL OPINION WAS LAWFUL

The R&R appears to conflate two of Plaintiffs' claims relating to the Service's reliance on the Habitat Functional Assessment (HFA) and abruptly dispose of them without adequate analysis. *See* R&R at 14 (appearing to suggest that Plaintiffs argue the HFA is a "black box" because it fails to consider the individualized needs and impacts on species). The Service's reliance on the HFA in analyzing the Project's impacts on species is arbitrary and capricious because it: 1) failed to consider important aspects of the problem because the HFA does not account for the individual species-specific needs and impacts; and 2) failed to draw a rational connection between the facts found and the decision made because the HFA is a "black box" that obscures any connection between the generic factors it considered and the estimated "habitat value" it produces. *See* ECF 4 (Motion for TRO/PI) at 7–9; ECF 53 (Reply) at 9–10. Rather than analyze these interrelated claims as two separate arguments, the R&R erroneously conflates them, resulting in incorrect findings.

With regard to Plaintiffs' first argument that the Service's reliance on the generic HFA is unlawful because it fails to consider species-specific impacts, the R&R contains several errors of fact. First, the R&R relies on Appendices D and G to the HCP, documents prepared by the Developers, to support its factual conclusion that the Service assessed the specific and individualized habitat needs of each listed species when determining that the HFA accurately reflects the impacts to and mitigation for listed species. *See* ECF 80 (R&R) at 14-15. Appendix D is an inventory of plants that were present on the Coral Reef Commons site in 2014. *See* ECF 36-8. Appendix G is a spreadsheet presenting numbers purporting to reflect the current value of polygons on the site and their projected value post-development. *See* ECF 36-12. Neither of

these documents addresses Plaintiffs' argument that the Service failed to analyze the Project's impacts on the specific habitat needs for each individual species covered by the ITP.[14] *See* ECF 36-4 (HCP) at 91-98 (providing six generic factors that do not identify, discuss, or place value on any specific habitat features necessary for the survival or recovery of each covered species). The ESA requires the Service to "evaluate the effects of the action . . . on the listed species." 50 C.F.R. § 402.17(g)(3). Thus, the Service's reliance on "habitat values" from an assessment that fails to consider the specific impacts to the broad range of listed species covered under the permit—from beetles to bats—is arbitrary and capricious.[15] *See* 5 U.S.C. § 706; ECF (Mot. for TRO/PI) 4 at 7-8; *see also* ECF 36-3 (BO) at 36-38, 48 (Service's BO relying on HFA).

The R&R also appears to have dismissed Plaintiffs' specific examples of how the Service's reliance on the HFA is arbitrary and capricious in favor of a position that "the Court's role in determining the likelihood of success on the merits [does] not entail a deep dive into minutiae."[16] ECF 80 (R&R) at 15. The HFA provides the very basis for the Service's approval of the Developers' HCP, the ITP, and the BO on the take permit. *See, e.g.*, ECF 36-3 (BO) at 37-38, 129; ECF 36-22 (EA) at 65-66. Accordingly, analysis of record evidence that shows that the HFA is arbitrary and not rationally supported is not "diving into minutiae" but rather a necessary analysis of the key facts at issue in the instant case. Plaintiffs' arguments regarding illogical polygon scores, double-crediting, and unsupported factual findings in the HFA are just a few examples of how the HFA is arbitrary and capricious, and thus the Service's reliance on it also arbitrary and capricious. *See* ECF 4 (Motion for PI/TRO) at 6-9; ECF 77-2 (Tr. at 36-43).

Additionally, the R&R appears to have adopted Developers' argument that "Plaintiffs have not produced any evidence supporting their argument that prescribed fires under the HCP will not occur once the area is developed." ECF 80 (R&R) at 16. However, Plaintiffs identified

---

[14] For example, the generic "native plant presence" factor in the HFA would reflect high habitat value for the site so long as any number of hundreds of native plant species were present, regardless of whether specific species of plants necessary for the survival of covered species were present. *See* ECF 77-2 at 33-35.

