# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:17-cv-24444-UU

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

       *Plaintiffs,*

          v.

RYAN ZINKE, in his official capacity as Secretary of the U.S. Department of the Interior; *et al.*,

       *Defendants*,

and

CORAL REEF RETAIL, LLC, *et al.*,

       *Intervenor Defendants.*

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

# **TABLE OF CONTENTS**

Page

TABLE OF CITATIONS ...................................................................................................... ii

I.   STANDARD OF REVIEW ........................................................................................ 1

II.   ARGUMENT ............................................................................................................ 2

    A.   FWS Failed to Ensure that CRC will not Jeopardize the Existence of Listed Species. 3

        1.   FWS's No-Jeopardy Determinations Are Arbitrary and Capricious. ................... 3

        2.   FWS Failed to Satisfy Procedural Requirements of the ESA. ........................... 5

            a.   FWS Improperly Conflated the "Action Area" with the "Plan Area." ....... 5

            b.   FWS Failed to Use the Best-Available Scientific Information. .................. 5

            c.   FWS's Use of the HFA Instead of Surveys Resulted in an Unlawful Incidental Take Statement. ......................................................................... 7

            d.   RAM's Mitigation Measures Should Have Been Factored into the Environmental Baseline, Not as Mitigation or Minimization Measures. ... 8

    B.   FWS Arbitrarily Reversed Course in its NEPA Review of CRC. ............................... 9

        1.   FWS arbitrarily reversed course by ordering its staff to not prepare an Environmental Impact Statement. .................................................................... 10

        2.   FWS arbitrarily failed to prepare an Environmental Impact Statement despite CRC's significant impacts to the human environment. ..................................... 11

            a.   In the context of globally imperiled pine rockland impacts, CRC may significantly impact this geographic area's unique characteristics. .......... 13

            b.   CRC's effects are highly controversial. .................................................... 14

            c.   The action may adversely affect listed species and their habitat. ............. 15

        3.   FWS deprived the public and itself of valuable information. ........................... 17

    C.   Plaintiffs have Standing to Bring the Claims in Their First Amended Complaint. .... 19

    D.   The Court Should Set Aside the ITP and Order the Parties to Negotiate Terms of Injunctive Relief for FWS's ESA Violations. ........................................................... 19

III.  CONCLUSION. ...................................................................................................... 20

# <u>TABLE OF CITATIONS</u>

<u>Page</u>

**Cases**

*Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs,*
    833 F.3d 1274 (11th Cir. 2016) ................................................................. 4, 19, 20

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
    789 F.3d 1075 (9th Cir. 2015) ......................................................................... 19

*Ctr. for Biological Diversity v. Animal & Plant Health Inspection Serv., No. 10-14175-CIV,*
    2011 U.S. Dist. LEXIS 115905 (S.D. Fla. Oct. 6, 2011) ................................. 14

*Ctr. for Biological Diversity v. BLM,*
    698 F.3d 1101 (9th Cir. 2012) ........................................................................... 9

*Defenders of Wildlife v. Salazar,*
    877 F. Supp. 2d 1271 (M.D. Fla. 2012) .......................................................... 11

*Fla. Key Deer v. Paulison,*
    522 F.3d 1133 (11th Cir. 2008) ......................................................................... 4

*Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,*
    404 F. Supp. 2d 1352 (S.D. Fla. 2005) ........................................................... 15

*Florida Key Deer v. Brown,*
    364 F.Supp.2d 1345 (U.S. Dist. Ct. S.D. Fla. 2005) ...................................... 3, 4

*Found. for N. Am. Wild Sheep v. USDA,*
    681 F.2d 1172 (9th Cir. 1982) ......................................................................... 15

*Friends of the E. Fork, Inc. v. Thom,*
    688 F. Supp. 2d 1245 (W.D. Wash. 2010) ........................................................ 9

*Grand Canyon Trust v. FAA,*
    290 F.3d 339 (D.C. Cir. 2002) ................................................................... 12, 13

*Great Old Broads For Wilderness v. Kempthorne,*
    452 F. Supp. 2d 71 (D.D.C. 2006) .................................................................. 12

*Hill v. Boy,*
    144 F.3d 1446 (11th Cir. 1998) ....................................................................... 17

*Miccosukee Tribe of Indians of FL v. U.S.,*
    420 F. Supp. 2d 1324 (S.D. Fla. 2006) .............................................................. 1

*Miccosukee Tribe of Indians v. United States,*
    566 F.3d 1257 (11th Cir. 2009) ................................................................. 6, 7, 8

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................................... 2, 6

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    361 F.3d 1108 (9th Cir. 2004) .................................................................................. 12

*Ouachita Watch League v. Jacobs*,
    463 F.3d 1163 (11th Cir. 2006) .................................................................................. 1

*Sierra Club v. Babbit*,
    15 F. Supp. 2d 1274 (S.D. Ala. 1998) ............................................................... passim

*Sierra Club v. Glickman*,
    156 F.3d 606 (5th Cir. 1998) .................................................................................. 4, 6

*Sierra Club v. Marsh*,
    816 F.2d 1376 (9th Cir. 1987) ..................................................................................... 4

*Sierra Club v. Norton*,
    207 F. Supp. 2d 1310 (S.D. Ala. 2002) ............................................................... 15, 16

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    295 F.3d 1209 (11th Cir. 2002), and "hold unlawful and set aside ..................... 1, 11

*Sierra Club v. U.S. Forest Serv.*,
    843 F.2d 1190 (9th Cir. 1988) ................................................................................... 15

*Sierra Club v. Van Antwerp*,
    719 F. Supp. 2d 77 (D.D.C. 2010) ............................................................................ 19

*Swan View Coal. v. Barbouletos, CV06-73-M-DWM*,
    2008 U.S. Dist. LEXIS 108211 (D. Mont. June 13, 2008) .......................................... 8

*Town of Golden Beach v. U.S. Army Corps of Eng'rs, No. 94-1816 CIV*,
    1994 U.S. Dist. LEXIS 15832 (S.D. Fla. Sept. 22, 1994) ......................................... 18

*TVA v. Hill*,
    437 U.S. 153 (1978) .................................................................................................... 5

**Statutes**

5 U.S.C. § 704 ............................................................................................................... 1

5 U.S.C. § 706(2)(A) ..................................................................................................... 2

5 U.S.C. § 706(A)(2) ................................................................................................... 19

16 U.S.C. § 10(a)(2)(B)(ii) ............................................................................................ 9

16 U.S.C. § 1533(a)(3) .................................................................................................. 17

16 U.S.C. § 1536(a)(2) .............................................................................................. 3, 5, 6

16 U.S.C. § 1536(b)(3)(A) .............................................................................................. 6

16 U.S.C. § 1536(b)(4)(C) .............................................................................................. 8

16 U.S.C. § 1539(a)(2)(B)(ii) .......................................................................................... 9

16 U.S.C. § 1540(g) ........................................................................................................ 2

16 U.S.C. § 1540(g)(4) ............................................................................................. 1, 20

28 U.S.C. § 2412 ...................................................................................................... 1, 20

42 U.S.C. § 4331(b) ...................................................................................................... 18

42 U.S.C. § 4332(2)(C) ................................................................................................. 10

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................... 2

Federal Rule of Civil Procedure 54(d); and (11) .................................................... 1, 20

**Regulations**

40 C.F.R. § 1500.1(b) .................................................................................................... 18

