# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case Number:  1:17-cv-24444-UU

CENTER FOR BIOLOGICAL DIVERSITY;
TROPICAL AUDUBON SOCIETY;
MIAMI PINE ROCKLANDS COALITION;
and SOUTH FLORIDA WILDLANDS
ASSOCIATION,

      *Plaintiffs,*

          v.

RYAN ZINKE, in his official capacity as
Secretary of the U.S. Department of Interior;
U.S. DEPARTMENT OF THE INTERIOR;
U.S. FISH AND WILDLIFE SERVICE;
GREG SHEEHAN, in his official capacity as
Principal Deputy Director of the U.S. Fish and
Wildlife Service; and JIM KURTH, in his
official capacity as Deputy Director for
Operations and Acting Director of U.S. Fish
and Wildlife Service,

      *Defendants.*

_____/

## FEDERAL DEFENDANTS' COMBINED RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Local General Rule 7.5A and the Court's Order dated March 16, 2018 (ECF No. 107), Federal Defendants (Ryan Zinke, in his official capacity, U.S. Department of the Interior, U.S. Fish and Wildlife Service ("FWS" or "the Service"), Greg Sheehan, in his official capacity, and Jim Kurth, in his official capacity), by and through undersigned counsel, hereby move for summary judgment on all counts asserted by Plaintiffs (Center for Biological Diversity, Tropical Audubon Society Miami Pine Rocklands Coalition, and South Florida Wildlands Association) in Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief (ECF No. 95). As explained below and in Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction (ECF No. 32) and Federal Defendants' Response to Plaintiffs' Objections to Magistrate Judge's Report and Recommendation (ECF No. 86), FWS reasonably concluded the habitat conservation plan ("HCP") for the Coral Reef Commons project ("the Project") met all criteria for issuing an Endangered Species Act ("ESA") Section 10 permit authorizing Coral Reef Retail LLC, Coral Reef Resi PhI LLC, Ramdev LLC, and the University of Miami (collectively "the Permittees") to develop portions of private property in southwest Miami-Dade County. *See* 16 U.S.C. § 1539(a)(2)(B). Because FWS complied with all applicable provisions of the ESA, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"), and there are no genuine issues of material fact, Federal Defendants are entitled to summary judgment on all claims, with the parties bearing their own attorneys' fees and costs.

## STANDARD OF REVIEW

The ESA and NEPA contain no internal standard or scope of review; therefore, the default standard and scope set forth in the APA apply. *See United States v. Carlo Bianchi & Co*., 373 U.S. 709, 715 (1963) ("[I]n cases where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record and that no de novo proceeding may be held." (citations omitted)); *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1114 - 15 (11th Cir. 2013) (evaluating ESA claims under "arbitrary and capricious" standard of APA); *Fund for Animals v. Rice,* 85 F.3d 535, 541 (11th Cir. 1996) (ESA and NEPA claims reviewed under APA standard). The APA states that a court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Eleventh Circuit has explained, "this standard is exceedingly deferential" to the FWS. *Fund for*

1

*Animals*, 85 F.3d at 541. "The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action." *Id.* at 542. Rather, the court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 - 98 (1983). In addition, where, as here, an agency's technical expertise is involved, "a reviewing court must generally be at its most deferential." *Id.* at 103.

In accordance with the plain language of APA Section 706, judicial review is limited to the agency's administrative record. The statute provides that under the "scope of review":

> [T]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law. … In making the foregoing determinations, the court shall review the **whole record or those parts of it cited by a party.**

5 U.S.C. § 706 (emphasis added). *See also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Pres. Endangered Areas of Cobb's History ("PEACH") v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("The focal point for judicial review of an administrative agency's action should be the administrative record." (citation omitted)). The reviewing court is "not 'generally empowered'" to go beyond the administrative record. *PEACH*, 87 F.3d at 1246.[1]

Prior to the filing of any response by Defendants, the Court granted Plaintiffs' motion to supplement the administrative record with the declaration of former FWS biologist Christopher Nagano, ECF No. 119-2. *See* ECF No. 120 ("The Court will permit Plaintiffs to supplement the administrative record with the declaration of Mr. Nagano because it assists the Court in understanding how the Service operates usually and how it operated here."). With all due respect,

---

[1] Citing Ninth Circuit authority, the *PEACH* court acknowledged that a reviewing court may go beyond the administrative record in certain narrow circumstances such as where:

> 1) an agency's failure to explain its action effectively frustrates judicial review; 2) it appears that the agency relied on materials not included in the record; 3) technical terms or complex subjects need to be explained; or 4) there is a strong showing of agency bad faith or improper behavior.

87 F.3d at 1246 n.1 (citing *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436-37 (9th Cir. 1988)). The *PEACH* court did not specifically endorse any of these exceptions. Instead, the *PEACH* court held that none of the exceptions applied in that case. *Id.*

it would be error for the Court to engage in *de novo* review of Plaintiffs' claims by considering the declaration. *E.g.*, *Pollgreen v. Morris*, 770 F.2d 1536, 1545 (11th Cir. 1985) ("Although the district court properly received testimony necessary to its determination on the preliminary injunction, it was in error to consider this evidence in its merits decision.") (internal citation omitted).[2] However, to the extent the Court deems it appropriate to consider the Nagano declaration, this declaration should be afforded no weight.[3]

Although Federal Defendants maintain that extra-record agency testimony is unnecessary and inappropriate in this case, Federal Defendants are prepared to submit a declaration from current FWS staff to rebut the unsupported and misleading assertions in the Nagano Declaration. For example, Federal Defendants are prepared to explain how agency procedures vary among the FWS regions, depending in part on differences in state or local permitting procedures.

## ARGUMENT

I. **FWS Reasonably Concluded that the Project will not Result in Jeopardy or Adverse Modification.**

ESA Section 7(a)(2) provides that federal agencies must ensure that any action authorized, funded, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical. . . ." 16 U.S.C. § 1536(a)(2).[4] In its biological opinion ("Biop") here, FWS determined that its action of issuing the

---

[2] If the Court determines that the existing record is inadequate for some reason, the proper course would be to obtain any supplemental testimony from the agency, not from Plaintiffs' witness. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). ("The court may require the administrative officials who participated in the decision to give testimony explaining their action."); *Camp* 411 U.S. at 142-143 ("If . . .there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a de novo hearing but, as contemplated by *Overton Park*, to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.").