[15] For example, the Service relies on the HFA's assessment of "habitat value units" throughout its BO and environmental assessment when discussing the overall impact of the project. *See, e.g.*, ECF 36-3 (BO) at 72, 169, 178. Without a clear explanation for how those values were created, reliance on them is arbitrary and capricious. *See Motor Veh. Mfrs.*, 463 U.S. at 43 (holding that an agency must provide a "rational connection between the facts found and the choice made").

[16] The R&R appears to recount parts of each party's argument without clearly articulating which argument it found persuasive. ECF 80 (R&R) at 15.

numerous examples in the record, including in appendices to the Developers' own HCP, showing the Project will inhibit prescribed fire. *See* ECF 36-6 (HCP Appx. B) at 10 ("As residential and commercial developments have expanded to surround the subject property, the fire regimen has been reduced or eliminated . . . . Once the Coral Reef Commons project is constructed, we anticipate that further restrictions will be placed upon the fire programs."); ECF 36-22 (EA) at 14 (explaining that prescribed fires in populated areas like Miami "are hampered by the pattern of land ownership and development in addition to residential and commercial properties located proximal to pine rockland habitat"); ECF 36-27 (Att. 5 to EA) at 6 (explaining that prescribed fire "is hampered" in pine rocklands where "residential and commercial properties are … within or in close proximity to pine rockland habitat"); ECF 6  at 4-6 ("As a former naturalist and resource manager for Miami-Dade Parks Department, I do not see how prescribed burns on 50 acres could possibly be conducted adjacent to a Walmart, LA Fitness, a restaurant, an apartment buildings.");  ECF 6 at 13 (biologist opining that "it is not realistic to expect that prescribed fire could be implemented in preserves which surround 900 homes and dozens of businesses").

The Service itself concedes that prescribed fire will be more challenging in an urbanized environment and will be wholly dependent on the uncertain collaboration of nearby property owners, otherwise "the habitat and species will likely suffer," ECF 36-2 (SOF) at 32-33,[17] which is consistent with and fails to dispel the multitude of concerns in the record that prescribed fire will be infeasible following construction. Contrary to the R&R's position that it is Plaintiffs' burden to prove that burns will not occur, Plaintiffs' burden is to show that given the bleak history of prescribed burns on the site, *See* ECF 36-15 (HCP Appx J) at 6-8, and overwhelming information showing the Project will hamper fire, the Service cannot reasonably draw a connection between the facts before it and its ultimate conclusion that the habitat will improve due to future prescribed fire.[18] *See Motor Veh. Mfrs. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983); 5 U.S.C. § 706.

---

[17] The Service concedes that the success of fire on the Project site will be wholly dependent on the uncertain collaboration of nearby property owners. ECF 36-2 (SOF) at 32-33.
[18] The R&R's citation (ECF 80 at 16) to a post-permit declaration that the Developers submitted in their opposition to Plaintiffs' motion makes Plaintiffs' point:  There is nothing *in the record* before the Service to support the Service's conclusion that prescribed burns will occur after residential and commercial projects are built on site, and the Service (and Court) may not now rely on post-hoc rationalizations. *See* ECF 52 (Pls.' Mot. to Strike) at 3-6.

Likewise, the R&R's factual finding that "[t]he FWS responded to the arguments concerning polygons, prescribed fire, and double-dipping" in its set of findings, ECF 80 (R&R) at 15, is also unsupported by the record. For example, the Service's response to claims that crediting both "increased native plant cover" and "decreased invasive plant cover" in the HFA amounted to "double-dipping," was that "[p]ine rockland habitat could be predominantly native plants yet still lack the desired abundance of plants necessary to support the butterflies." ECF 36-2 (SOF) at 19. However, this explanation is irrelevant and nonsensical because the generic "native plant cover" factor under the HFA does not guarantee the presence of any particular species of plants (like "plants necessary to support the butterflies"). It merely considers the percentage of native plant cover, regardless of the plant species, so long as the plants are among the hundreds of plant species considered native. *See* ECF 36-4 (HCP) at 95-96. With regard to apparent inconsistencies in valuing habitat polygons, the Service concedes in the set of findings that "in some cases the polygon scores are counter intuitive," but does not then provide a satisfactory explanation for the discrepancies. ECF 36-2 (SOF) at 20.