40 C.F.R. § 1500.1(b)-(c) .............................................................................................. 10

40 C.F.R. § 1501.4(a)(1) ............................................................................................... 18

40 C.F.R. § 1501.4(e) .................................................................................................... 11

40 C.F.R. § 1501.4(e)(2) ............................................................................................... 18

40 C.F.R. § 1506.6(c)(1) ............................................................................................... 10

40 C.F.R. § 1508.27(4) ............................................................................................ 11, 17

40 C.F.R. § 1508.27(b)(3) ............................................................................................. 13

40 C.F.R. § 1508.27(b)(4) ............................................................................................. 14

40 C.F.R. § 1508.27(b)(9) ............................................................................................. 15

40 C.F.R. §§ 1501.3, 1501.4, 1508.9 ........................................................................... 10

50 C.F.R. Part 17 ................................................................................................................ 9

50 C.F.R. Part 402 .............................................................................................................. 5

50 C.F.R. § 402.14(c) .......................................................................................................... 6

50 C.F.R. § 402.14(d) .......................................................................................................... 6

50 C.F.R. § 402.14(h) .......................................................................................................... 6

50 C.F.R. § 402.16 .............................................................................................................. 7

50 C.F.R. § 402.2 ................................................................................................................ 5

50 C.F.R. § 502.14(i)(1)(i) .................................................................................................. 7

50 C.F.R. §§ 402.14 ........................................................................................................ 8, 9

50 C.F.R. §§ 1500.1(a)–(c) .............................................................................................. 18

**Other Authorities**

H.R. Conf. Rep. No. 697 ...................................................................................................... 7

Plaintiffs move for summary judgment on all Counts in their First Amended Complaint (ECF No. 95). For the reasons set forth below,[1] Defendants Ryan Zinke, Greg Sheehan, and Jim Kurth, in their official capacities; U.S. Department of the Interior; and U.S. Fish and Wildlife Service (collectively, "FWS") violated the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and the Endangered Species Act ("ESA" or "Act") when FWS approved an incidental take permit ("ITP") to kill and displace federally protected plants and animals to construct a shopping plaza and apartments.

Plaintiffs request that the Court: (1) declare FWS's decision to issue the ITP violates NEPA and the APA; (2) declare FWS's biological opinion ("BO") violates the ESA and APA; (3) declare FWS's reliance on the BO violates the ESA; (4) declare FWS's environmental assessment ("EA") violates NEPA; (5) vacate permit no. TE15009C-0; (6) vacate the BO and its incidental take statement and remand to FWS to prepare a BO that complies with the mandates of the ESA; (7) vacate the EA and FONSI and remand to FWS to prepare an Environmental Impact Statement ("EIS"); (8) enjoin FWS from authorizing any further action under TE15009C-0 until it fully complies with the requirements of NEPA and the APA; (9) order FWS to take all feasible and practicable steps necessary to restore and recover habitat that was altered or destroyed; (10) award Plaintiffs their costs and reasonable attorneys' fees pursuant to the ESA, 16 U.S.C. § 1540(g)(4), Equal Access to Justice Act, 28 U.S.C. § 2412, and Federal Rule of Civil Procedure 54(d); and (11) award Plaintiffs any other relief that is just and proper.

## I.        STANDARD OF REVIEW

Review of agency actions, including decisions under the ESA and NEPA, is provided by the APA. 5 U.S.C. § 704; *Miccosukee Tribe of Indians of FL v. U.S.,* 420 F. Supp. 2d 1324, 1332 (S.D. Fla. 2006); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1169 (11th Cir. 2006). The reviewing court must review the administrative record, *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002), and "hold unlawful and set aside agency action,

---

[1] Plaintiffs incorporate by reference arguments made in their Motion for Temporary Restraining Order and/or Preliminary Injunction, Consolidated Reply in Support of Temporary Restraining Order and/or Preliminary Injunction, Objections to Magistrate Judge's Report and Recommendation, and Consolidated Reply to Responses to Opposition (ECF Nos. 4, 53, 82, and 93) and including arguments made during the hearing on January 3, 2018.

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is "arbitrary and capricious" if:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II.      ARGUMENT

FWS's decision to issue an ITP to destroy rare forest crucial to the survival of endangered and threatened species is arbitrary and capricious, and violates the ESA, NEPA, and the APA. Most troubling, FWS issued the permit without knowing how species would be impacted, positively or negatively, by Coral Reef Commons ("CRC") because it relied on a self-serving "Habitat Functional Assessment" ("HFA") to characterize the impact of CRC on the pine rocklands produced and closely guarded by Coral Reef Retail LLC, Coral Reef RESI PH 1 LLC, and RAMDEV LLC (collectively, "RAM"). In addition to previously raised claims, Plaintiffs now raise two substantive violations of the ESA.[2] As the Administrative Record ("Record") reveals,[3] FWS rushed environmental review and issued the ITP even though it lacked the requisite scientific and rational basis to do so. This not only violates the ESA's and NEPA's procedural requirements, but also FWS's substantive statutory mandate under those laws to carefully review the environmental impacts of its decisions and ensure they will not jeopardize a species' very existence. Therefore, this Court should find that FWS failed to ensure that CRC will not jeopardize the existence of listed species, and that it violated NEPA and the APA by arbitrarily deciding not to produce an EIS.

---

[2] Due to the ESA's jurisdictional 60-day notice requirement, 16 U.S.C. § 1540(g), the Court did not have jurisdiction to adjudicate Counts III & IV when Plaintiffs filed their original complaint on December 8, 2017. ECF 1. Plaintiffs raise those claims here.
[3] When this Court denied Plaintiffs' motion for preliminary injunction, FWS had not yet filed the Record.

**A.    FWS Failed to Ensure that CRC will not Jeopardize the Existence of Listed Species.**

FWS's determination that CRC is not likely to jeopardize endangered or threatened species or destroy or adversely modify critical habitat was arbitrary and capricious and contrary to law because FWS failed to satisfy the ESA's stringent procedural requirements, as it must to meet its duty to avoid jeopardy pursuant to ESA section 7(a)(2). 16 U.S.C. § 1536(a)(2). To jeopardize the continued existence of the species is to engage in an activity that either, "directly or indirectly . . . reduces appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[4]

1.    FWS's No-Jeopardy Determinations Are Arbitrary and Capricious.

Because CRC may compromise species' survival by destroying and fragmenting their habitat, AR 3 at 85, 86, FWS's no-jeopardy determination was arbitrary and capricious. CRC will "take"—kill, harm, or harass—at least 20 Richmond Pine Rocklands ("Richmond Rocklands") species, AR 3 at 62–63, as well as a significant portion of the largest intact pine rocklands forest left outside Everglades National Park, which is important to the near- and long-term survival of the Miami tiger beetle ("Beetle"), Bartram's scrub-hairstreak butterfly ("Bartram's"), and other species in the face of development and sea-level rise. AR 3 at 88–90; AR 3 at 119.