[3] Mr. Nagano states that he "reviewed both the biological opinion and HCP for the Coral Reef Commons project." ECF No. 119-2 at ¶ 6. However, it is unclear whether he has reviewed other materials from the agency administrative record, including the Statement of Findings, Doc. 1 AR at 00001-38, which refutes most if not all of the criticisms in the declaration. Furthermore, Mr. Nagano was previously employed in FWS offices in California and New Mexico and has no experience in FWS' Florida offices. *See* ECF No. 119-2 at ¶ 4.

[4] "Secretary" as used in the ESA means the Secretary of the Interior or the Secretary of Commerce, who in turn have delegated their responsibilities to FWS and NMFS, respectively. 16

incidental take permit ("ITP") to the applicants is not likely to jeopardize the continued existence of any species or adversely modify any critical habitat. Doc. 3 AR at 00062-63. The record before the Court demonstrates that FWS based its decisions on the "best scientific and commercial data available" for each species as required under Section 7 of the ESA, 16 U.S.C. § 1536(a)(2).

A.     **FWS's "No Jeopardy" Determinations Are Fully Supported by the Record.**

The record demonstrates that FWS's determination that issuance of the ITP will not jeopardize the continued existence of any listed species. As provided in the HCP, the habitat value of the preserve areas to pineland species will be improved through ongoing habitat management measures including exotic plant control, pine rockland species planting, prescribed burning, and installation and maintenance of bat boxes. Doc. 3 AR at 00076–78. And FWS evaluated the effects the Project would have on each species in the action area.[5] *See id.* at 00063.

For example, FWS determined that the Project "would cause a net increase in the [Miami tiger beetle] population of the Action Area." Biop, Doc. 3 AR at 00149. Similarly, "[h]abitat enhancement accomplished in the on- and off-site Preserves would provide a net increase in the conservation value of [Bartram's Scrub-Hairstreak Butterfly and leafwing critical habitat] in the Action Area." *Id.* at AR000130. FWS determined that management of the preserves through the thinning of canopy is expected to have beneficial effects on foraging opportunities for the Florida bonneted bat. *Id.* at 000188. In addition, bat boxes installed in the preserve areas will provide supplemental roosting structures. *Id.* The Court should defer to FWS' expertise in determining the anticipated benefits of both the on-site and offsite habitat restoration proposed here. *See Fund for Animals,* 85 F.3d at 545 (noting that the challenged Corps permit, while facilitating development within species habitat, would otherwise further other conservation benefits through a mitigation plan that provided for creation, restoration, and enhancement of adjacent wetland areas).[6]

---

U.S.C. § 1532(15). In general, FWS has authority over terrestrial species, and NMFS has authority over marine species.

[5] In contrast to the facts in *Sierra Club v. Glickman*, 156 F.3d 606, 616 (5th Cir. 1998) and *Florida Key Deer v. Paulison*, 522 F.3d 1133, 1146 (11th Cir. 2008), cited by Plaintiffs at ECF No. 117 at 10,  FWS did not undertake a "generalized consultation" to assess merely the overall effects of the Project on pine rockland habitat. Rather, the record before the Court confirms that FWS considered the Project's effects on each of the species.

[6] *See also Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F. Supp. 3d 1260, 1306 (M.D. Fla. 2017) ("An agency's expert determinations such as the appropriate mitigation measures to protect endangered species are owed exceeding deference." (citation omitted); *Fla. Keys Citizens Coal. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1161 (S.D. Fla. 2005) ("FWS and the NMFS

Plaintiffs' arguments in their summary judgment brief do nothing to advance their argument that FWS violated its duty to avoid jeopardy pursuant to ESA Section 7(a)(2). Although this claim is now presented as an alleged violation of FWS's substantive ESA duties pursuant to the ESA citizen-suit provision, 16 U.S.C. § 1540(g), Plaintiffs' argument is substantially the same as they presented at the preliminary injunction stage, when they alleged APA-based claims that FWS failed to comply with its procedural obligations to avoid jeopardy to species. *Compare* Complaint, ECF No. 1 ¶ 161 ("The Service's biological opinion is arbitrary and capricious, and contrary to its administrative consultation requirements of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14, and is thus violation of the APA, 5 U.S.C. § 706(2)(A).") *with* Amended Complaint, ECF No. 95 ¶ 185 ("The Service violated Section 7 of the ESA, 16 U.S.C. §1536, when as a result of the aforementioned procedural and substantive deficiencies in the Service's analysis of species impacts, it arbitrarily concluded in the biological opinion that the Project will not likely jeopardize the continued existence [sic] listed species or adversely modify their critical habitat."). The Court should reject Plaintiffs' ESA citizen-suit claims based on the same facts and analysis the Court used to reject Plaintiffs' similar claims at the preliminary injunction stage.

For example, Plaintiffs continue to assert that FWS erred in relying on the permit applicants' Habitat Functional Analysis ("HFA") to conclude that the Project will not jeopardize any of the species' existence. ECF No. 117 at 10. FWS acknowledged in its Statement of Findings ("SOF") that it considered the HFA because it was the model utilized in the HCP submitted by the applicants. Doc. 1 AR at 00021. Nevertheless, FWS relied on its own experts to conduct independent evaluations of the effects of the Project, including planned mitigation, on each individual species. *Id.* Accordingly, the Court has already concluded that "the Biological Opinion and the Set of Findings (both independently prepared by the Service) show that the Service indisputably considered the needs and impacts of each affected species and habitat and, based on those needs and assessments as well as the HFA and [HCP], reached logical conclusions regarding habitat value and conservation." ECF No. 103 at 6. The Court should grant summary judgment in favor of Federal Defendants on Plaintiffs' ESA citizen-suit claims based on the same facts and analysis on which the Court denied Plaintiffs' motion for a preliminary injunction.

---

also properly considered the beneficial results from Project mitigation in assessing the extent of any potential adverse [e]ffects on marine life and its habitat.").

Plaintiffs incorrectly suggest that FWS made unwarranted assumptions about the anticipated benefits of future mitigation. *See* ECF No. 117 at 9–11. Each of the cases cited by Plaintiffs is distinguishable.[7] Contrary to Plaintiffs' arguments, FWS's determinations that the HCP presented by the applicants avoided jeopardy to all of the covered species and otherwise satisfied all statutory criteria for issuance of an ITP is entitled to "special deference" because FWS is "making predictions, within its area of special expertise. . . ." *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1289 (11th Cir. 2016) (quoting *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1264) (11th Cir. 2009)).