## V.   THE R&R IGNORES RECORD EVIDENCE AND RELEVANT CASELAW IN CONCLUDING THAT THE SERVICE'S RELIANCE ON ALREADY CONSERVED OFF-SITE MITIGATION WAS LAWFUL

In concluding that the Developers' off-site mitigation was sufficient, the R&R states that Plaintiffs had "not provided any authority indicating that the County could not memorialize pre-existing measures in the permit," and that the Service concluded that management of the property was going to improve with respect to the existing requirements. ECF 80 (R&R) at 17. First, the *County's* actions are not relevant to Plaintiffs' claims in this case. Second, regarding the Service's conclusion that the off-site mitigation provided enough of an environmental benefit to either comply with the requirements of ESA Section 10, 50 C.F.R. §§ 17.22(b)(2)(i)(B), 17.32(b)(2)(i)(B), or to mitigate impacts to below a "significance" threshold, Plaintiffs' motion demonstrated that the Service acted arbitrarily and capriciously.

Specifically, the Service's "minimization and mitigation" finding relied on conservation restrictions the Developers proposed on an off-site mitigation parcel of property owned by University of Miami (UM). But the off-site conservation restrictions that the Service credited to this Project were already largely embodied in existing, recorded deed restrictions.

Although the R&R acknowledges that the UM site was "subject to prior land use restrictions," ECF 80 (R&R) at 16, it incorrectly states that Plaintiffs did not provide authority

indicating pre-existing restrictions should not be credited to the permitted project. *Id.* at 17. In fact, Plaintiffs cited in their motion 16 U.S.C. § 1539(a)(2)(B)(ii), which requires the Service to find that "the applicant will . . . minimize and mitigate the impacts of [species take]." Plaintiffs also cited *Pacificans for a Scenic Coast v. California Department of Transportation*, 204 F. Supp. 3d 1075, 1088 (N.D. Cal. 2016), which found that the approval of a transit project was arbitrary where the Service credited as mitigation a proposal to preserve a 5.14-acre site that was already under a preservation easement. The court explained that the Service is required to "assess[] the net effect of the overall project" including adverse effects from the project and "mitigation designed to offset them." *Id.* at 1088.  Where a proposed mitigation site is already under a conservation requirement, it "could not be considered a new mitigation measure." *Id.; see also Gerber v. Norton*, 294 F.3d 173, 183 (D.C. Cir. 2002) (discussing the "problem" that "an open-space covenant already existed on the mitigation site, thus drawing into question whether placing a conservation easement on the site added anything to existing protections"). Thus, contrary to the R&R's conclusion, mitigation measures that are part of "pre-existing" requirements are actually not any *new* mitigation at all, and the Service's reliance on the off-site mitigation to comply with the ESA or NEPA was arbitrary.

The HCP relies on UM's off-site mitigation area to offset species impacts from the Project, HCP at 79, 119–21, which the Service required to better compensate for the Project's impacts. ECF 36-2 (SOF) at 6. The UM property offered as off-site mitigation, however, is already subject to deed restrictions that require preservation and protection of the site. ECF 36-21 (HCP App. O) at 10-11, 18-20. The restrictions were imposed after consultation between the federal government and UM for the conveyance of the property to UM in 2000. *Id.* at 3 (HCP App. O, Quitclaim Deed at 2). The existing restrictions include prohibitions on construction, removal of vegetation, and excavation, *id.*; that the land must "remain predominantly in its natural condition," *id.* at 9 (HCP App. O, Declaration of Restrictions on Deed); and, that "[a]ctivities detrimental to drainage, flood control, water conservation, soil conservation, or fish and wildlife habitat Preservation" are prohibited. *Id.*  A "conservation management plan" was incorporated as part of the deed restriction, which requires periodic removal of exotic vegetation by hand or through chemical treatment, or prescribed burning every 3 to 5 years. ECF 36-21 (HCP App. O) at 10-11, 18-20. Hence, the proposed off-site mitigation that the Service used to

authorize this Project was illusory and provided no new conservation benefit to mitigate the Project's impacts since the site is already under a conservation deed restriction.