For example, the Beetle occurs in just two places on Earth, one population in the Richmond Rocklands and a much smaller population nearby, AR 3 at 134. CRC will destroy 9.35 percent of its occupied habitat in the Richmond Rocklands and 8.15 percent of its habitat overall, AR 116 at 3017, att. 2 at *4. It will also kill the rare Beetles and ultimately divide the largest population into two smaller, isolated ones with low chances for genetic exchange, population growth, or recovery. *Id.*; Wirth Decl. at 2–4 (citing "an increased probability of extirpation and extinction"). Bartram's and the Florida leafwing butterfly ("Leafwing") also exist in similarly limited areas, AR 3 at 96, AR 119 at 3020, att. 1 at *1, and will lose ecologically significant habitat to CRC. AR 3 at 100 (40 percent of Bartram's only host plant on site destroyed); AR 119 at 3020, att. 1 at *4 (9.35 percent of "potentially occupied" Leafwing critical

---

[4] *Florida Key Deer v. Brown*, 364 F.Supp.2d 1345, 1359 (U.S. Dist. Ct. S.D. Fla. 2005) (citing 50 C.F.C. § 402.02).

habitat in the Richmond Rocklands, and 0.67 percent of all its habitat will be destroyed). This habitat is "some of the last remaining refugia" from extinction as rising seas inundate more than 75 percent of all pine rocklands. AR 119 at 3020, att. 1 at *4; AR 3 at 111, 112.

FWS should have considered CRC's effects to each of these species. *See Sierra Club v. Glickman*, 156 F.3d 606, 616 (5th Cir. 1998) ("[A]gencies must consult with FWS as to each of the listed species, not just undertake a generalized consultation . . . ."); *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1146 (11th Cir. 2008) (quoting *Glickman*). Instead, FWS used the HFA to conclude that CRC will not jeopardize any of the species' existence, AR 3 at 93–94, and in doing so arbitrarily failed to provide a satisfactory explanation for its conclusions and failed to consider relevant factors. *Fla. Key Deer v. Brown*, 364 F. Supp. 2d 1345, 1349 (S.D. Fla. 2005).

For instance, the HFA does not consider the specific habitat needs of the Beetle or the Florida bonneted bat ("Bat"). The Beetle requires patches of sandy soil at forest edges, AR 3 at 131; AR 269 at 42253, and the Bats prefers "relatively open" areas with open water for hunting, AR 3 at 175, but the HFA does not factor in those habitat features; it simply applies the same six generic factors, which do not capture the Beetle's and Bat's needs. AR 4 at 348; AR 3 at 92 (RAM's model is "spatially explicit" not "species specific").[5] In fact, FWS admitted that the HFA does not factor in the "increased value" of cleared areas for the Beetle because it considers those areas to have "low functional value as pine rockland habitat," meaning "the net effect of habitat lost and habitat preserved . . . could be a decrease" in conservation value for the Beetle. AR 123 at 3024, att. 1 at *2.

FWS also arbitrarily concluded that CRC will not jeopardize the Beetle, Bat, or other endangered species by assuming that CRC will eventually restore more habitat than it destroys. AR 1 at 4–5. But without specifics on *how much* habitat will be improved, Nagano Decl. at 3, for *each* species, *see Paulison*, 522 F.3d at 1146—or how these species will persist until the promised improvements may be realized, *see Sierra Club v. Marsh*, 816 F.2d 1376, 1389 (9th Cir. 1987)—this assumption is patently arbitrary and capricious. *See Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1285 (11th Cir. 2016) (court may only uphold an agency decision "of less than ideal clarity" if its "path may reasonably be discerned"); *Sierra*

---

[5] FWS biologists asked RAM to alter the HFA to incorporate the Beetle's specific soil requirements, AR 133 at 3044, att., but RAM refused. AR 132 at 3042.

*Club v. Babbit*, 15 F. Supp. 2d 1274, 1283 (S.D. Ala. 1998) ("'[F]acts' on which the FWS based its decision appear to be assumptions, presumption, or conclusions themselves" and not based on "any evidence, documents, or data in the . . . Record").[6]

2.   <u>FWS Failed to Satisfy Procedural Requirements of the ESA</u>.

The sole means for FWS to satisfy its duties under ESA section 7(a)(2)—*i.e.*, to ensure that CRC does not jeopardize endangered or threatened species, or destroy or adversely modify critical habitat, 16 U.S.C. § 1536(a)(2)—was to discharge the Act's strict procedural requirements. 50 C.F.R. Part 402. FWS violated these procedures in four primary ways, thereby undermining its ability to ensure against the likelihood of jeopardy. *TVA v. Hill*, 437 U.S. 153, 174 (1978) ("Congress clearly intended that the [agency] give 'the highest of priorities' and the 'benefit of the doubt' to preserving endangered species") (quoting H.R. Conf. Rep. No. 697, 96th Cong., 1st Sess. 12 (1979), *reprinted in* 1979 U.S. Code Cong. & Admin. News 2572, 2576).

a.   <u>FWS Improperly Conflated the "Action Area" with the "Plan Area</u>."

When analyzing a project's impacts on species, FWS must define the action area to include "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.2. Applying this definition to CRC, the action area is the 800-acre Richmond Rocklands, which sustain the protected species and will be fragmented and damaged by CRC. Yet FWS defined the action area as the much smaller "188.86-acre 'Plan Area'" described by RAM, AR 3 at 70, ignoring impacts to whole swaths of surrounding habitat and far-ranging species. Nagano Decl. at 2.

b.   <u>FWS Failed to Use the Best-Available Scientific Information</u>.

FWS was required to "use the best scientific and commercial data available" when evaluating CRC's effects to species. 16 U.S.C. § 1536(a)(2). Anticipating CRC's impacts on endangered species, several of which were already "at or near jeopardy," AR 51 at 2546, FWS

---

[6] FWS's no-jeopardy determination is also arbitrary because the BO relies on prescribed fires to restore pine rocklands (a fire-dependent forest type), even as it doubts the feasibility of "managing smoke and ensuring public safety" in urban settings. AR 3 at 85 ("[L]iability concerns and limited resources have hindered . . . prescribed burning . . . , especially on smaller parcels."); *see also* ECF 4 at 7. FWS dismissed these concerns for the sole reason that CRC residents will be required to "sign documentation acknowledging that fire management activities would occur on the CRC property." AR 3 at 126.

5

biologists asked RAM to provide site-specific species survey data to assess how CRC will result in take, and accordingly, how best to avoid, minimize, or mitigate those adverse effects. AR 48 at 2541, AR 116 at 3017. However, RAM resisted surveying, AR 4498, and FWS acquiesced with no explanation. Because survey methods were developed and extensive surveying had been done for some of the imperiled species nearby, AR 269 at 21123, FWS failed to satisfy the ESA's demand for the best-available scientific information. 16 U.S.C. § 1536(a)(2)

The ESA required FWS to "*detail[]* how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A) (emphasis added); 50 C.F.R. § 402.14(h). FWS's implementing regulations require it to supply descriptions of the "*specific* area" and "*any* listed species or critical habitat" that may be affected, as well as "a description of the manner in which the action may affect *any* listed species or critical habitat." 50 C.F.R. § 402.14(c) (emphases added); *cf. Glickman*, 156 F.3d at 616 ("[A]gencies must consult . . . as to each of the listed species, not just undertake a generalized consultation."). FWS requires the "best scientific and commercial data available" to include all pertinent information "*which can be obtained during the consultation* for an adequate review of the effects that an action may have upon listed species or critical habitat." 50 C.F.R. § 402.14(d) (emphasis added). Here, it cannot be disputed that FWS could have required species- or site-specific data during consultation. AR 189 at 3144; AR 203 at 3173; AR 147 at 3067 at atts. It is axiomatic that "without knowing how many of the species are being destroyed in the project site," FWS "cannot reasonably estimate the extent of the impact the additional takings will pose." *Cf. Sierra Club v. Babbit*, 15 F. Supp. 2d at 1284; *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1275 (11th Cir. 2009) ("[S]pecific population data is required unless it is impractical.").