**B.  FWS Complied with the Procedural Requirements of the ESA.**

**1.  FWS Properly Described the "Action Area" for consultation.**

As defined in the consultation regulations, the "action area" to be considered during ESA consultation includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The action area for purposes of the consultation here is the 188.86-acre "Plan Area" described in the Applicants' HCP. Doc. 3 AR at 00070. "Deference to an agency's decision regarding the determination of an appropriate action area is recognized and in order for the Court to find that the Agencies' decision was arbitrary and capricious, the Court must find that 'a clear error in judgment' was committed." *Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F. Supp. 3d at 1302 (citing *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990)). Plaintiffs bear a "difficult burden" in challenging FWS' decision with respect to defining the action area for purposes of consultation.

---

[7] The court found that the conservation program at issue in *Florida Key Deer v. Paulison*, was a "voluntary program with no effect on the specific species affected by its actions." 522 F.3d at 1145. Here, by contrast, FWS has concluded that improving the property's management pursuant to the HCP would increase benefits for the listed species sufficiently to offset Project impacts. Doc. 1 AR at 00003. In *Sierra Club v. Marsh*, 816 F.2d 1376, 1379 - 80 (9th Cir. 1987), FWS found that a local government had already failed to acquire mitigation lands and that such failure was likely to jeopardize the continued existence of the species in that case. Here, by contrast, there have been no findings by FWS of delay or non-compliance with respect to the implementation of the HCP. Furthermore, FWS accounted for potential effects on species both in the short-term during Project construction and over the long-term as the mitigation measures in the HCP are implemented. In *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1283 (S.D. Ala. 1998), the court concluded that the biological opinion had insufficient information about the total remaining population of the Alabama beach mouse to draw conclusions about the effects of habitat loss resulting from the issuance of the ITP in that case. There is no corresponding gap in available information concerning the baseline status of the species here.

*Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1222 (11th Cir. 2002). Plaintiffs fail to carry that difficult burden here.

Plaintiffs cite only the Nagano declaration in support of their assertion that FWS should have considered the Project's effects in relation to the larger, 800-acre Richmond Rocklands area. *See* ECF No. 117 at 11. The Nagano declaration states that pine rockland habitat in the Richmond Pine Rocklands outside the Biop action area "will be directly or indirectly impacted" by the Project. ECF No. 119-2 ¶ 7. Mr. Nagano provides no basis anywhere in the declaration to support this claim. In any event, FWS did consider the Project's potential effects outside the 188.86-acre "Plan Area". For example, FWS acknowledged that smoke from prescribed burning and increased traffic effects may extend beyond the HCP Plan Area, but that "we do not expect any such effects to influence the status of the Covered Species or their designated CH outside the HCP Plan Area." Doc. 3 AR at 00070. Plaintiffs fail to demonstrate that FWS erred in defining the action area for purposes of ESA consultation.

### 2.   FWS Used the Best-Available Scientific Information.

The permittees commissioned and completed a rare plant and floristic survey of the CRC property in 2014. Doc. 3 AR at 00072. The FWS biological opinion also required the permittees to complete pre-construction surveys for the Florida bonneted bat to inform subsequent pre-construction actions to reduce impacts. Doc. 3 AR at 00071. However, FWS determined that it was not necessary to require the Permittees to undertake additional surveys of the CRC property or the off-site preserve areas to count the number of individuals present. Doc. 1 AR at 15.

Plaintiffs assert that FWS "could have required" additional surveys to "detail[]how the agency action affects the species or its critical habitat" pursuant to 16 U.S.C. § 1536(b)(3)(A). ECF No. 117 at 12. However, the relevant issue is not whether, theoretically, FWS could have required additional surveys but rather whether FWS based its decisions on the "best scientific and commercial data available" for each species as required under Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), and the consultation regulations, 50 C.F.R. § 402.14(g)(8*). See Heartwood v. U.S. Forest Serv.*, 380 F.3d 428, 436 (8th Cir.2004) (finding that this requirement "does not require an agency to conduct new studies when evidence is available upon which a determination can be made.... All that is required of the agencies is to seek out and consider all existing scientific evidence relevant to the decision at hand") (citation omitted). The record here explains the basis of FWS's decisions to issue the biological opinion and ITP based on the existing survey

information.[8]

As explained in the Statement of Findings, additional biological surveys were unnecessary because each of the species considered in the biological opinion was presumed to occur in the action area. Doc. 1 AR at 00015. Furthermore, several of the species such as the eastern indigo snake and Miami tiger beetle are cryptic and difficult to detect such that surveys would likely underestimate their presence. *Id.* In light of these findings by FWS, Plaintiffs fail to demonstrate that it was arbitrary and capricious for FWS to issue its biological opinion and ITP without requiring the applicant to undertake additional biological surveys. "The general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination deserving deference." *Miccosukee Tribe*, 566 F.3d at 1265 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377–78 (1989)). Therefore, FWS's consideration of potential effects of the Project, based on the assumed presence of the Florida bonneted bat, Miami tiger beetle, and other species, is fully consistent with its obligation to utilize the "best scientific and commercial data available," as required under Section 7 of the ESA, 16 U.S.C. § 1536(a)(2). *See Nat. Res. Def. Council v. Nat'l Park Service*, 250 F. Supp. 3d at 1305 (upholding biological opinion that assumed presence of species within action area).

### 3. Because FWS authorized incidental take by the Permittees in the ITP, it was unnecessary for FWS to separately enumerate incidental take in the biological opinion.

As Federal Defendants have repeatedly explained, the ITP authorizes the incidental take of species by the Permittees at the Project site as a result of implementing their HCP pursuant to Section 10 of the ESA.[9] *See* ECF No. 32 at 12-13; ECF No. 86 at 4 – 8. The Incidental Take

---

[8] As explained in the response to public comments in FWS' Statement of Findings, FWS did not rely solely on the applicants' HFA to determine the Project's effects. Doc. 1 AR at 00021. Rather, FWS relied on its own experts to conduct independent valuations of the effects of the Project, including planned mitigation, on each individual species. *Id.*

[9] Based on the Permittees' agreement to implement the avoidance, minimization, and mitigation measures described in the HCP, the ITP authorizes all incidental take by the Permittees associated with the development of 86.5 acres of the Coral Reef Commons parcel, as well as management of the on-site and off-site preserve areas. Doc. 2 AR at 00041. The authorized take includes all take of the covered wildlife species "in the form of harassment, harm, or mortality incidental to demolition, land clearing, grading, construction, occupation, maintenance, and habitat management throughout the Project Area. . . ." *Id.* Thus, it is unnecessary for the ITS to enumerate the numbers of each individual species that will be incidentally taken during implementation of the HCP.