To be sure, the 2000 deed restriction on the UM site was prompted by concern over deltoid spurge, which was listed as an endangered species at the time. *Id.* at 2. Since 2000, an additional twelve species are covered that will be impacted by the Project. ECF 71-1 at 8. But the R&R's statement that the outstanding conservation requirements "pertain[] to only one species," ECF 80 (R&R) at 17, is in error. Whether protected for one species or for twenty, the UM site is already protected, and the Service's double-counting contravenes Section 10's mandate that the Service find that the applicant "to the maximum extent practicable, minimize and mitigate the impacts of taking," 16 U.S.C. § 1539(a)(2)(B)(ii), so as to create an *added* conservation benefit. *See Pacificans*, 204 F. Supp. 3d at 1088. Moreover, because the off-site mitigation does not mitigate for the impacts of this Project, it cannot be offered as rationale for reaching a Finding of No Significant Impact. *Infra* Section IV(A).

## VI. THE R&R RECITES DEFENDANTS' POSITION WITHOUT INDEPENDENTLY ANALYZING PLAINTIFFS' ARGUMENTS WITH RESPECT TO THE SERVICE'S FAILURE TO PRODUCE AN ENVIRONMENTAL IMPACT STATEMENT OR MAKE ITS FINDING OF NO SIGNIFICANT IMPACT AVAILABLE FOR 30 DAYS

### A. The Service Erred in Finding that the Project Would Not Significantly Impact the Human Environment

The R&R errs by ignoring applicable caselaw from the Eleventh Circuit that holding that where there is doubt as to the benefits of a project or the project's true impact on listed species, the Service should treat such unknowns as significant and conduct an environmental impact statement. *Sierra Club v. Norton*, 207 F. Supp. 2d 1310 (S.D. Ala. 2002). Under NEPA, federal agencies "shall" prepare an EIS on all major federal actions that "significantly affect" the environment. 42 U.S.C. § 4332(C). The Council on Environmental Quality's regulations implementing NEPA require that federal agencies consider "significance" factors in determining whether an action may have a significant affect warranting an EIS, including: the unique characteristics of the geographic area; the degree to which the environmental effects of the proposed action are highly controversial; and, the degree to which the action may adversely affect a listed species or its habitat. 40 C.F.R. § 1508.27. Here, all of these factors are present.

#### 1. *The geographic area has unique characteristics*

The Service has repeatedly emphasized the rarity of once-vast pine rocklands and the significance of this site in particular, including as occupied habitat for numerous endangered and

threatened species.  See, e.g., ECF 4-7 (Ex. 1, ITP) at 2; ECF 4-11 (Ex. 5, EA) at 71; ECF 4-9 (Ex. 3, BO) at 33, 130; ECF 6 (Ex. 6, Comments by Roger L. Hammer) at 3; ECF 4-10 (Ex. 4, HCP) at 10, 136.  Regardless of how one qualifies the habitat quality of the Project area, it is indisputable that it includes some of the last remaining habitat for the species covered in the ITP, and its destruction for apartments and a big box store would render it completely uninhabitable. The record is replete with information about the Project site that explains its uniqueness; nothing in the record refutes the conclusion that the Project site is unique.