Given the importance of site surveys to FWS's final decision, the agency was required to at least explain why it would not require RAM to supply surveys or gather the data itself. *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43. No such explanation is in the BO or Record. Survey protocols for the species make clear that surveys were practicable and the data obtainable. AR 147 at 3067 and atts. Without the best available science for each species, FWS failed to meet the requirements of the Act, rendering the BO "arbitrary and capricious" and "not in accordance

with" the ESA. [7] Reliance on RAM's generic and arbitrary HFA is no substitute for using the best available science. *Supra* Part I.A.; *cf. Sierra Club v. Babbit*, 15 F. Supp. 2d at 1283 (finding "many of the important 'facts'" FWS based its decision on "appear to be assumptions, presumptions, or conclusions themselves—not facts based on any evidence, documents, or data in the Administrative Record").

c.     FWS's Use of the HFA Instead of Surveys Resulted in an Unlawful Incidental Take Statement.

Because FWS concluded that CRC will take listed species, it was required to prepare an incidental take statement ("ITS") with: (1) a numerical "cap" or in some cases, a rational surrogate; and (2) ways to monitor actual take that can serve as an effective "trigger" for reinitiation of consultation when permissible levels of take are exceeded. *Miccosukee Tribe*, 566 F.3d at 1271–72, 1275; 50 C.F.R. § 402.16. This legally required limit acts as a stopgap to prevent an action from taking so many individuals of a species that it jeopardizes the species' existence. *Miccosukee Tribe*, 566 F.3d at 1271–72. Congress declared a preference for a numerical expression of take, *id.* at 1274; thus, FWS may use a surrogate measure *only if* it "explains why it is not practical to express the amount or extent of anticipated take . . . in terms of individuals" and "[d]escribes the causal link between the surrogate and take of the listed species." 50 C.F.R. § 502.14(i)(1)(i). Here the ITS lacks a numerical estimate of take, or any estimate at all; rather, it refers the reader to the HCP. *See* AR 3 at 236–37 ("The amount or extent of incidental take anticipated . . . [is] as described in the HCP and its accompanying . . . permit(s).").

FWS does not explain, nor does the Record establish, why it was purportedly impracticable to express take numerically. Replacing the ITS with references to pages of the HCP is not sufficient to explain why numerical caps were impracticable, let alone satisfy the statutory command for a "written statement" that "specifies the impact of the incidental taking on the species," "specifies those reasonable and prudent measures that [FWS] considers necessary or appropriate to minimize such impact," and "sets . . . terms and conditions . . . that must be

---

[7] While FWS included some discussion of the habitat requirements and possible impacts of for each listed species, *see e.g.*, AR 3 at 131–134, these discussions are abstract, generalized, and based on RAM's arbitrary HFA rather than real data. *See, e.g.*, AR 3 at 140–141.

complied with" to implement the measures. 16 U.S.C. § 1536(b)(4)(C); *see also Miccosukee Tribe*, 566 F.3d at 1274 ("'[A]n [ITS] that utilizes a surrogate [measure] . . . must explain why it was impracticable to express a numerical measure of take.'"); Nagano Decl. at 2–3. In fact, FWS was able to estimate take for several species impacted by CRC,[8] belying any claim that quantifying take was impracticable. Relying on a vague, complicated HCP and HFA for statutorily required, numerical limits on take is like "turning on the weather channel to see if it is raining instead of looking out a window." *Miccosukee Tribe*, 566 F.3d at 1275. The ITS does not satisfy FWS's duties under section 7(a)(2); accordingly, it must be modified or replaced.

> d.  RAM's Mitigation Measures Should Have Been Factored into the Environmental Baseline, Not as Mitigation or Minimization Measures.

FWS's designation of RAM's pre-existing legal requirements to conserve lands or species as mitigation was arbitrary and capricious and contrary to the ESA. FWS was required to evaluate the "effects of the action," which are "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. §§ 402.14; 402.02. The "environmental baseline" includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area." *Id*. § 402.02.

FWS incorporated "conservation measures"—"actions to benefit or promote the recovery of listed species," ESA Handbook at xii, 4-27—into the ITP, including protecting the on-site and off-site "preserves." AR 3 at 63; AR 4 at 371; AR 2 at 41. However, these measures were pre-existing, legally binding on RAM and UM, and unrelated to the ITP. AR 114 at 3014 (Natural Forest Community protections on the on-site preserves "are independent of any pending applications to USFWS."); AR 126 at 3029 & att. at *1, *17–19 (Off-site preserve was "already under conservation" through an agreement executed with FWS in 2000). Thus relying on them as mitigation for CRC was arbitrary and capricious. If anything, these preexisting measures should have been incorporated into the "environmental baseline" for CRC. *See*, *e.g*., *Swan View Coal. v.*

---

[8] FWS estimated that CRC would crush 859 Beetles (roughly six percent of the 13,000 Beetles in existence), AR 3 at 143, 151; disrupt the feeding and breeding of 16 adult Bartram's and kill all their eggs, larvae, and pupae, AR 3 at 102; kill up to three eastern indigo snakes and destroy two nests with eggs, AR 3 at 156–57, 159; and harm or kill at least ten Bats, AR 3 at 182–83.

8

*Barbouletos*, CV06-73-M-DWM, 2008 U.S. Dist. LEXIS 108211 at *16 (D. Mont. June 13, 2008) (finding that "FWS's use of 'existing degraded habitat conditions brought on by the [action agency's] refusal to enforce its own rules [wa]s contrary to law").

FWS inclusion of the conservation areas' "existing degraded conditions" that were brought on by RAM's and its predecessors' failure to comply with their preexisting requirements was contrary to law, and FWS was obliged to analyze the fact that the areas were already under conservation easements as part of the environmental baseline. *Id*.; *accord Friends of the E. Fork, Inc. v. Thom*, 688 F. Supp. 2d 1245, 1255 (W.D. Wash. 2010) (FWS "should consider the state of the land as it should have been if [the ITP applicant] had met its state reclamation obligations, in establishing the baseline for its analysis"); *see also Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1114 (9th Cir. 2012) ("[E]nforceability of mitigation measures turns on their integration into the proposed action . . . ."). RAM's and UM's preexisting obligations to reclaim, conserve, and protect the mitigation areas should have been included in the "environmental baseline" as they are "private actions and other human activities in the action area" and/or "the impact of State or private actions which are contemporaneous with the consultation" for CRC. 50 C.F.R. § 402.14.

Fundamentally hampered by the procedural flaws outlined above, FWS failed to make any determination that RAM's HCP meets the minimum requirements of ESA section 10 and its implementing regulations. 16 U.S.C. § 10(a)(2)(B)(ii); 50 C.F.R. Part 17. In particular, the Record lacks a sufficient basis for FWS's determination that RAM's conservation measures will "minimize and mitigate" CRC's take of endangered wildlife "to the maximum extent practicable" as required by" 16 U.S.C. § 1539(a)(2)(B)(ii). *See Sierra Club v. Babbit*, 15 F. Supp. 2d at 1279 (FWS must "supply a sufficient basis" to determine whether the HCP "minimizes and mitigates" the project's harm to endangered species "'to the maximum extent practicable' as required by ESA § 10(a)(2)(B)(ii)").