Statement ("ITS") in the biological opinion does not separately exempt any incidental take of species by the Permittees. *See* Doc. 3 AR at 00236-37. Because the ITS does not authorize the Permittees' incidental take, it is unnecessary for the biological opinion here to identify numeric triggers to reinitiate consultation due to unforeseen incidental taking as otherwise is required in biological opinions that exempt incidental take outside the ESA Section 10 context, such as the biological opinion described in *Miccosukee Tribe*, 566 F.3d at 1271-72. [10]

In denying Plaintiffs' motion for preliminary injunction, the Court properly concluded that "[b]ecause there is no separate obligation in Section 10 to quantify incidental take or to have a numerical trigger to reinitiate consultation in the Biological Opinion, the Magistrate Judge did not need to address Plaintiff's arguments regarding whether habitat loss was an appropriate surrogate for numerical estimation of incidental take in the [Report and Recommendation]." ECF No. 103 at 5 (citing *Loggerhead Turtle v. Cty. Council of Volusia Cty.*, 148 F.3d 1231, 1244 (11th Cir. 1998)). Here too, for purposes summary judgment, Plaintiffs fail to demonstrate that the biological opinion should have required monitoring of incidental take for purposes of reinitiating ESA consultation upon some numerical trigger. As provided in the FWS HCP Handbook, FWS addresses any unanticipated taking of species that occurs over the course of HCP implementation as a matter of its law enforcement discretion:

> If we become aware of a deficiency in implementation, either of the project or the mitigation, of activities not covered by the incidental take permit, or of take in excess of that authorized, we should notify the permittee. What we describe here is an escalation of notice, administrative measures, law enforcement investigation, suspension, revocation, and civil or criminal processes.

HCP Handbook at p. 17-10, https://www.fws.gov/endangered/esa-library/index.html#hcp (last visited May 29, 2018). *See also Loggerhead Turtle*, 120 F. Supp. 2d 1005, 1025 (M.D. Fla. 2007)

---

[10] Although the ITS does not incorporate any numeric criteria for unanticipated taking of species, reinitiation of consultation may be triggered by one of the other occurrences identified in the biological opinion's "reinitiation statement." Doc. 3 AR at 00237. For example, reinitiation of consultation would be required if new information reveals effects of the action that were not considered in the biological opinion. *Id.* Similarly, reinitation would be required if the action is modified in a manner that causes effects not considered in the biological opinion. *Id.* For example, it is possible that FWS may reinitiate consultation with itself in the future, if it determines that it is necessary to amend the ITP under certain limited circumstances set forth in the "no surprises" regulations governing the ESA Section 10 process. 63 Fed. Reg. 8859 (Feb. 23, 1998); 50 C.F.R. § 17.22(b)(5). Reinitation would also be necessary under the terms of the reinitiation statement if a new species is listed or critical habitat is designated. Doc. 3 AR at 00237.

("The Service must choose the best way to deal with [violations of the ITP] in light of several factors."). Thus, the Court properly concluded that "[t]he Permit sets out dozens of conditions, which if breached, will trigger the Service to revisit the Permit pursuant to its enforcement power." ECF No. 103 at 5.

Because it is unnecessary for FWS to establish a numeric trigger for reinitiating consultation based on exceeding some authorized level of incidental take, it follows that it is also unnecessary for FWS to explain why it would have been impractical to identify such numeric triggers. *See Loggerhead Turtle,* 148 F.3d at 1244 ("[T]he law governing incidental take statements issued under 16 U.S.C. § 1536(b), the statutory source in *Ramsey [v. Kantor*, 96 F.3d 434 (9th Cir. 1996)], differs from the law governing incidental take permits issued under 16 U.S.C. § 1539(a), the statutory source in this case."). However, assuming for sake of argument that FWS had any such obligation, the biological opinion does estimate take in the effects analysis sections in terms of numbers of individuals of species for which FWS had available information to support such estimates. *See, e.g.,* Doc. 3 AR at 00107 (Bartram's Scrub-Hairstreak butterfly); *id.* at 000150 (Miami tiger beetle); *id.* at 000159 (Eastern indigo snake); *id* at 000190 – 91 (Florida bonneted bat). The Court properly concluded that the biological opinion satisfies any requirement to estimate take to the extent practicable. *See* ECF No. 103 at 5-6 ("[E]ven assuming Plaintiffs are correct that take must be estimated in the Biological Opinion, the Biological Opinion does just that for those species that the Service has information about."). Based on the same reasoning as the order denying Plaintiffs' motion for preliminary injunction, the Court should grant summary judgment in favor of FWS with respect to Plaintiffs' claims concerning reinitiation triggers.

### 4. FWS Properly Included Off-Site Mitigation Measures among Terms and Conditions of the Biological Opinion.

In addition to providing for habitat preservation and restoration on the Project site, the Section 10 permit also incorporates (among other terms and conditions) a detailed management plan for an off-site preserve of 50.96 acres, as set forth in the HCP. *See* Doc. 4 AR at 00270–71 (Location Map). The biological opinion incorporated all terms and conditions of the ITP as non-discretionary terms and conditions of the "incidental take statement" pursuant to 50 C.F.R. § 402.14(i). Doc. 3 AR at 00236–37. Plaintiffs incorrectly suggest that the off-site mitigation area will not result in any conservation benefit to the species because it is already subject to land-use restrictions. ECF No. 117 at 14. Currently, the conservation easement on the off-site area is

10

limited to one species (the deltoid spurge) and allows the owner to vacate the restriction. Doc. 4 AR at 00389. As explained in the Statement of Findings, FWS determined that the planned mitigation under the HCP improves the level of protection to species habitat in the off-site area through increased management and a permanent deed restriction. Doc. 1 AR at 00011. Thus, the Court already considered and rejected Plaintiffs' arguments concerning the off-site mitigation and concluded that "[t]he Magistrate Judge was, therefore, correct to defer to the Service's expertise." ECF No. 103 at 8.