### 2.  The effects of the project are highly controversial

The R&R incompletely recites Plaintiffs' position with respect to the degree to which the effects of the Project are highly controversial. ECF 80 (R&R) at 21-22. Plaintiffs argue that: (1) the Project is very controversial as evidenced by the public comments the Service received; *and* (2) there is controversy as to the effects of the Project, which is also evidenced by the public comments the Service received. ECF 4 (Plaintiffs' Motion for TRO/PI) at 17. Notably, the R&R does not make a finding as to whether there was either, but in particular, the latter kind of controversy in this case, and instead states in passing that even if "there was a legitimate controversy. . . that finding would not be fatal." ECF 80 (R&R) at 22 (citing 40 C.F.R. 1508.27(b) for the proposition that "controversy" is one of several factors).

### 3.  The action may adversely affect listed species and their habitat

As Plaintiffs explained in their briefing and at the hearing, ECF 77-2 at 40-41, in *Sierra Club v. Norton*, 207 F. Supp. 2d 1310 (S.D. Ala. 2002), the court found that the Service's issuance of take permits for the Alabama beach mouse were unlawful because the Service's arbitrary decision that the loss of 20 percent of the optimal habitat in the action area would have no significant impact on the mouse. Rather than proffer the relevant total population, population density, and distribution or viability data, the Service instead relied upon a habitat-based analysis. *Id.* at 1316.  The court rejected this analysis because the Service's environmental assessment made clear that the Service did not know what effect the loss of optimal habitat will have on the species nor what minimum habitat requirements are necessary for the survival and recovery of the species. *Id.* The court noted:

> An environmentally significant action need not involve a threat of extinction to a federally-protected species. Lesser impacts, including impacts on non-listed species, constitute a significant effect. However the involvement of a federally protected threatened or endangered species and the possibility of a threatened impact as potentially serious as extinction or extirpation from a traditional habitat

16

are factors weighing in favor of a finding of significance. Another factor of particular relevance in this action is the existence of uncertainty regarding the environmental effect of the proposed action.

*Id.* at 1322.

In *Norton*, the developers asserted the development would impact .35 acres of mouse critical habitat and that they would set aside in perpetuity for conservation 105.5 acres of the 196.5 acres tract, and reslope and replant sand dunes. *Id.* at 1325. The court found that the record clearly demonstrated the development was expected to destroy 58.9 acres of beach mouse habitat, including 34.5 acres of optimal habitat. *Id.*

The court found that it was "almost beyond question that the destruction of 20% of an endangered species' "optimal habitat" (defined to include all habitat needed by the species) . . . of approximately 20%, for a species which was rendered endangered by pre-listing losses of habitat, will have an impact on that species which is 'significant' under any reasonable definition of that term." *Id.* at 1326. Relevant to the matter before this Court, the court in *Norton* found:

> Despite the fact that the FONSI list and addresses each of the FONSI lists and addresses each of the ten factors . . . the FWS does not clearly state how it weighed or balanced those factors or how it reached its determination of no significant impact under that framework. Nor, despite the inclusion of large amounts of data, findings and analysis, has the agency answered how such a large absolute and relative habitat loss can be said to not be significant.

*Id.* at 1326-27. Likewise here, this Court should not accept the Service's "largely implicit conclusion" that the effects of this habitat loss is so insignificant that preparation of an EIS is not required. *Id.* at 1329.

Like the Alabama beach mouse, the species at issue here have all been found by the Service to be threatened with extinction, extirpated from much of their original habitat, and suffering severe declines in population and available habitat due to the alteration of their ecosystems due to residential and commercial development and vegetational succession. *Compare id.* at 1323 *with* ECF 1 (Complaint) at 17-23. Moreover, like the Alabama beach mouse, the Bartram's scrub hairstreak butterfly and Florida leafwing—the only two species for which the Service has complied with its legal obligation to designate critical habitat[19]—have

---

[19] The ESA requires that the Service designate critical habitat concurrently with listing a species as endangered or threatened. 16 U.S.C. 1533. The Service listed the eastern indigo snake on January 31, 1978, the Florida bonneted bat on November 1, 2013, and the Miami tiger beetle on November 4, 2016. But the Service has yet to designate critical habitat for these species. This

critical habitat designated for which the Service has determined the preservation is essential to the continued survival and recovery of the species. ECF 4-9 (Ex. 3, BO) at 53-59.