**B.     FWS Arbitrarily Reversed Course in its NEPA Review of CRC.**

FWS violated NEPA and the APA by arbitrarily ordering FWS staff biologists to not prepare an EIS and by ignoring the significant negative environmental effects of CRC and unlawfully issuing a Finding of No Significant Impact ("FONSI"). It is indisputable that CRC will result in significant environmental impacts by destroying more than 80 acres of critically

9

endangered habitat that is important to many imperiled species. AR 4 at 275; AR 3 at 62. FWS field office biologists evaluating the ITP application knew this when they received the request to authorize the take of nearly two dozen endangered and threatened species, so they proceeded to evaluate CRC with an EIS in mind. AR 51 at 2548; AR 146 at 3065; AR 208 at 3183. But FWS abruptly changed course with no explanation in the Record.

> 1. <u>FWS arbitrarily reversed course by ordering its staff to not prepare an Environmental Impact Statement</u>.

FWS violated NEPA and the APA by arbitrarily ordering its field office staff to not produce an EIS after staff determined that one was warranted. FWS biologists originally determined that CRC warranted an EIS due to its serious and controversial impacts, AR 146 at 3065; AR 145 at 3063–64, but FWS's regional office abruptly reversed course and ordered the field office biologists to not prepare one, AR 140 at 3056–57. This decision is not supported by the Record; rather, the Record reveals an arbitrary, top-down directive unsupported by the law and circumstances.

The purpose of NEPA is to help public officials make decisions based on a thorough understanding of environmental consequences before decisions are made. 40 C.F.R. § 1500.1(b)-(c). To that end, NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). When an agency is uncertain whether an EIS is required, it may first prepare an EA, 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, but it "is not necessary if the agency . . . prepare[s] an [EIS]." *Id*. § 1501.3.

Here, FWS field office biologists familiar with CRC and the harm and destruction it would cause to 80 acres of pine rockland and many imperiled species, in coordination with the regional office, "determined that an Environmental Impact Statement (EIS) [wa]s the most appropriate document" to analyze CRC "based on the potential for significant impacts to the human environment and the controversial nature of the project." AR 146 at 3065; *see also* AR 208 at 3181 (scheduling public hearings). FWS reasonably concluded that because CRC had significant impacts and was controversial, it should be evaluated through a robust EIS with a publically accessible process. *See* 40 C.F.R. § 1506.6(c)(1).

RAM tried to convince FWS field office biologists to reverse course, AR 145 at 3063; AR 144 at 3062, but they held their position, citing NEPA's implementing regulations to explain

that "[t]he trigger [to prepare an EIS] is whether the proposed action may have a significant effect on the human environment (not just the biological resources)" and "whether the effects of the action are controversial." AR 145 at 3063 (citing 40 C.F.R. § 1508.27(4)). The Record does not provide any further evidence regarding FWS's decision-making on this matter.

Nearly three months after FWS field office biologists decided that an EIS was warranted, the Deputy Assistant Regional Director of Ecological Services for FWS abruptly ordered FWS field office biologists to not prepare an EIS, stating that "an Environmental Assessment is the more appropriate approach . . . for the proposed issuance of an incidental take permit for the Coral Reef Commons project." AR 140 at 3057. The Regional Director went on to inaptly "compare [CRC] with . . . the manatee swim-with program" an unassociated project at a wildlife refuge in North Florida, claiming it was "arguably as, or more, controversial and could potentially be litigated, and [FWS] is using an EA to meet its NEPA responsibilities." AR 140 at 3057. FWS plainly did not "examine[] the relevant data" and "articulat[e] a satisfactory explanation" for its decision to not prepare an EIS, making it arbitrary and capricious. *Defenders of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1298 (M.D. Fla. 2012) (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d at 1216).

2.    FWS arbitrarily failed to prepare an Environmental Impact Statement despite CRC's significant impacts to the human environment.

FWS violated NEPA and the APA when it ignored CRC's significant environmental impacts, including the cumulative impacts of climate change, and refused to prepare an EIS. An EA, which the FWS prepared here, should provide "sufficient evidence and analysis for determining whether to prepare an EIS". CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regs., at 36a (Mar. 23, 1981). If the EA shows that the proposed project will have no significant impact on the human environment, the agency may issue a FONSI, and proceed with the proposed action. 40 C.F.R. § 1501.4(e). If the agency concludes that there may be significant impacts, it must prepare an EIS. *Id.* §§ 1501.4, 1502.3, 1508.27.

To determine whether a project's effects are significant, an agency must consider the project's context and intensity. *Id.* § 1508.27. Context refers to the long and short term impacts of the project from a national, regional, and local perspective. *Id.* § 1508.27(a). Intensity means

"the severity of the impact"—including both beneficial and adverse impacts—and requires consideration of numerous factors at play here. *Id.* § 1508.27(b). For example, FWS must consider the unique characteristics of the area; the degree to which the project's effects are likely to be highly controversial; the degree to which the project may establish precedent for future actions; and the degree to which the action may adversely affect a species listed under the ESA. *Id.* § 1508.27(b)(3), (4), (6), (9). Just one intensity factor may trigger the need to prepare an EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1125 (9th Cir. 2004).

Furthermore, a "discussion of cumulative impacts is a necessary part of any assessment," and "'must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.'" *Great Old Broads For Wilderness v. Kempthorne*, 452 F. Supp. 2d 71, 84 (D.D.C. 2006) (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002)).

Ms. Paula Halupa, A 20-year FWS biologist who reviewed CRC in her professional capacity, determined that an EIS was appropriate based on these factors. AR 253 at 9367–76. At some point, Ms. Halupa stopped working on CRC in her professional capacity, but submitted comments in her personal capacity explaining that CRC: (1) "comes with enormous consequences and losses to natural resources and humans"; (2) "would be the largest, most consequential development in the remaining pine rocklands of south Florida"; (3) "has significant consequences for numerous federally listed species, most notably the endangered Miami tiger beetle, Bartram's scrub-hairstreak, and Florida leafwing, which are each dangerously close to extinction"; (4) has a "size and location [that] are significant"; and (5) "will result in the loss, degradation, and fragmentation of globally imperiled habitat both on the project sire and within the surrounding lands." AR 253 at 9369. Ms. Halupa further questioned "why [FWS] opted to prepare an Environmental Assessment (EA) rather than an Environmental Impact Statement (EIS)" given the "significant effects of increasing human population density in a densely populated area, potential impacts of conducting or not conducting prescribed fire in an urban landscape, increased traffic and impacts from traffic, and increased demands on natural

resources." *Id*. Ms. Halupa noted there was no "finding of no significant impact" in the EA and that "an EIS can be extremely helpful for this consequential project as it can: (1) help ensure a complete, unbiased, and robust evaluation of significant environmental impacts; and (2) inform or enhance the quality of the environment." AR 253 at 9370.Ms. Halupa also cited "the flaws and questions in methodology and misrepresentation of information within the HCP, and incomplete survey data and lack of survey information" as reasons for why an EIS is appropriate and a FONSI not possible. AR 253 at 9370.