In their summary judgment brief, Plaintiffs fail to meaningfully advance their arguments concerning off-site mitigation beyond those arguments already rejected by the Court. The Statement of Findings explains the basis for FWS's determination that the HCP meets the minimum requirements of ESA Section 10 to "minimize and mitigate" the impacts of permitted taking of wildlife "to the maximum extent practicable" pursuant to 16 U.S.C. § 1539(a)(2)(B)(ii). Doc. 1 at 00004-5, 10-11. "The Service believes that permanently protecting the property and improving management actions would result in increased benefits for the listed species thereon." *Id.* at 11. Therefore, FWS supplied a "sufficient basis" to demonstrate that the actions described in the HCP meet the criteria for an ESA Section 10 permit. *Sierra Club v. Babbitt*, 15 F. Supp. 2d at 1279. The cases cited by Plaintiffs do not support any contrary conclusion.[11] The Court should continue to defer to FWS' expertise in determining the anticipated benefits of both the on-site and off-site habitat restoration proposed here. *See Fund for Animals*, 85 F.3d at 545. In sum, FWS reasonably concluded that the HCP here meets all issuance requirements pursuant to ESA Section 10 and its implementing regulations, 16 U.S.C § 1539(a)(2)(B) and 50 C.F.R. Part 17.

## II.    FWS Reasonably Concluded that the Project Would Not Have Significant

---

[11] In *Swan View Coalition v. Barbouletos*, Civ. No. 06-73-M-DWM, 2008 WL 5682094, at *15 (D. Mont. June 13, 2008), the court criticized FWS's decision to consider the effects of existing, illegal snowmobile use as part of the environmental baseline for assessing effects of a motorized recreation plan for a national forest. Here, by contrast, there was no illegal activity that was allegedly ongoing in the Project area. In *Friends of the East Fork v. Thom*, the Court concluded that the permit applicant had failed to meet reclamation obligations under pre-existing state permits. 688 F. Supp. 2d 1245, 1252 (W.D. Wash. 2010) ("[T]here can be no question that state reclamation was legally required . . . ."). Here, the HCP will result in protections above and beyond what existed under the existing easement that pertained only to the deltoid spurge. *See* Doc. 1 AR at 00010. To the extent FWS had any obligation to account for the pre-existing easement in its baseline analysis concerning the deltoid spurge, it did so. Doc. 3 AR at 00194 ("The 50.96-acre off-site Preserve, UM Richmond Campus, has a deed restriction which is limited to the listing of the deltoid spurge.").

**Environmental Impacts.**

Whether an action will have significant environmental impacts is a factual determination which "implicates substantial agency expertise" and is entitled to deference. *Marsh,* 490 U.S. at 376. The Court has recognized that its role "is not to substitute its judgment for the Services' but rather to determine whether the Service 'examined the relevant data and articulated a satisfactory explanation for its action.'" ECF No. 103 at 9, quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983). Thus, in denying Plaintiffs' Motion for Preliminary Injunction, it properly rejected Plaintiffs' argument that FWS violated NEPA by preparing an Environmental Assessment ("EA"), rather than an Environmental Impact Statement ("EIS"). The Court based its conclusion on analysis of the relevant factors identified in the Council on Environmental Quality[12] NEPA regulations:

> In determining whether a proposed action will likely have a significant effect on the human environment, the Service must consider the following factors, among others that are not at issue here: (1) the unique characteristics of the geographic area, (2) the degree to which the environmental effects of the proposed action are highly controversial, and (3) the degree to which the action may adversely affect a listed species or its habitat.

ECF No. 103 at 9 (citing 40 C.F.R. § 1508.27(b)). The Court found that FWS appropriately identified the relevant environmental concerns based on its findings that the area currently "provides relatively low habitat quality for the pine rockland dependent Covered Species," and that "the development, with its habitat restoration, management and mitigation conditions, 'will minimize and mitigate the Project's impacts to the Covered Species to the maximum extent practicable.'" ECF No. 103 at 9-10. That decision was, in turn, informed by the biological opinion's conclusion that the "development would actually increase habitat quality, thereby leading to an increase in abundance of several of the species." *Id.* at 10. The Court concluded that "Plaintiffs simply have presented no reason to disregard" these determinations, which go to the heart of the Agency's technical expertise and are entitled to special deference. *Id.* As explained below, Plaintiffs' Motion for Summary Judgment fails to identify any additional information that would compel a different result.

**A.  FWS' Decision to Prepare an Environmental Assessment was Reasonable.**

---

[12] The Council on Environmental Quality ("CEQ"), an agency created by NEPA in the Executive Office of the President, has issued regulations to guide agencies' NEPA compliance. 40 C.F.R. §§ 1500.1-1508.28.

As Plaintiffs acknowledge, under applicable regulations, "[w]hen an agency is uncertain whether an EIS is required, it may first prepare an EA." ECF No. 117 at 16 (citing 40 C.F.R. §§ 1501.3, 1501.4, and 1508.9). "The purpose of an [Environmental Assessment] is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement." *Fund for Animals,* 85 F.3d at 546, *quoting River Road All. v. Corps of Eng'rs of U.S. Army,* 764 F. 2d 445, 449 (7th Cir. 1985). Where, as here, an agency prepares an EA and concludes that the proposed action is not likely to have significant impacts, the agency may issue a finding of no significant impact (FONSI), and the NEPA process is complete. 40 C.F.R. § 1508.13.

Plaintiffs argue that because some FWS personnel originally favored preparation of an EIS, the subsequent decision to prepare an EA was arbitrary and capricious. ECF No. 117 at 15-17. However, agencies are entitled to change their minds provided they follow proper procedures. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658–59 (2007). The record here shows that FWS followed all proper procedures here with respect to preparation of an EA and issuance of a FONSI.