> **B.      The Service has not met its Obligation to Independently Conclude that the Developers Will Minimize and Mitigate the Impact of the Taking**

Under the ESA it is unlawful to take a listed species without a Service-issued ITP. The Service is to issue such a permit if it finds that, among other things, "the applicant will, to the maximum extent practicable, minimize and mitigate the impact of such taking." 50 C.F.R. § 17.22(b)(2).

In *Sierra Club v. Babbitt*, the Southern District of Alabama held that the Service violated the ESA and NEPA because its decision to issue two incidental take permits for housing construction that would permanently destroy 44 acres of occupied Alabama beach mouse habitat and an undetermined number of mice was arbitrary, capricious, and without sufficient basis in the record. 15 F. Supp. 2d 1274 (S.D. Ala. 1998). The plaintiffs argued that there was no reviewable basis in the administrative record for the court to determine whether the amount of mitigation funding will minimize and mitigate the harm to the Alabama beach mouse to the maximum extent practicable as required by the ESA. *Id.* at 1279. The court found that there was nothing in the administrative record explaining or providing any analysis as to whether the amount of off-site mitigation required was "to the maximum extent practicable" nor any explanation regarding inconsistent mitigation policies. *Id.* at 1281.

As in *Sierra Club v. Babbitt*, the Service here violated NEPA in failing to prepare an environmental impact statement because it based its decision on assumptions, presumptions, and conclusions rather than on evidence or data in the record. *Id.* at 1284. In *Norton*, the Service and developers asserted that even if the project may have a significant impact on the mouse, the impact would be mitigated to insignificant by the proposed mitigation. 207 F. Supp. 2d at 1330. The court first found that although the conservation plan promised benefits to 105.5 acres, the loss of 20 percent of the habitat in the action area could be a significant environmental impact "regardless of what beneficial measures may also exist," and that "admittedly beneficial and admittedly minimizing many of the lesser adverse effects of this action, do nothing to lessen the irreducible destruction of habitat found by the agency." 207 F. Supp. 2d. at 1330. Most directly

_____

failure is in violation of the ESA and does not indicate that the species do not have habitat that is essential to their continued survival and recovery.

relevant to this case, the court in Norton found "[e]ven if the court were to presume that the HCP would completely reduce any effect on that 105.5 acres portion of the 196.5-acre tract at issue to insignificance, the HCP will not 'undo' that destruction, and will not create new habitat to replace that lost through this construction." 207 F. Supp. 2d at 1330-31.

### C.   The Service Unlawfully Failed to Make the FONSI Available to the Public for 30 Days Prior to Taking Action

Defendants posit, and the R&R repeats without independent analysis, the hollow claim that Plaintiffs have failed to explain how the four factors requiring that the Service make a FONSI available for 30 days prior to taking action have been met here. ECF 32 (Opp'n to Pls.' Mot. for PI) at 14; ECF 80 (R&R) at 19. Here, each of the four factors are met. *See* 550 FW 3.3(B)(4)(c) (factors for when to make FONSI available for 30 days).

First, this was a borderline case. *See Id.* at 3.3(B)(4)(c)(i). It is not disputed that the Project that would destroy— wholesale—approximately 86.5 acres of unique land that provides habitat for 22 sensitive species to make way for development that would make the prescribed burns even more impractical. ECF 4-10 (Ex. 4, HCP) at 2, 55. Even if the impact would be beneficial, as Defendants claim, for the reasons cited above, this is a case in which the Service could have found that such a project may have significant impacts, *i.e.* it was a borderline case. Second, this was clearly an unusual or precedent-setting action because the issuance of a take permit was predicated on a never-before-seen-or-tested HFA. This is precisely the kind of unusual or precedent-setting action contemplated by the regulation. *See* 550 FW 3.3(B)(4)(c)(ii). Third, all parties agree that the Service's approval of the Project was in spite of well-documented scientific and public controversy regarding its nature, size, and impacts. ECF 6 (Excerpted Public Comments). Therefore, this Project was a matter subject to scientific or public controversy warranting the invocation of this provision. 40 C.F.R. §§ 1501.4(e)(2)(i), 1508.27(b)(4); 550 FW 3.3(B)(4)(c)(iii). Finally, this is the sort of action that normally would require an EIS for the reasons stated above. 40 C.F.R. § 1501.4(a)(1); 550 FW 3.3(B)(4)(c)(iv); *supra* IV.A.