For many species, CRC's site is the last of very few places left where they *can* survive. *See, e.g.*, AR 4 at 309–10,317, 321–22; *See* AR 243 at 9226–28 (comments by expert Jennifer Possley). No matter how the Defendants play up the purported environmental benefits of CRC, it is undisputed that it will destroy more than 86 acres of some of the most valuable pine rocklands for many protected species that cannot live anywhere else. *See* AR 31 at 1729, 1735, 1749–54. Destroying that habitat will have permanent significant consequences for the species' habitat and likely their very existence.

        a.    <u>In the context of globally imperiled pine rockland impacts, CRC may significantly impact this geographic area's unique characteristics.</u>

When determining whether to prepare an EIS, FWS ignored the significance of impacting the Richmond Rocklands in the context of their "ecologically critical" and globally imperiled status. 40 C.F.R. § 1508.27(b)(3) (requiring agency to consider "unique characteristics of the geographic area such as proximity to…ecologically critical areas"). FWS repeatedly emphasized that the Richmond Rocklands are an "uncommon ecosystem supporting a number of listed and at-risk plants and wildlife" AR 48 at 2539, that are highly sensitive to "population level effects" from habitat fragmentation, AR 116 at 3017. Construction in this rare habitat is significant. 40 C.F.R. § 1508.27(b)(3).

It is indisputable that it includes some of the last remaining habitat for the species covered in the ITP and that paving it over for CRC would render it completely uninhabitable. Broad-scale losses of pine rocklands (roughly 88 percent) in Miami-Dade County alone, *compare* AR 31 at 1734 *with* AR 4 at 268, will be compounded by the reasonably foreseeable effects of climate change, making "the Richmond Pine Rocklands . . . some of the last remaining refugia" from sea-level rise. AR 116 at 3017. While pine rocklands at lower elevations flood

regularly and are subject to inundation from sea-level rise and hurricanes, AR 269 at 26733–34, 45463–64, CRC's site is a rare forest among the rare because of its high elevation, AR 33 at 2012; AR 269 at 26717, which shields it from these long-term impacts. FWS failed to analyze this long-term importance anywhere in the EA, and if it had, it would have precluded a FONSI and necessitated an EIS

> b.    CRC's effects are highly controversial.

FWS ignored record evidence regarding the "degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). FWS received 3,000 comments opposing the Project, including comments from individuals and organizations with relevant expertise, who explained how CRC's effects on the quality of the human environment are highly controversial. AR 1 at 7. Public controversy over the potential impacts of a federal action on the human environment strongly suggests an EIS is required. *Id.* § 1508.27(b)(4), (5). FWS conceded that "the proposed Project has generated controversy in the County community." AR 1 at 34.

FWS repeatedly relied on the work of Ms. Possley, AR 31 at 1749, 1826, 1861; AR 3 at 251–252, who informed FWS that she "is of the opinion that the [project site] holds extremely high ecological value," AR 243 at 9225, and wholly rejected RAM's HFA—which relied on her published work—as "completely inappropriate." AR 243 at 9225–26. FWS staff biologist Ms. Halpua, stated that CRC "would be the largest, most consequential development in the remaining pine rocklands of south Florida," would have "significant consequences for numerous federally list species," and would be of a "significant" size and location. AR 253 at 9369–70. Likewise, Christopher Wirth found the HFA "is likely to poorly estimate the presence or quality of necessary pine rockland characteristics" for each of the species. AR 234 at 9172–73. Mary Truglio also explained how CRC will not provide the net benefit to imperiled species promised by the HCP. AR 246 at 92521.

The numerous comments from scientists, conservationists, and experts pointing to significant environmental impacts not adequately analyzed in the EA constitute precisely the type of controversy that warrants an EIS. *See Ctr. for Biological Diversity v. Animal & Plant Health Inspection Serv.*, No. 10-14175-CIV, 2011 U.S. Dist. LEXIS 115905, at *17 (S.D. Fla. Oct. 6, 2011) ("'A substantial dispute exists when evidence . . . casts serious doubt upon the

reasonableness of an agency's conclusions.'"); *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1358 (S.D. Fla. 2005) ("Comments from . . . the public regarding the indirect and cumulative effects of the project suggest that the size, scope and nature of the proposed project's impacts are highly controversial."); *Sierra Club v. U.S. Forest Serv.,* 843 F.2d 1190, 1193–94 (9th Cir. 1988) (holding an EA that receives overwhelming criticism from "conservationists, biologists, and other experts" is "precisely the type of 'controversial' action for which an EIS must be prepared"); *Found. for N. Am. Wild Sheep v. USDA*, 681 F.2d 1172, 1182 (9th Cir. 1982) (finding an action was "controversial" where the agency "received numerous responses from conservationists, biologists, and other knowledgeable individuals [that were] all highly critical of the EA"). Even FWS's Regional Director explained that public controversy is a factor FWS considers in deciding whether to proceed with an EIS. AR 140 at 3057.

c.   <u>The action may adversely affect listed species and their habitat.</u>

FWS ignored record evidence that CRC will kill and harm listed species and destroy and fragment more than 80 acres of their exceptionally rare habitat. 40 C.F.R. § 1508.27(b)(9)(degree to which the action may adversely affect an endangered or threatened species or its habitat"). These plants and animals are already threatened with extinction, and destroying their habitat will adversely affect them. While "[a]n environmentally significant action need not involve a threat of extinction to a federally-protected species[,] . . . the involvement of a federally protected . . . species and the possibility of a threatened impact as potentially serious as extinction or extirpation from a traditional habitat are factors weighing in favor of a finding of significance." *Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1322 (S.D. Ala. 2002).

FWS staff found that CRC "will result in the permanent loss of 82.61 acres of occupied Miami tiger beetle habitat" which constitutes 9.35 percent of potentially occupied habitat within Richmond Rocklands and 8.15 percent of occupied habitat range-wide. AR 116 at 3017, att. 2 at *4. This loss "minimizes the opportunities for [the Beetle's] population growth and recovery." AR 116 at 3017, att. 2 at *4; Wirth Decl. at 5. Nothing in the record contradicts these findings.

FWS also found that CRC "will increase the fragmentation of the remaining habitat within the Richmond Pine Rocklands and has the potential to have population level effects." AR 116 at 3017, att. 1 at *6, att. 2 at *4. Yet, these impacts were not explicitly identified or analyzed

15

in the EA. AR 31 at 1722–1864. Likewise, while the Record shows FWS was concerned about the loss of habitat at the CRC's site due to its importance as "some of the last remaining refugia" as sea-level rise inundates surrounding rocklands, AR 116 at 3017, att. 2 at *4, the EA utterly failed to mention the impacts of sea-level rise, climate change, or coastal squeeze on species found on the project site. AR 31 at 1722–1864.