FWS prepared a robust EA[13] and Biop, from which it reasonably concluded that an EIS was unnecessary. *See* Doc. 1 AR at 00038 ("In the spirit and intent of the [CEQ] regulations for implementation of [NEPA], other statues, orders, and policies that protect fish and wildlife resources, I have made a finding of no significant impact for the proposed action."). As shown above, preparation of an EA to determine whether there are significant environmental impacts that would justify preparation of an EIS is explicitly contemplated by the applicable regulations and cases construing them. Plaintiffs' focus on the decisionmaking process – rather than the substance of FWS' decisions – misstates the appropriate inquiry: whether FWS' ultimate finding that the Project would not result in significant environmental impacts was arbitrary and capricious. The Court *already* concluded in denying Plaintiffs' motion for preliminary injunction that FWS' ultimate finding was not

---

[13] The EA includes a detailed description of the affected "Physical Environment," including geology, soils and topography, water resources, air quality, and climate change. Doc. 31 AR at 01735–44. It then examines at length the "Biological Environment" -- from Natural Forest and Vegetative Communities, to wildlife and protected and invasive species. *Id.* at 01746–55. The EA then provides an 80-page, in-depth analysis of a full range of alternatives to the Project and the anticipated environmental impact of each alternative on the physical and biological environment. *Id.* at 01767–847.

arbitrary and capricious. ECF No. 103 at 9 ("The Court concludes that the Service's determination that the impact of the development was not significant was not arbitrary and capricious."). Based on the full record at summary judgment, Plaintiffs still fail to carry to carry their burden of showing that FWS' ultimate finding was arbitrary and capricious.

**B. The Record Fully Supports FWS' Conclusion that the Project Will Not Significantly Impact the Human Environment.**

As explained in the Statement of Findings, the Project will create 51.41 acres of on-site preserves and a new 50.96-acre off-site preserve that will be managed and protected in perpetuity. The on-site preserves also include an area that will provide connectivity between the east and west sections of the site. Both on-site and off-site preserves will be protected by a permanent conservation easement, with funds allocated for management of this land in perpetuity. Doc. 1 AR at 00002-03.

FWS concluded that permanently protecting the property and improving its management would result in increased benefits for both vegetative communities and listed species. Doc. 31 AR at 01800-03. That decision was informed by its comprehensive Biological Opinion, which analyzed the Project's effects on each covered species and concluded, as to each, that the anticipated take associated with the Project would not appreciably reduce the likelihood of the species' survival and recovery in the wild. Doc. 3 AR at 00063. FWS also developed mandatory measures to reduce or eliminate adverse effects of the Project. Taking these protective measures into account, FWS reasonably concluded that the Project would not result in significant impacts. Doc. 31 AR at 01800-03; Doc. 1 AR at 00002-03.

Plaintiffs do not contend that the EA failed to identify relevant environmental concerns. Nor could they—the EA exhaustively analyzes the affected environment, impacts to vegetation, soils, wetlands, protected species, water quality, hydrology, wilderness, visitor use, and other issues. Nor can Plaintiffs credibly argue that FWS failed to take a hard look at the environmental effects of the Project. The 136-page EA comprehensively examines the affected environment, and a full range of alternatives, as well as both cumulative effects and climate change. Doc. 31 AR at 01722-864.

Instead, Plaintiffs simply begin with the assumption that the Project will result in significant environmental effects and argue in conclusory fashion that FWS "ignored" those effects, "including the cumulative impacts of climate change." ECF No. 117 at 17. In fact, the EA includes sections on both cumulative effects and climate change. Doc. 31 AR at 01744, 01847–49. Contrary to Plaintiffs' assertions, those sections discuss all of the factors set forth in *Great Old Broads for Wilderness v.*

*Kempthorne,* 452 F. Supp. 2d 71, 84 (D.D.C. 2006). Plaintiffs fail to even acknowledge that analysis.

Plaintiffs also rely heavily upon comments submitted by Paula Halupa, a FWS biologist who commented in her personal capacity. Doc. 253 AR at 09367-76. Ms. Halupa had been involved with the Project in her professional capacity in its early phases and also provided input at that time. *Id.* at 09368. Ms. Halupa's remarks, however, do not establish that FWS acted arbitrarily and capriciously. They are simply statements of personal opinion, with no new supporting facts or data. An issue that appears throughout Ms. Halupa's comments relates to the purported lack of sufficient baseline information on the status of the covered species. The SOF responded at length to that concern, explaining that:

> the Service and the Applicants agreed, for purposes of this application, each Covered Species is present in or could enter in the action area during the duration of the requested permit. This approach errs on the side of the species in our analysis of the extent to which a species would be adversely affected by the proposed action and likely overestimates the amount of occupied habitat. Using this approach, the Applicants were required to include actions to avoid and minimize effects to Covered Species. . . . Furthermore, several of the Covered Species, such as the eastern indigo snake, rim rock crowned snake, and Miami tiger beetle, are cryptic and difficult to detect, and survey would likely underestimate their presence.

Doc. 1 AR at 00015.[14]

Ms. Halupa's comments fall far short of demonstrating that the Service's conclusion that the Project would not significantly affect the environment was arbitrary and capricious. They reflect, at most, her disagreement with the Service's conclusions. The "mere existence of internal disagreements between agency experts does not make the agency's decision arbitrary or capricious." *Nat'l Wildlife Fed'n v. Norton*, 306 F. Supp. 2d 920, 928 n.15 (E.D. Cal. 2004) (citation omitted); *Fund for Animals v. Norton*, 365 F. Supp. 2d 394, 419 (S.D.N.Y. 2005) ("The vigorous and thoughtful debate . . . does not equate to a lack of substantial evidence, as required by *Overton Park* and the APA."), *aff'd* 538 F.3d 124 (2d Cir. 2008). To the contrary, the comments in the record show that the biological opinion was developed from a lively debate on important issues and that the decisionmaking process worked exactly as it should. *See, e.g., Aluminum Co. of Am. v. Bonneville Power Admin.,* 175 F.3d 1156, 1162 (9th Cir. 1999) (holding that a biological opinion was not arbitrary and capricious where differing

---

[14] Another issue Ms. Halupa raised was the omission of the Miami tiger beetle from certain sections of the draft EA. As explained in the SOF, this was an oversight and typographical error that was corrected in the final EA. Doc. 1 AR at 00037.

scientific views were resolved through expert choices).

### 1. FWS Fully Considered the Unique Characteristics of the Geographic Area and the Pine Rocklands Habitat

Plaintiffs again argue that the "imperiled" status of the pine rocklands habitat demonstrates that the Service's conclusion that the Project will not significantly affect the environment is arbitrary and capricious. ECF No. 117 at 19. This Court previously rejected the same argument. ECF No. 103 at 9–10. Nothing in the administrative record or Plaintiffs' motion compels a different conclusion.