## VII.   <u>CONCLUSION</u>

De novo review of the R&R demonstrates its numerous factual and legal errors. Beyond those already detailed, and important for the resolution of this motion, the R&R uncritically accepts at face value the Developers' unsupported statement at the PI hearing that the site consisted of only 33 acres of pine rocklands, of which 31 were cleared before this Court could

issue temporary injunctive relief,[20] which would leave only two remaining acres of pine rocklands on the site, perhaps suggesting that the worst of the Developers' devastation had already come to pass. ECF 77-2 (Tr.) at 109-110, 125.  In fact, the record shows that the Project would destroy approximately 86.5 acres in the Richmond pine rockland and upland, exceptionally rare habitat. *See* ECF 4-11 (EA) at 2, 8, 22-27; ECF 4-10 (HCP) at 2, 9.  Assuming that Developers' claims that they have destroyed 31 acres so far are true, more than 53 acres remain in status quo and continue to provide some benefits to listed species. The R&R erred in accepting the Defendants' unverified claims, which are contrary to the record.

Perhaps more importantly, this conclusion ignores Plaintiffs' arguments at the hearing and in the reply brief that even if the Developers managed to rapidly clear 31 acres, causing irreparable harm by directly killing and displacing plants and animals, this land could be rehabilitated, which would prevent further irreparable harm that would arise once Developers paved over the land. *See* ECF 77-2 (Tr.) at 185-187; ECF 53 (Reply) at 2-3.

For the foregoing reasons, the Court should reject the R&R, ECF 80, and grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse
Miami, Florida  33133
Telephone:     (305) 858-2900
Facsimile:     (305) 858-5261

By:     s/   Paul J. Schwiep
Paul J. Schwiep, FBN 823244
PSchwiep@CoffeyBurlington.com
**Secondary:**     YVB@CoffeyBurlington.com
**Tertiary:**     service@CoffeyBurlington.com

Jaclyn Lopez, FBN 96445
JLopez@BiologicalDiversity.org
Elise Pautler Bennett, FBN 106573
EBennett@BiologicalDiversity.org

---

[20] The Developers' own declarant states that somehow the Developers had advance notice of the ITP such that they were able prepare for and to commence ground-clearing activities "early" on December 5, 2017, Wilson Declaration (ECF No. 34-2) ¶ 17, many hours before the public and Plaintiffs were informed of the Permit issuance at 3:13 p.m.  ECF No. 5-17.

CENTER FOR BIOLOGICAL DIVERSITY
Post Office Box 2155
St. Petersburg, Florida  33731
Telephone:      (727) 490-9190 (J Lopez)
Telephone:      (727) 755-6950 (E Bennett)
Facsimile:      (520) 623-9797

Amy R. Atwood, Esq. *(admitted pro hac vice)*
Atwood@BiologicalDiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
Post Office Box 11374
Portland, Oregon  97211
Telephone:      (971) 717-6401
Facsimile:      (503) 283-5528

John Peter Rose *(admitted pro hac vice)*
JRose@BiologicalDiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
660 South Figueroa Street, Suite 1000
Los Angeles, California  90017
Telephone:      (213) 785-5406
Facsimile:      (213) 785-5748

***Counsel for Plaintiffs***

## **REQUEST FOR HEARING**

Pursuant to S.D. Fla. L.R. 7.1(b), Plaintiffs respectfully request that the Court convene a hearing on these Objections. While Plaintiffs believe that the errors in the R&R are patent, oral argument may be of value of to the Court as it would allow counsel to provide the Court with demonstrative presentations of the site at issue and the harms that will occur if a preliminary injunction is not entered, and would permit counsel to detail the legal arguments in support of the Objections.  Counsel request that the forty-five minutes be allotted to present these Objections; one hour for any opposition; and, fifteen minutes for rebuttal.