In *Sierra Club v. Norton*, where developers sought to pave almost 60 acres of endangered Alabama beach mouse habitat, the court found that it was "almost beyond question that the destruction of 20% of an endangered species' 'optimal habitat'. . . for a species which was rendered endangered by pre-listing losses of habitat, will have an impact on that species which is 'significant' under any reasonable definition of that term." 207 F. Supp. 2d at 1326. The court focused on two significance factors: the possibility of extinction or extirpation from a traditional habitat, and uncertainty regarding the environmental effect. *Id*. at 1322. Similarly in *Sierra Club v. Babbit*, also concerning development in beach mouse habitat, the court found the record clearly established "that the FWS's determination of no significant impact is based on insufficient, inaccurate, old and out of date data," where, as in this case, FWS determined "the number . . . conserved or incidentally taken as a result of HCPs cannot be directly estimated." 15 F. Supp. 2d at 1284. FWS made a finding of no significant impact despite many unknowns, including "'the size of a minimally viable population,'" "current or past population data trends," "population size and density," and most relevant to the case at issue, "how many of the species are being destroyed in the project sites." *Id*. The court found FWS "cannot reasonably state that the projects will not have a significant impact" and remanded the case to FWS to gather the necessary scientific data. *Id.*

Like the Alabama beach mouse, the five ESA-listed species at issue here are threatened with extinction, extirpated from much of their original habitat, and suffering severe declines in population and available habitat due to development. *Compare Norton*, 207 F. Supp. 2d at 1323 *with* ECF 1 (Complaint) at 17–23. Moreover, like the Alabama beach mouse, Bartram's and

Leafwing have designated critical habitat that FWS has determined is essential to the continued survival and recovery of the species,[9] AR 3 at 117–23, and CRC will degrade it.

Here, FWS also operated with as much uncertainty as it did in *Norton* and *Babbit* when it made its finding of no significant impact. FWS did not know "[p]opulation and density estimates" for many species on the project site. AR 116 at 3017, att. 2 at *1 ("Population and density estimates are not known for [the Beetle]"). FWS did not have comprehensive, site-specific surveys, despite RAM's ability to obtain them and FWS's need for them to "help describe the [CRC] effects." AR 116 at 3017, att. 1 at *5, att. 3 at *5; AR 188 at 3142. Absent surveys, neither RAM nor FWS knew whether impacted species are present in the off-site mitigation area, AR 3 at 100; AR 4 at 314, and the record shows that aside from deltoid spurge, the Beetle, and Bartram's, "nothing more is known to occur" there. AR 104 at 2990. Thus, the ability for mitigation to reduce impacts to listed species from significant to a minimum is also unknown, and cannot be relied upon to avoid an EIS. *See Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998) ("[I]f the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum."). Consequently, CRC meets several of the intensity factors and is significant in both local and more global contexts. FWS's failure to prepare an EIS is arbitrary and capricious and violates NEPA.

### 3.    FWS deprived the public and itself of valuable information.

By denying the public a hearing, FWS deprived the public and itself of valuable information necessary to analyze CRC. FWS staff acknowledged a hearing would be appropriate early on, AR 146 at 3065, an EIS would have necessitated a hearing, *id.*; AR 2018 at 3183, and CEQ and FWS regulations indicate a public hearing was required. 40 C.F.R. § 1508.27(4); AR 145 at 3063. However, FWS later reported that it would not hold a public hearing because Representative Curbelo's office was "no longer . . . requesting a public meeting or hearing." AR 136 at 3048. Thus, FWS arbitrarily decided not to host a public hearing based on a politician's whims rather than its own binding regulations that govern when a public hearing is necessary.

---

[9] The other listed species do not have critical habitat because FWS failed to meet its statutory duty to designate it, *see* 16 U.S.C. § 1533(a)(3), not because habitat is not necessary or important to their survival and recovery.

Agencies must make high quality information available to officials and citizens so they "make decisions that are based on understanding of environmental consequences," and "use all practicable means" to assure a safe, healthy environment and preserve the nation's natural heritage. 50 C.F.R. §§ 1500.1(a)–(c); 1502.2(d); 42 U.S.C. § 4331(b). "'[C]itizen participation is a vital ingredient in the success of NEPA,'" and the "'opportunity for local citizens or other interested parties to participate in the preparation of the environmental analysis is *mandatory*.'" *Town of Golden Beach v. U.S. Army Corps of Eng'rs*, No. 94-1816 CIV, 1994 U.S. Dist. LEXIS 15832, *18–19 (S.D. Fla. Sept. 22, 1994); 40 C.F.R. § 1500.1(b).

To that end, FWS policy "dictates that the FONSI must be made available to the affected public." 550 FW 3, at 3.3(B)(4)(a). FWS must make the FONSI available for a 30-day public review, in accordance with 40 C.F.R. § 1501.4(e)(2), if: (i) the proposal is a borderline case (i.e., there is a reasonable argument for preparing an EIS); (ii) the proposal is an unusual case, a new kind of action, or a precedent-setting case; (iii) there is either scientific or public controversy over the proposal; [or] (iv) when the FONSI involves a proposal that is or is closely similar to one which normally requires preparation of an EIS.  550 FW 3 at 3.3(B)(4)(c)(i)-(iv); 40 C.F.R. § 1501.4(e)(2), 1508.27.

Here, all four factors are present. First, this was a borderline case because there is a reasonable argument for preparing an EIS, AR 145 at 3063, and until receiving a mandate from the Regional Director, AR 140 at 3056–57, FWS staff had determined an EIS was necessary. AR 146 at 3065–66; AR 145 at 3063. Second, this was an unusual or precedent-setting action because the issuance of a take permit was predicated on the generalized HFA, which had never been used before and was heavily criticized by the scientific community. AR 243 at 9225–26. Third, all parties agree that FWS's approval of CRC was in spite of well-documented scientific and public controversy regarding its nature, size, and impacts. ECF 6 (excerpted public comments). Finally, this is the sort of action that normally would require an EIS for the reasons stated above. 40 C.F.R. § 1501.4(a)(1); 550 FW 3.3(B)(4)(c)(iv); *Supra* II.B. By not holding this mandatory hearing, FWS violated its own guidance, 550 FR 3.3(B)(4)(c)(i)–(iv), thwarted meaningful public participation, and deprived itself valuable information.

18

**C.      Plaintiffs have Standing to Bring the Claims in Their First Amended Complaint.**

Plaintiffs are entitled to summary judgment on Claims I-IV based on all of the above, their Motion for Temporary Restraining Order and/or Preliminary Injunction, Consolidated Reply in Support of Temporary Restraining Order and/or Preliminary Injunction, Objections to Magistrate Judge's Report and Recommendation, and Consolidated Reply to Responses to Opposition (ECF Nos. 4, 53, 82, and 93) and arguments made during the hearing on January 4, 2018, which are incorporated by reference. Permanent remedies for these Claims are discussed in Part IV below.

Plaintiffs are non-profit organizations and bring their claims on behalf of their adversely affected members. Plaintiffs' members' interest in pine rocklands and impacted species include hiking, nature watching, wildlife viewing, contemplation, and photography. *See* ECF Nos. 4-17– 4-20; Decls. of Noah Greenwald, Erin Clancy, Al Sunshine, Matthew Schwartz (collectively, Standing Declarations). Their aesthetic and recreational interests are harmed by FWS's approval of the incidental take permit, and these harms would be redressed by a Court order vacating and remanding FWS's approval and compelling FWS to reevaluate the incidental take permit. *Id.*

Plaintiffs' members also have recreational, aesthetic, scientific, and commercial interests in protecting the Beetle, Bartram's, Leafwing, Bat, and eastern indigo snake. *Id.* These interests are harmed by FWS's unlawful permit authorizing their take. *Id.* A Court order vacating the BO and ITP, and directing FWS to comply with the law would redress these harms. *Id.*; *see Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079–83 (9th Cir. 2015).

The interests Plaintiffs seek to protect are germane to their organizational purposes and this case does not require individual members to participate. *See* Standing Declarations. Accordingly, Plaintiffs have organizational standing. *See Black Warrior Riverkeeper, Inc.*, 781 F.3d at 1279-80.