To begin with, the EA clearly and explicitly addresses the importance of the pine rocklands habitat in South Florida – many of Plaintiffs' citations are from the EA itself. Doc. 31 AR at 01733-34. The EA acknowledges that the Project will result in the loss of 82.16 acres of pine rocklands habitat. But it also discusses the current degraded condition of the habitat within the Project's footprint:

> All of the pine rocklands within the property proposed for CRC show varying levels of degradation from fire suppression and infestation of exotic plant species and some successional habitat change appears to be occurring with dense stands of native hardwoods and pines present, atypical of pine rockland habitat…. [W]ithout any habitat restoration and management, it is likely that habitat quality will continue to degrade and exotic infestation and hardwood encroachment will continue to deteriorate the habitat for pine rockland dependent species.

Doc. 31 AR at 01774.

The Service thus reasonably concluded that the area covered by the Project currently "provide[s] relatively low quality habitat for the pine rockland dependent Covered Species." Doc. 1 AR at 00002. It further concluded that the Project, with its habitat restoration, management, and mitigation conditions, would improve habitat quality. *Id*. at 00005. Thus, contrary to Plaintiffs' assertions, FWS analyzed both adverse and beneficial effects of the Project on the pine rocklands habitat and reasonably concluded that the Project would improve habitat quality which would, in turn, lead to increases in the populations of certain covered species. Doc. 31 AR at 01800-03. The record fully supports those conclusions. Plaintiffs' arguments, by contrast, ignore entirely the current degraded condition of the pine rocklands habitat covered by the Project, as well as the beneficial effects of habitat restoration, management and mitigation.

### 2. FWS Reasonably Concluded that the Development Would Have an Overall Beneficial Effect on Both Vegetative and Wildlife Communities.

Plaintiffs argue that FWS "ignored record evidence" of the Project's adverse impacts on both listed species and the pine rocklands habitat. ECF No. 117 at 21. In fact, however, the EA carefully

evaluated adverse and beneficial impacts on both the habitat and listed species. It painstakingly examined the Project's potential effects on each covered species, including the Miami tiger beetle. Contrary to Plaintiffs' assertion, the EA includes a lengthy discussion of the Project's beneficial and adverse effects on the Miami tiger beetle. Doc. 31 AR at 01825-35. Based on all of the evidence, FWS concluded that the Project could be expected to:

> improve the functional value of the pine rockland habitat that is preserved after development and result in a net benefit to the vegetative communities considering development and conservation activities. Consequently, resident wildlife populations, particularly pine rocklands dependent species would also be expected to experience an overall beneficial effect.

*Id.* at 01800. The record fully supports the above conclusion. S*ee generally* Doc. 31 AR at 01796-841. By contrast, Plaintiffs focus solely on adverse effects of the Project, but nowhere mention or address the beneficial impacts discussed in the EA and Biop. Similarly, Plaintiffs incorrectly claim that the EA "failed to mention the impacts of sea-level rise, climate change, or coastal squeeze," on covered species. ECF No. 117 at 11. However, the EA includes sections entitled "CUMULATIVE EFFECTS" and "CLIMATE CHANGE" that analyze those issues. As explained in the SOF, based on available information on sea-level rise projections, FWS concluded that: "we do not believe that sea-level rise will directly affect the Project over the requested 30-year ITP term. Nevertheless, sea level rise will need to be monitored periodically throughout any permit term, and will be a special consideration if permit renewal is contemplated." Doc. 1 AR at 00005.

Relying on *Sierra Club v. Norton*, 207 F. Supp. 2d 1310 (S.D. Ala. 2002), Plaintiffs again argue that FWS' conclusions as to the Project's impact on covered species is arbitrary and capricious because FWS did not conduct population surveys on all species. As this Court previously concluded, however, *Norton* is inapposite. Unlike here, in *Norton*, "the Service acknowledged uncertainty about the effect of the development on a native species. The Service expresses no such uncertainty here; rather, the biological opinion considered the effect for each species." ECF No. 103 at 10 n.4. The record thus refutes Plaintiffs' argument that FWS "operated with as much uncertainty" here as it did in *Norton*. ECF No. 117 at 23.

### 3.  FWS Reasonably Concluded that the Project is Not Highly Controversial.

The Court also previously rejected Plaintiffs' argument that the "highly controversial" nature of the Project's environmental impact required preparation of an EIS. In denying Plaintiffs' Motion for Preliminary Injunction, the Court explained that "Plaintiffs pointed only to the public comments, and

provided no scientific or other evidence that the project was highly controversial." ECF No. 103 at 10. *See also*, *Fund for Animals v. Frizzell,* 530 F.2d 982, 988, n.15 (D.C. Cir. 1975) ("[C]ertainly something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter."). Based on the full record, Plaintiffs have cited no such evidence here.

 FWS received, reviewed, and considered numerous public comments on the Project and concluded that: "[A] large number of commenters expressed opposition to the Project . . . but provided little to no supporting documentation as to why such action should be taken." Doc. 1 AR at 00008. Such disagreement with agency policy and conclusions does not make an action "highly controversial" under the CEQ regulations. *Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F. Supp. 3d at 1298 ("Plaintiffs have not identified any underlying flaws in NPS's analysis of the impacts from the Plan, and opposition alone is not enough to require that an EIS be performed."). Rather, there must be "scientific or other evidence that reveals flaws in the methods or data relied upon by the agency in reaching its conclusions." *Ga. River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1338 (N.D. Ga. 2003). *See also Nat'l Parks Conservation Ass'n v. U.S. Forest Service*, 177 F. Supp. 3d 1, 33 (D.D.C. 2016) (mining project near national park not highly controversial).

Plaintiffs have produced no evidence that FWS's methods or the data it relied upon were flawed. Instead, Plaintiffs cite the unsupported opinions of various commenters who disagree with FWS' conclusions, *see* ECF No. 117 at 20, but include no factual information evidencing flaws in FWS' methodology or data. Thus, Plaintiffs' claim that the Project is highly controversial again fails.

### C.  FWS Provided Ample Opportunity for Public Comment.

FWS provided ample opportunity for public comments on the Project prior to issuing the ITP. The public comment period extended for two months -- from March 23 through May 22, 2017. Doc. 1 AR at 00007. Although FWS did not convene a public hearing, it did conduct a public information webinar during which the ITP process and NEPA obligations were explained and participants posed questions and commented on the Project.[15] The webinar concluded when there were no additional comments. *Id.* Public comments were received following the webinar and combined with those received during the public comment period. *Id.* at 00008.