Case No. 1:17-cv-24444-UU

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 31, 2018, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

<u>s/  Paul J. Schwiep</u>

| Service List | |
|---|---|
| **George S. LeMieux, Esq.**<br>GLemieux@gunster.com<br>**Angel A. Cortiñas, Esq.**<br>ACortinas@gunster.com<br>**Luna E. Phillips, Esq.**<br>LPhillips@gunster.com<br>**Jonathan H. Kaskel, Esq.**<br>JKaskel@gunster.com<br>GUNSTER<br>600 Brickell Avenue, Suite 3500<br>Miami, Florida  33131<br>Telephone:   (305) 376-6000<br>Facsimile:   (305) 376-6010<br>Secondary:   NSalazar@gunster.com<br>JBuck@gunster.com<br><br>*Counsel for Intervenor Defendants Coral Reef Retail, LLC, Coral Reef RESI PH 1, LLC, and RAMDEV LLC* | **Martin J. Alexander, Esq.**<br>Martin.Alexander@hklaw.com<br>**Rafe Petersen, Esq.** *(admitted pro hac vice)*<br>Rafe.Petersen@hklaw.com<br>**Aaron Heishman, Esq.** *(admitted pro hac vice)*<br>Aaron.Heishman@hklaw.com<br>HOLLAND & KNIGHT<br>701 Brickell Avenue, #3300<br>Miami, Florida  33131<br>Telephone:   (305) 374-8500<br>Secondary:   Carmen.Ramsey@hklaw.com<br><br>*Counsel for Intervenor Defendants Coral Reef Retail LLC, Coral Reef RESI PH1 LLC and RAMDEV LLC* |
| **Mark Arthur Brown**<br>Senior Trial Attorney<br>Mark.Brown@usdoj.gov<br>U.S. Department of Justice<br>Environmental and Natural<br>   Resources Section<br>Wildlife and Marine Resources Section<br>Post Office Box 7611<br>Washington, D.C.  20044-7611<br>Telephone:   (202) 305-0204<br>Facsimile:   (202) 305-0275 | **Mark A. Salky, Esq.**<br>salkym@gtlaw.com<br>**Eva M. Spahn, Esq.**<br>spahne@gtlaw.com<br>GREENBERG TRAURIG, P.A.<br>333 SE 2 Avenue, Suite 4400<br>Miami, Florida  33131<br>Telephone:   (305) 579-0500<br>Facsimile:   (305) 579-0717<br>Secondary:   burkek@gtlaw.com<br>FLService@gtlaw.com<br>cryzm@gtlaw.com |

| | |
|---|---|
| **Lucinda J. Bach**<br>Trial Attorney<br>Lucinda.Bach@usdoj.gov<br>U.S. Department of Justice<br>Environmental and Natural<br>    Resources Division<br>Natural Resources Section<br>601 D Street, NW<br>Washington, D.C.  20044<br>Telephone:   (202) 616-9663<br><br>***Counsel for Federal Defendants***<br><br>**Vicki Mott**<br>Attorney-Advisor<br>Vicki.Mott@sol.doi.gov<br>U.S. Department of the Interior<br>Office of the Regional Solicitor<br>Southeast Region<br>75 Ted Turner Drive SW, Suite 304<br>Atlanta, Georgia  30303<br>Telephone:   (404) 331-0722 x233<br><br>***Of Counsel for Federal Defendants*** | ***Counsel for University of Miami*** |