**D.      The Court Should Set Aside the ITP and Order the Parties to Negotiate Terms of Injunctive Relief for FWS's ESA Violations.**

To remedy the foregoing violations of the ESA, NEPA and APA, the Court must vacate the ITP pursuant to the APA. 5 U.S.C. § 706(A)(2); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 80 (D.D.C. 2010) (holding "vactur is appropriate in order to prevent significant harm

resulting from keeping the agency's decision in place"); *see Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (acknowledging that "'vacatur . . . is the ordinary APA remedy'"). Along with vacatur, the Court should remand and set deadlines for FWS to prepare a new BO that complies with ESA and an EIS that complies with NEPA. Should the Court also hold that FWS failed to meet its affirmative duties under section 7(a)(2), *see* ECF 95 at 35-36 (Fourth Claim for Relief), Plaintiffs respectfully request the Court to exercise its equitable discretion and enter a declaratory order on Claim Four along with an order directing and setting a deadline for the parties to discuss a remedy for this claim and any other remaining issues. If the Parties are not able to stipulate to terms, Plaintiffs would respectfully request the Court to order the Parties to separately brief appropriate injunctive relief to adequately remedy FWS's legal violations and further offset CRC's effects to listed species, particularly in light of the land-clearing and other activities that have occurred at the CRC site.

## III.        CONCLUSION.

Plaintiffs respectfully request that the Court grant them summary judgment on all Counts and (1) declare FWS's decision to issue the ITP violates NEPA and the APA; (2) declare FWS's BO violates the ESA and APA; (3) declare FWS's reliance on the BO violates the ESA; (4) declare FWS's EA violates NEPA; (5) vacate permit number TE15009C-0; (6) vacate the BO and its ITS and remand to FWS to prepare a BO that complies with the mandates of the ESA; (7) vacate the EA and FONSI and remand to FWS to prepare an EIS; (8) enjoin FWS from authorizing any further action under Permit Number TE15009C-0 until it fully complies with the requirements of NEPA and the APA; (9) order FWS to take all feasible and practicable steps necessary to restore and recover habitat that was altered or destroyed by the Permittees; (10) award Plaintiffs their costs and reasonable attorneys' fees pursuant to the ESA, 16 U.S.C. § 1540(g)(4), Equal Access to Justice Act, 28 U.S.C. § 2412, and Federal Rule of Civil Procedure 54(d); and (11) award Plaintiffs any other relief that is just and proper.

## **REQUEST FOR HEARING**

Plaintiffs respectfully request a hearing on this Motion, and estimate that a hearing would last four hours, with one hour for each side's arguments, i.e. Plaintiffs, Federal Defendants, RAM, and UM. A hearing would assist this Court in understanding the highly technical and complex matters contained in the Record.

Dated: May 4, 2018

Respectfully submitted,

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse
Miami, Florida 33133
Telephone: (305) 858-2900
Facsimile: (305) 858-5261


By: s/ Paul J. Schwiep
Paul J. Schwiep, FBN 823244
PSchwiep@CoffeyBurlington.com
**Secondary:** YVB@CoffeyBurlington.com
**Tertiary:** service@CoffeyBurlington.com

Jaclyn Lopez, FBN 96445
JLopez@BiologicalDiversity.org
Elise Pautler Bennett, FBN 106573
EBennett@BiologicalDiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
Post Office Box 2155
St. Petersburg, Florida 33731
Telephone: (727) 490-9190 (J Lopez)
Telephone: (727) 755-6950 (E Bennett)
Facsimile: (520) 623-9797

Amy R. Atwood, Esq. *(admitted pro hac vice)*
Atwood@BiologicalDiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
Post Office Box 11374
Portland, Oregon 97211
Telephone: (971) 717-6401
Facsimile: (503) 283-5528

John Peter Rose *(admitted pro hac vice)*
JRose@BiologicalDiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
660 South Figueroa Street, Suite 1000
Los Angeles, California 90017
Telephone: (213) 785-5406
Facsimile: (213) 785-5748

***Counsel for Plaintiffs***

21

Case No. 1:17-cv-24444-UU

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 4, 2018, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

s/  Paul J. Schwiep

| Service List | |
|---|---|
| **George S. LeMieux, Esq.**<br>GLemieux@gunster.com<br>**Angel A. Cortiñas, Esq.**<br>ACortinas@gunster.com<br>**Luna E. Phillips, Esq.**<br>LPhillips@gunster.com<br>**Jonathan H. Kaskel, Esq.**<br>JKaskel@gunster.com<br>GUNSTER<br>600 Brickell Avenue, Suite 3500<br>Miami, Florida  33131<br>Telephone:   (305) 376-6000<br>Facsimile:    (305) 376-6010<br>Secondary:    NSalazar@gunster.com<br>                    JBuck@gunster.com<br><br>***Counsel for Intervenor Defendants Coral Reef Retail, LLC, Coral Reef RESI PH 1, LLC, and RAMDEV LLC*** | **Martin J. Alexander, Esq.**<br>Martin.Alexander@hklaw.com<br>**Rafe Petersen, Esq.** *(admitted pro hac vice)*<br>Rafe.Petersen@hklaw.com<br>**Aaron Heishman, Esq.** *(admitted pro hac vice)*<br>Aaron.Heishman@hklaw.com<br>HOLLAND & KNIGHT<br>701 Brickell Avenue, #3300<br>Miami, Florida  33131<br>Telephone:   (305) 374-8500<br>Secondary:    Carmen.Ramsey@hklaw.com<br><br>***Counsel for Intervenor Defendants Coral Reef Retail LLC, Coral Reef RESI PH1 LLC and RAMDEV LLC*** |
| **Mark Arthur Brown**<br>Senior Trial Attorney<br>Mark.Brown@usdoj.gov<br>U.S. Department of Justice<br>Environmental and Natural<br>    Resources Division<br>Wildlife and Marine Resources Section<br>Post Office Box 7611<br>Washington, D.C.  20044-7611<br>Telephone:   (202) 305-0204<br>Facsimile:    (202) 305-0275<br><br>**Lucinda J. Bach**<br>Trial Attorney<br>Lucinda.Bach@usdoj.gov<br>U.S. Department of Justice<br>Environmental and Natural<br>    Resources Division<br>Natural Resources Section<br>601 D Street, NW<br>Washington, D.C.  20044<br>Telephone:   (202) 616-9663<br><br>***Counsel for Federal Defendants*** | **Mark A. Salky, Esq.**<br>salkym@gtlaw.com<br>**Eva M. Spahn, Esq.**<br>spahne@gtlaw.com<br>GREENBERG TRAURIG, P.A.<br>333 Southeast 2 Avenue, Suite 4400<br>Miami, Florida  33131<br>Telephone:   (305) 579-0500<br>Facsimile:    (305) 579-0717<br>Secondary:    burkek@gtlaw.com<br>                    FLService@gtlaw.com<br>                    cryzm@gtlaw.com<br><br>***Counsel for University of Miami*** |

Case No. 1:17-cv-24444-UU

| | |
|---|---|
| **Vicki Mott**<br>Attorney-Advisor<br>Vicki.Mott@sol.doi.gov<br>U.S. Department of the Interior<br>Office of the Regional Solicitor<br>Southeast Region<br>75 Ted Turner Drive SW, Suite 304<br>Atlanta, Georgia  30303<br>Telephone:   (404) 331-0722 x233<br><br>*Of Counsel for Federal Defendants* | |

24