---

[15] The webinar included audio and PowerPoint presentations, with hard copies of the presentation material available for those without internet access. The Powerpoint presentation for the webinar, a transcript of the proceeding, and a participant list are included in the Administrative Record. *See* Docs. 218-220 AR at 04427-508; Doc. 1 AR at 00008.

Plaintiffs nonetheless argue that FWS was required to hold a public hearing, citing CEQ regulations relating to context and intensity, which provide that one factor to be considered is the extent to which the Project is "highly controversial." ECF No. 117 at 20. As explained above, Plaintiffs have failed to carry their burden of establishing that the Project is highly controversial. The ESA does not require a public hearing on an ITP application, and NEPA grants discretion over appropriate levels of public involvement. Doc. 1 at 00007-8. In short, no public hearing is required as part of the EA process.[16] Although FWS may have considered holding a public meeting or hearing at the request of Representative Curbelo, it had no obligation to do so and ultimately decided that "the comment period was sufficient and a hearing was not necessary." *Id.* Plaintiffs' assertion that FWS "arbitrarily decided not to host a public hearing based on a politician's whims rather than its own binding regulations" is baseless. ECF No. 117 at 23. The regulations Plaintiffs cite did not require FWS to hold a public hearing, and the record is devoid of support for the conclusion that the decision was dictated by a "politician's whims." Rather, as set forth in the SOF, FWS reasonably decided that a public hearing was unnecessary. That decision is entitled to substantial deference.

Plaintiffs' further assertion that FWS failed to make "high quality information available" to the public is also baseless. *See* ECF No. 117 at 24. That complaint rings particularly hollow in light of Plaintiffs' complete and utter failure to identify any such "high quality" information that FWS failed to consider, or that Plaintiffs requested and did not receive. This Court previously rejected Plaintiffs' argument that FWS was required to make the SOF available to the public 30 days before making its final decision. ECF No. 103 at 11. Yet Plaintiffs again argue that such review was required under FWS guidelines. Plaintiffs assert that this was a borderline case because a reasonable argument could be made for preparation of an EIS. ECF No. 117 at 24.

As this Court already held, the Service did not conclude that this was a borderline case, and

---

[16] *Fund for Animals,* 85 F.3d at 549 ("[T]here is no *legal* requirement that an Environmental Assessment be circulated publicly and, in fact, they rarely are) (emphasis in original); *Como-Falcon Cmty. Coal. v. U.S. Dep't of Labor,* 609 F.2d 342, 345 (8th Cir. 1979) (there is no statutory requirement that an agency provide opportunity for comment of any particular kind, and "we are unwilling by judicial decision to legislate such a requirement into [NEPA]"); *Greater Yellowstone Coal v. Flowers,* 359 F.3d 1257, 1279 (10th Cir. 2004) (not making available a draft EA and other project documents before a decision was made was found not to be arbitrary); *Pogliani v. U.S. Army Corps of Eng'rs,* 306 F.3d 1235, 1238-39 (2d Cir. 2002) (plaintiffs were unlikely to succeed on their claim that defendant "erred by failing to release its draft EA and FONSI for public comment prior to their issuance).

Plaintiffs "offer no evidence or sound rationale why the Court should not defer to the Service." ECF No. 103 at 11. Plaintiffs next argue that the Project was precedent-setting because "the issuance of a take permit was predicated on the generalized HFA, which had never been used before and was heavily criticized by the scientific community." ECF No. 117 at 24. As explained above and in Defendants' prior briefs, that assertion is factually incorrect. FWS acknowledged in its SOF that it considered the HFA because it was the model utilized in the HCP submitted by the applicants. Doc. 1 AR at 00021. Nevertheless, FWS relied on its own experts to conduct independent evaluations of the effects of the Project, including planned mitigation, on each individual species. *Id.* Finally, Plaintiffs assert, without citation of any support, that this is the type of action that would normally require an EIS. ECF No. 117 at 24. FWS decided otherwise, and that decision is entitled to substantial deference. *E.g. Fund for Animals,* 85 F.3d at 541.

Finally, Plaintiffs have failed to identify "any additional relevant information that they or any other party would have provided the FWS" during any such 30-day notice period. *Sabine River Auth. v. U.S. Dep't of Interior,* 745 F. Supp. 388, 401 (E.D. Tex. 1990) (holding that 30-day notice period was not required), *aff'd,* 951 F.2d 669 (5th Cir. 1992). As in *Sabine River*, "there is nothing to suggest that the absence of the additional comment period deprived the FWS of relevant information such as would undermine the reasonableness or adequacy of the FWS's NEPA review process." *Id*. at 401. This is particularly true given that – although it was not required to do so pursuant to NEPA,[17] FWS released a draft EA and a draft HCP on March 23, 2017, convened a public information webinar, and responded in detail to public comments. Doc. 1 AR at 00007-08. FWS provided sufficient opportunity for public comments on the Project.

## CONCLUSION

Plaintiffs' summary judgment motion does nothing to advance Plaintiffs' claims beyond the arguments already presented by Plaintiffs in two rounds of briefing plus oral argument on Plaintiffs' motion for a preliminary injunction. The Court already considered and rejected Plaintiffs' arguments. For the reasons explained above and in the briefing previously submitted by Federal Defendants, *see* ECF Nos. 32 and 86, the Court should grant summary judgment in favor of Federal Defendants as to all claims.

---

[17] ESA Section 10(c) requires FWS to advertise applications for an ITP in the Federal Register. 16 U.S.C. § 1539(a)(2)(B). FWS used the required notice of receipt of the ITP application to advertise the availability of the EA. 82 Fed. Reg. 14,908 (March 23, 2017).

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Section Chief

Dated June 1, 2018                    *s/ Mark Arthur Brown*
MARK ARTHUR BROWN
Florida Bar No. 0999405
Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0204
Facsimile: (202) 305-0275
mark.brown@usdoj.gov

LUCINDA J. BACH
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
601 D Street, NW
Washington, DC 20004
Tel: (202) 616-9663
Lucinda.bach@usdoj.gov

Counsel for Federal Defendants

Of Counsel for Federal Defendants:

Vicki Mott
Attorney-Adviser
U.S. Department of the Interior
Office of the Regional Solicitor
Southeast Region
75 Ted Turner Drive SW, Suite 304
Atlanta, GA 30303
Telephone: 404-331-0722 (x233)
vicki.mott@sol.doi.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2018 a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

/s/ *Mark Arthur Brown*
MARK ARTHUR BROWN