UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:17-cv-24444-UU

---

CENTER FOR BIOLOGICAL DIVERSITY, *et al.,*

      *Plaintiffs*,

         v.

RYAN ZINKE, in his official capacity as Secretary of the U.S. Department of the Interior, *et al.,*

      *Defendants*,

and

CORAL REEF RETAIL, LLC, *et al.,*

      *Intervenor Defendants*.

---

## INTERVENOR DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and this Court's Scheduling Order of April 10, 2018, [Doc. 113], Intervenor Defendants Coral Reef Retail, LLC, Coral Reef RESI PH 1, LLC, RAMDEV, LLC, and University of Miami ("Permittees"), by and through their respective counsel, hereby move for Summary Judgment on all counts of Plaintiffs' First Amended Complaint, [Doc. 95].

For the reasons set forth in the accompanying "Intervenor Defendants' Combined Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment," Permittees are entitled to summary judgment on all claims, with each party bearing its own fees and costs.

Respectfully submitted,

By: /s/ George S. LeMieux
      Florida Bar No. 16403
By: /s/ Jonathan H Kaskel
      Florida Bar No. 52718
GUNSTER
600 Brickell Avenue, Suite 3500
Miami, Florida  33131
Telephone:  305-376-6000
Facsimile:  305-376-6010
glemieux@gunster.com
jkaskel@gunster.com
*Attorneys for Coral Reef Retail, LLC, Coral Reef RESI PH 1, LLC, RAMDEV, LLC*

By: /s/  Rafe Petersen
HOLLAND & KNIGHT LLP
*Admitted Pro Hac Vice*
800 17th Street, NW
Suite 1100
Washington, DC 20006
Telephone: 202-419-2481
Rafe.Petersen@hklaw.com
*Attorneys for Coral Reef Retail, LLC, Coral Reef RESI PH 1, LLC, RAMDEV, LLC*

By: /s/ Mark A. Salky
GREENBERG TRAURIG, P.A.
Florida Bar Number: 58221
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
salkym@gtlaw.com
*Attorneys for the University of Miami*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2018, the foregoing was filed using the Court's CM/ECF system and served via email or transmission of Notices of Electronic Filing generated by CM/ECF to all counsel by the Court's CM/ECF system.

By: /s/ Jonathan H Kaskel

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:17-cv-24444-UU

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.,*

       *Plaintiffs*,

            v.

RYAN ZINKE, in his official capacity as
Secretary of the U.S. Department of the
Interior, *et al.,*

     *Defendants*,

and

CORAL REEF RETAIL, LLC, *et al.,*

     *Intervenor Defendants*.

**INTERVENOR DEFENDANTS' COMBINED MEMORANDUM
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT**

Intervenor Defendants Coral Reef Retail, LLC, Coral Reef RESI PH 1, LLC, RAMDEV, LLC, and University of Miami ("Permittees"), by and through their respective counsel, hereby file this Combined Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment and state:

**INTRODUCTION**

The vast majority of arguments set forth in Plaintiffs' Motion for Summary Judgement, [Doc. 117] ("Motion"), have already been subjected to substantial briefing and a

1

half-day of oral argument before Magistrate Judge Turnoff.[1]   Plaintiffs' Motion largely recycles arguments that have already been rejected by this Court at the preliminary injunction stage.[2] Indeed, in concurring with and adopting the Magistrate Judge's Report and Recommendation ("R&R") [Doc. 80],[3] the Court made the following findings in its Order Adopting Magistrate Judge's Report and Recommendation ("Order") [Doc. 103],[4] which are directly relevant to Plaintiffs' Motion:

(1)    There is no distinct obligation to quantify incidental take or to have a trigger for reinitiating consultation.   "Defendants were not required to quantify independently the amount of incidental take in the Biological Opinion." [Order at *2].

(2)    The Service did not rely exclusively on the Habitat Functional Assessment ("HFA") to issue the Incidental Take Permit.  Moreover, "the Biological Opinion and the Set of Findings (both independently prepared by the Service) show that the Service indisputably considered the needs and impacts of each affected species and habitat and, based on those needs and assessments as well as the HFA and HFC [sic], reached logical conclusions regarding habitat value and conservation." [Order at *3].

(3)    The Service's reliance on the off-site mitigation plan was not arbitrary and capricious.  Even if the off-site preserve is already subject to conservation requirements, "[t]here

---

[1] Permittees incorporate by reference all prior briefings and the oral argument on the Motion for Preliminary Injunction.

[2] The Court previously cautioned Plaintiffs against rehashing the same arguments that have already been addressed and rejected in connection with the motion for preliminary injunction.  [Doc. 107].  Plaintiffs largely ignored the Court's suggestion to focus on what, if anything, in the newly produced administrative materials "compels different conclusions than those reach in the Court's Order denying the preliminary injunction."

[3] Report and Recommendation on Plaintiffs' Motion for Preliminary Injunction, Center For Biological Diversity v. Zinke, No. 17-CV-24444-UNGARO/TURNOFF, 2018 WL 1796261 (S.D. Fla. 01/17/2018).

[4] Order Adopting Magistrate Judge's Report and Recommendation, *Center For Biological Diversity v. Zinke*, No. 17-CV-24444-UNGARO/TURNOFF, 2018 WL 1795444 (S.D. Fla. 03/13/2018).

2

is no rule . . . that an off-site mitigation parcel must be previously free from any conservation requirements." [Order at *4].

(4)     The "Service's determination that the development was not significant within the meaning of [the National Environmental Policy Act] and that therefore no [environmental impact statement] was required is entitled to deference." [Order at *4-5].

(5)     The Service was not required to make the Finding of No Significant Impact ("FONSI") available to the public 30 days before making a final determination. [Order at *5-6].

For the most part, Plaintiffs either repeat their prior arguments or attempt to reanimate them with the declaration of an ex-Service employee who is now on their payroll, Mr. Christopher Nagano. [Doc. 119-2].   Yet, Mr. Nagano had no role in the approval of this incidental take permit ("ITP") and did not even bother to review the full set of the decision documents in this case,[5] much less the administrative record.  [Doc. 119-2 at ¶ 6].[6]  Hence, Mr. Nagano's declaration about what he would have done *if* he had the opportunity to participate in the Service's three-year review, *if* he were still an employee of the Service, and *if* he were "in charge of this project" is entitled to little, if any, weight.  As discussed further below, Mr. Nagano's opinions on process and the other documents Plaintiffs mined from the administrative

---

[5] The main decision documents are: "Coral Reef Commons Habitat Conservation Plan" dated October 2017 [Doc. 33-1] (the "HCP"); the "Set of Findings", dated December 4, 2017 [Doc. 33-2] (the "SOF"); the "Biological Opinion and Conference Opinion", dated November 30, 2017 [Doc. 33-3] (the "BiOp"); the "Environmental Assessment for the Coral Reef Commons Project Incidental Take Permit Application", dated November 2017 [Doc. 33-4] (the "EA"); and Incidental Take Permit No. TE1500C-0 [Doc. 33-5] (the "Permit").  For consistency, Permittees reference the long-standing docket numbers of these material documents rather than their more recent AR numbers. HCP (AR 4), SOF (AR 1), BiOp (AR 3), EA (31), and ITP (AR 2).

[6] Mr. Nagano admits that he did not work on the Project and reviewed only the BiOp and HCP. [Doc. 119-2 at ¶ 6].   The fact that he did not review the ITP and SOF – the very documents upon which the Service's decision is based – should be enough by itself to make his opinions on agency practice irrelevant. A person with Mr. Nagano's supposed credentials should understand the importance of those critical documents and the administrative record in supporting the agency's decision.

record do not outweigh the well-reasoned decisions of the Service staff that actually spent three years reviewing the Habitat Conservation Plan ("HCP").

## STANDARD OF REVIEW

As previously briefed, Plaintiffs' claims in this case are governed by the Administrative Procedure Act, 5 U.S.C. §§701-706, which is a highly deferential standard under which the Service's action is presumed valid.  *See Sierra Club v. Johnson*, 436 F.3d 1269, 1273 (11th Cir. 2006); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996).  An agency's decision may be set aside only where "there has been a clear error of judgment."  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).  Moreover, "[w]hen examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential." *Id.*, 490 U.S. at 377 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).

## ARGUMENT

## I.    THE SERVICE COMPLIED WITH THE ENDANGERED SPECIES ACT ("ESA")

### A)    The Biological Opinion Reasonably Concludes that Coral Reef Commons will not Jeopardize the Existence of Listed Species

Plaintiffs argue that "[b]ecause CRC may compromise species' survival by destroying and fragmenting their habitat . . . FWS's no-jeopardy determination was arbitrary and capricious. . ." [Doc. 117 at 9][7] (*citing* to BiOp at 85, 86).  Plaintiffs assert that the Service must analyze "effects to each of these species" and allege that the Service failed to do so, choosing instead to rely on the HFA. [Doc. 117 at 10]. In an attempt to support their argument, Plaintiffs cherry pick certain sentences from the Biological Opinion ("BiOp") (ignoring its ultimate conclusion) and

---

[7] Note: the citations to page numbers herein correspond to the page number assigned on the docket at the top of the page (*e.g.* Page __ of 30).

present the declaration of Mr. Wirth. However, the Court previously declined to consider the Wirth declaration "because it is not the Court's role to second-guess the scientific judgments of the Service." [Doc. 120 at 2].

As a threshold matter, where an issue, such as the question of "jeopardy" "requires a high level of technical expertise," the courts "defer to the informed discretion of the [agency]." *Marsh*, 490 U.S. at 377; *see also Sierra Club v. Van Antwerp*, 526 F. 3d. 1353, 1360 (11th Cir. 2008) (courts are "exceedingly deferential" to expert agencies). Indeed, this is the very reason the Court rejected the Wirth declaration.  [Doc. 120 at 2].

Plaintiffs rely on case law holding that the Service was required to have considered the effects of the Project on each species, [Doc. 117 at 10], but conveniently ignore the fact that the BiOp does just that.  For each species, the BiOp provides analysis of, among other things, species history and current status, habitat, species numbers, reproduction, range, conservation needs, threats, impact of climate change, and also measures impacts from the HCP against a baseline and conservation needs, considering fragmentation, habitat loss and other effects. [BiOp at 30-127].  Plaintiffs' reinterpretation of the BiOp is misleading[8] and in any event unavailing in light of the conclusions of the expert agency that are entitled to deference.

Plaintiffs again misconstrue how the HFA was used. [Doc. 117 at 10].  The BiOp contains the Service's analysis of the functional assessment, [BiOp at 28-30], which, in the Service's words, "estimates a relative change in pine rockland habitat value, with some areas losing all or partial value due to development or reduced connectivity, and some areas gaining value due to habitat enhancement, assuming the proposed management is successful." [BiOp at

---

[8] For example, Plaintiffs state that 40 percent of the Bartram's only host plant on site will be destroyed. [Doc. 117 at 9]. Yet, Plaintiffs conveniently ignore the fact that, with the implementation of the HCP, the Service determined that this "host plant," pineland croton, "will increase in abundance" on the Project site.  [SOF at 22].

28].  The Service determined that the functional assessment "evaluates the effects of the action in a quantifiable manner and provides a means to evaluate the extent to which the Applicants' proposed Conservation Program will offset the impacts of the take of Covered Species." [SOF at 17].  The functional assessment predicted how HCP implementation (development and habitat management) would change the value of the pine rockland habitats on the property. [BiOp at 28].  The Service concluded that the functional assessment "provided a reasonable basis for evaluating the extent of the impacts from development and planning conservation on the Project site." [SOF at 4].  The Court has already held that attacks on the HFA are without merit. [Order at *3].

Yet, the Service did not rely exclusively on the HFA to issue the ITP.  [*See* Order at *3].  With respect to the need to analyze species-specific impacts, the BiOp "interprets the significance of the Applicants' assessment within the effects analysis sections for each species and critical habitat," [BiOp at 29], but the Service went far beyond the functional assessment in analyzing the impact on each species. [BiOp at 30-127].   Indeed as the Court has already found, "the Biological Opinion and the Set of Findings (both independently prepared by the Service) show that the Service indisputably considered the needs and impacts of each affected species and habitat and, based on those needs and assessments as well as the HFA and HFC [sic], reached logical conclusions regarding habitat value and conservation."  [Order at *3].

Plaintiffs contend that the Service should have provided "specifics on how much habitat will be improved"[9] and how the species will persist until the improvements will be provided.

_____

[9] Plaintiffs cite *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1146 (11th Cir. 2008), for the proposition that the Service must provide specifics on how much habitat will be improved.  However, the *Key Deer* case addresses Section 7(a)(1) of the ESA (which imposes an obligation upon federal agencies to "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of [listed species]," 16 U.S.C.  § 1536(a)(1).  The requirements of Section 7(a)(1) are distinct from the obligations of  the Section 7(a)(2) duty to consult and are not at issue in this case or cited in Plaintiffs' First Amended Complaint. Plaintiffs stubbornly refuse to acknowledge that this is a Section 10 permit.

6

[Doc. 117 at 10].[10]  Plaintiffs cite no legal authority—but instead rely solely on the declaration of their employee, Mr. Nagano—for the proposition that the Service has to make such specific findings in its jeopardy analysis.  *Id.*  In any event, the Service concluded that the HCP activities "would cause a *net increase* in conservation value" of the property "because the habitat improvements in the Preserves exceed the losses in the CRC development area," [BiOp at 172], and that net improvements in habitat quality would increase species abundance. [BiOp at 29].[11] Nothing Plaintiffs rely on contradicts these conclusions.

(B)    The Service Complied with all Procedural Requirements of the ESA

Plaintiffs allege four "procedural" ESA violations, [Doc. 117 at 11-15], most of which were previously disposed of at the preliminary injunction stage.  In fact, Plaintiffs cannot point to a procedure that was not followed.  Instead, Plaintiffs invite this Court to err by substituting its judgment for that of the expert agency -- favoring Plaintiffs interpretation of statutory terms over the Service's, reweighing the scientific evidence, and instructing the parties on the scope of the record.  This is a role that the Court has already properly rejected. *See* Order at *3.

(1)    *The "action area" was properly defined*

---

[10] *Sierra Club v. Marsh*, 816 F.2d 1376, 1389 (9th Cir. 1987), relied upon by Plaintiffs, [Doc. 117 at 10], addresses a completely different situation where the county failed to transfer 188 acres of land necessary to mitigate the project's effects on two endangered species of birds and the plaintiffs raised questions as to whether the mitigation land would be acquired.

[11] The BiOp contains numerous uncontroverted statements concerning the net gain in habitat for various species.  For example: "we estimate that this management will cause a net increase in numbers of Miami-tiger beetles within the action area (section 7.4 of the biological opinion)." [SOF at 25]. "We believe the action would cause a net increase in conservation value, because the habitat improvements in the Preserves exceed the losses in the CRC development area." [BiOp at 172].  "If the leafwing recolonizes or is reintroduced to the Action Area, we expect management of the on- and off-site Preserves and Stepping Stones to harm and harass a fraction of the future population, but to create conditions that support a higher density of leafwings than without management, and cause an overall net benefit." [BiOp at 53]. "Habitat enhancement accomplished in the on- and off-site Preserves would provide a net increase in the conservation value of CH in the Action Area. " [BiOp at 66].

Plaintiffs cite to the definition of "action area" under the ESA, and assert that the "action area is the 800-acre Richmond Rocklands, which sustain the protected species and will be fragmented and damaged by CRC." [Doc. 117 at 11]. The ESA regulations define "action area" as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.2. Thus, the extent of the action area is dependent on how far the effects of a project extend. It is appropriate for the "action area" to be the same as the project area when the effects are confined to the project. *See S.F. Baykeeper v. U.S. Army Corps of Eng'rs*, 219 F.Supp.2d 1001, 1021 (N.D. Cal. 2002).

As stated in the BiOp, the "action area" for this consultation is the 188.86-acre "Plan Area" described in the HCP. [BiOp at 6]. The BiOp adequately discloses which effects may extend beyond the Plan Area and the Service concluded that it does "not expect any such effects to influence the status of the Covered Species or their designated [Critical Habitat] outside the HCP Plan Area." *Id.* The Service also responded directly to a comment on this topic in the SOF:

> The action area is defined as all areas to be affected directly or indirectly by the action and not merely the immediate area involved in the action [50 CFR §402.02]. The action area is defined not by the species but by the extent of the effects of the action. The Service evaluated the effects of the HCP and based on the extent of the effects of the action define the action area as the Coral Reef Commons property footprint (including Conservation Areas) and the footprint of the Off-Site Mitigation Area.

[SOF at 14].

In support of their argument, Plaintiffs cite to the bald assertion by their employee Mr. Nagano that the entire Richmond Pine Rocklands "will be directly or indirectly impacted . . . by such a large development," [Doc. 119-2 at ¶ 7], which Plaintiffs translate to mean that "whole swaths of surrounding habitat" and that other species will be impacted by the Project. [Doc. 117 at 11]. Yet, Plaintiffs do not claim that there is better scientific information that the Service

8

failed to consider concerning direct and indirect effects of the Project; rather, they improperly ask the Court to substitute their judgment for that of the expert agency.  *See Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1980).

In *Oceana, Inc. v. Evans*, 384 F.Supp.2d 203, 228 (D.D.C. 2005), Plaintiffs challenged the National Marine Fisheries Service's ("NMFS") definition of an "action area" that was defined in terms of the area in which the scallop fishery operated.  Plaintiffs argued that the action area should be expanded to take "into account the wide range of threats" facing loggerhead turtles apart from the fishery.  *Id.*  The court in *Oceana, Inc.* found that "there is no support for the proposition that the action area must be extended to include the migratory range of loggerhead turtles. Any contrary conclusion would contravene the regulatory definition of 'action area,' which focuses on the effects of an action in a geographic 'area,' and not on a species."  *Id.* at 229.  Similarly, Plaintiffs offer no support for the notion that the Service was required to look at the entire Richmond area because of its benefits to the species.[12]

(2)     *The Service Used the Best-Available Scientific Information*

Plaintiffs argue that that the Service was required to "use the best scientific and commercial data available" when evaluating the HCP.  [Doc. 117 at 11] (citing 16 U.S.C. § 1536(a)(2)).  Plaintiffs are correct and the Service did.  Under the guise of the requirement to use the best "<u>available</u>" data, Plaintiffs assert that the Permittees were required to generate additional "site-specific species survey data" in support of the HCP application.  [Doc. 117 at 11-12].  This

---

[12] Even if Plaintiffs were correct about the scope of the action area, the HCP analyzed a wider scope of impacts.  "While it is unlikely that the effects of the Proposed Action will affect species within the larger Richmond Area, the Applicant, has conservatively analyzed the pine rocklands in the Richmond Area as the action area in this cumulative effects analysis. (Figure 2-1). This conservative analysis provides assurances that the cumulative effects analysis is comprehensive, despite the unlikelihood that the Proposed Action will have direct or indirect effects on pine rocklands within the Richmond Area."  [HCP at 132].

is an argument that has already been presented but that did not persuade Magistrate Judge Turnoff. [R&R at *8].

The requirement to include all pertinent information "which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat," found at 50 C.F.R. § 402.14(d), does not require any particular type of data. The Service explained that the best available science standard does not empower the agency to require species surveys. (SOF at 15); *Southwest Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60-61 (9th Cir. 2000). Regardless, the HCP was supported by multiple levels of surveying including for the presence of Florida bonneted bat, Bartram's scrub hair-streak butterfly, pineland croton (the host plant for the endangered butterflies) and vegetation habitat type. [HCP at 16-17; 88-89].[13] The Service also had survey information for the presence of Miami tiger beetle on the Project property and the off-site mitigation areas. [HCP at 56].

The SOF directly addresses Plaintiffs' argument that more species-specific data should have been gathered:

> In the absence of species' focused surveys, the Service and the Applicants agreed, for purposes of this application, each Covered Species is present in or could enter in the action area during the duration of the requested permit. This approach errs on the side of the species in our analysis of the extent to which a species would be adversely affected by the proposed action and likely overestimates the amount of occupied habitat. Using this approach, the Applicants were required to include actions to avoid and minimize effects to Covered Species. The habitat model also provided a means for the Applicants to evaluate and measure the change to the habitat from the development and land management. Furthermore, several of the Covered Species, such as the eastern indigo snake, rim rock crowned snake, and Miami tiger beetle, are cryptic and difficult to detect, and survey would likely underestimate their presence.

---

[13] "With respect to the Off-site Mitigation Area and applying the best available science, the Covered Species are reasonably certain to occur on or have been documented on the property via surveys (e.g., Miami tiger beetle, and deltoid spurge)." [SOF at 15].

[SOF at 15].  Hence, rather than try to argue whether or not the species were present, Permittees assumed they were present, which was the conservative choice.  And, as previously briefed, the HCP estimated "take" by using habitat loss (*i.e.* Habitat Value Units ("HVUs")) as a surrogate for "take" of individual species.  The Service concluded that the use of HVUs "evaluates the effects of the action in a quantifiable manner and provides a means to evaluate the extent to which the Applicants' proposed Conservation Program will offset the impacts of the take of Covered Species."  [SOF at 17].  Plaintiffs can point to no available data that the Permittees or the Service failed to consider.

> (3)    *The Inclusion of a Habitat Functional Assessment in the HCP did not Result in an Unlawful Incidental Take Statement*

Plaintiffs repeat their well-worn argument that the incidental take statement in the BiOp must have a numerical "cap" as well as "an effective 'trigger' for reinitiation of consultation when permissible levels of take are exceeded."  [Doc. 117 at 13-14].  The parties have already addressed these arguments at length.[14]  The fact that Plaintiffs' argument is now presented by an individual who left the Service to join the Center for Biological Diversity does not make Plaintiffs' legal argument any stronger.  [Doc. 117 at 14] (citing Nagano Decl. at 2-3). Mr. Nagano's statement that he has "never" seen "a biological opinion with an incidental take statement like the one at issue here" [Doc. 119-2 at ¶ 9], is of little consequence.[15]

---

[14] R&R at *9; Order at *2.

[15] The process used here is consistent with Service practice as spelled out in the HCP Handbook. *Compare* USFWS, Habitat Conservation Planning and Incidental Take Permit Processing Handbook (2016) ("HCP Handbook") at 14-28, https://www.fws.gov/endangered/what-we-do/hcp_handbook-chapters.html, *with* BiOp at 172-73.  Mr. Nagano's lack of familiarity with the difference between Section 7 and Section 10 processes and his failure to review the document that actually allows for the take – the ITP – at minimum, suggests that he does not know as much as he professes.

As discussed in prior briefing, no numerical standard for measuring take is required where the measure of a take is based on loss of habitat, as is commonly done by the Service.[16] Moreover, the "take" was not authorized by the BiOp, but rather by the ITP issued to Permittees. Therefore, the BiOp did not need to have a "trigger" for reinitiation.

Having heard these same legal arguments, the Court agreed with the Federal Defendants' position, holding the following:

> there is no distinct obligation to quantify incidental take or to have a trigger for reinitiating consultation because the authority for the Incidental Take Permit comes from Section 10, not Section 7, of the ESA, 2018 WL 179544, at and Section 10 does not contain such requirements.

[Order at *2.][17]   Permittees sought an ITP under Section 10.  Hence, "pursuant to the Service's normal practice, the Incidental Take Permit incorporates the amount of anticipated incidental take set forth in the Habitat Conservation Plan." *Id.* at * 2.  "Defendants were not required to quantify independently the amount of incidental take in the Biological Opinion." *Id.*  The ITP (the instrument that actually authorizes "take") "sets out dozens of conditions, which if breached, will trigger the Service to revisit the Permit pursuant to its enforcement power."  *Id.* at * 3.

   (4)   *Permittees' Mitigation Measures Should Not Have Been Factored into the Environmental Baseline*

The Court has already concluded that "[t]here is no rule . . . that an off-site mitigation parcel must be previously free from any conservation requirements."  [Order at *4] (noting that the final decision as to the efficacy and practicability of the mitigation measures rests with the Service).  Nonetheless, Plaintiffs attempt to argue that the on-site and off-site mitigation measures should not have been credited.  [Doc. 117 at 14-15].

---

[16] R&R at *9; Order at *2.

[17] The Court also noted that "even assuming Plaintiffs are correct that take must be estimated in the Biological Opinion, the Biological Opinion does just that for those species that the Service has information about."  [Order at *3].

Plaintiffs assert that the mitigation "measures were pre-existing, legally binding on RAM and UM, and unrelated to the ITP." [Doc. 117 at 14]. This was already rejected as a matter of fact and of law. [Order at *4]. The off-site mitigation measures were not "unrelated" to approval of the Project. During its review of the HCP, the Service "recommended additional off-site compensatory conservation to improve the conservation lift of the HCP," [SOF at 4-5], and Permittees accommodated the Service's request. While there is a deed restriction on the off-site Preserve, controlled burning is not mandatory and "the burning is not frequent enough to maintain open herbaceous understory." [BiOp at 170]. Moreover, the previous deed restriction is for only one species of plant (the deltoid spurge), and can be removed by the landowner. [SOF at 11]. Hence, the off-site parcel will indisputably be enhanced by the HCP requirements. [Doc. 76-3] (discussing the additional benefits of the HCP to the on-site and off-site parcels). The Service reasonably concluded "that permanently protecting the property and improving management actions would result in increased benefits for the listed species." [SOF at 11]. In any event, as Magistrate Judge Turnoff noted, Plaintiffs have not provided any authority indicating that the Service could not memorialize pre-existing measures in the ITP. [R&R at *8]. Furthermore, even mitigation that is already "on the books," may be part of a HCP mitigation package. *Loggerhead Turtle v. Cty. Council of Volusia Cty.*, 120 F.Supp.2d 1005, 1021 (M.D. Fla. 2000).

Plaintiffs also argue that "FWS failed to make any determination that RAM's HCP meets the minimum requirements of ESA section 10 and its implementing regulations." [Doc. 117 at 15]. The SOF sets forth a clear analysis of the Section criteria and why the HCP mitigates to the maximum extent practicable. [SOF at 2-3; 4-5]. "An agency's expert determinations such as the

appropriate mitigation measures to protect endangered species are owed exceeding deference."

*Nat. Res. Def. Council v. Nat. Park Serv.*, 250 F.Supp.3d 1260, 1306 (M.D. Fla. 2017).

## II.     THE SERVICE COMPLIED WITH THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA")

A)     <u>The Service Was Not Required to Prepare an Environmental Impact Statement</u>

The Court has already considered and rejected Plaintiffs' argument that the Service should have prepared an Environmental Impact Statement ("EIS") and Plaintiffs' theory that the approval of the HCP will significantly affect the quality of the environment.  [Order at *4-6]. This has not, however, deterred Plaintiffs from raising virtually the same claims again.  [Doc. 117 at 15-24].

1)     *The Service did not arbitrarily "reverse course" by deciding that an EIS was not warranted.*

Plaintiffs contend that the Service violated NEPA "by ordering its staff to not produce an EIS after staff determined that one was warranted." [Doc. 117 at 16]. The Environmental Assessment ("EA") and FONSI address all relevant environmental impacts and explain why the underlying agency action would not have a significant effect on the human environment.  [Order at *4] (citing to SOF at 37). Plaintiffs assert that the Service did not provide "a satisfactory explanation" for its decision not to prepare an EIS due to staff comments, thereby making it arbitrary and capricious. [Doc. 117 at 17]. Regardless of Plaintiffs' conclusions about the relationship between the Service leadership and staff, "the Service's determination that the development was not significant within the meaning of NEPA and that no EIS was required is entitled to deference." [Order at *4]. The fact that there was some debate internally among Service staff as to whether an EIS should be prepared in no way undercuts the final decision by the Service that no EIS was required. Rather, it shows that the issue was considered and rejected.

14

2)     *The Service Considered all Relevant Effects and Determined that an EIS was not Warranted.*

Plaintiffs recycle prior arguments that the Service ignored "significant" environmental impacts that would have triggered an EIS.  Plaintiffs make essentially the same arguments concerning "context" and "intensity," which the Court dispensed with at the preliminary injunction stage, with the only difference being that the arguments are now also based on a comment letter that was filed by a Service employee, Ms. Halupa, in her personal capacity. [Doc. 117 at 18-19].  Ms. Halupa's concerns – the size of the development, the impact on endangered species, and the loss of pine rocklands habitat [Doc. 117 at 18-19] – were vetted by the Service.  The role of the Court is to "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983).  Here, the Court has already considered and addressed issues related to "(1) the unique characteristics of the geographic area, (2) the degree to which the environmental effects of the proposed action are highly controversial, and (3) the degree to which the action may adversely affect a listed species or its habitat." [Order at *4]. The Service made the expert determination that the area of the Project provides "low quality" habitat;[18] the development, "with its habitat restoration, management, and mitigation conditions, 'will minimize and mitigate the Project's impacts to the Covered Species to the maximum extent practicable,'"[19] and the HCP will increase the habitat quality, thereby leading to an increase in species abundance.[20]  [Order at *5.]  Plaintiffs' bald

---

[18] "In their current state they provide relatively low quality habitat for the pine rockland dependent Covered Species. . . ." [SOF at 2].

[19] The HCP activities "would cause a net increase in conservation value" of the property "because the habitat improvements in the Preserves exceed the losses in the CRC development area." [BiOp at 172].

[20] The net improvements in habitat quality would increase species abundance. [BiOp at 29].

claim that construction within Richmond Rocklands is *per se* significant, citing simply to one of the intensity factors under the NEPA regulations, does not overcome the Service's determination. [Doc. 117 at 19] (citing to 40 C.F.R. § 1508.27(b)(3).

Ignoring the decision documents, Plaintiffs claim that the Service "failed to analyze" the long-term importance of the Project "because of its high elevation."  [Doc. 117 at 19-20]. The EA addresses the issue of sea level rise in the sections pertaining to affected environment, [EA at 7] and in a separate section on Climate Change. [EA at 120-21].   In turn, the SOF addresses Plaintiffs' comment directly:

> Richmond Rocklands are the "high ground" among remaining pine rockland habitat, so they will be the last vestige of this habitat as projected sea level rise inundates other pine rocklands in the Florida Keys and Everglades National Park. The Service has considered the available information on sea-level rise projections. Based on our analyses of publicly available data, we do not believe that sea-level rise will directly affect the Project area over the requested 30-year ITP term. Nevertheless, sea-level rise will need to be monitored periodically throughout any permit term, and will be a special consideration if permit renewal is contemplated.

[SOF at 5].

The Service further explains that the expert agency "thoroughly considered climate change and sea level rise in our biological opinion, particularly in the sections on the statuses of and current threats to the Covered Species" and describes the models used and how climate change is expected to alter pine rockland habitat in the foreseeable future.  [SOF at 33].[21]

Finally, these issues were addressed in the HCP, which modeled the expected change in available pine rockland habitat over the 30-year term of the Permit and potential 25 year extension.  [HCP at 151].  This will be periodically reviewed:

> In an abundance of caution, to address the uncertainty regarding future sea level rise projections, the annual HCP Administrative Report will include updated

---

[21] The Service also addresses these effects in terms of loss of critical habitat.  *See e.g.* BiOp at 66 (addressing amount of butterfly critical habitat that will remain based on projections of sea level rise).

analysis of the latest available climate projections, describe any new impact data and include any recommended adjustments to the Conservation Program based on climate impacts. This will occur at a minimum of every five years or in conjunction with updates to the Compact (or comparable entity).

[HCP at 154].  The issue of climate change and projections of sea level rise require the "high level of technical expertise," to which Courts are exceedingly deferential.  *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671 (9th Cir. 2016) (deferring to National Marine Fisheries Service analysis of climate change and the impacts on endangered seals); *Marsh*, 490 U.S. at 377.

> (3) *The effects of the Project are not "highly controversial" such that an EIS is warranted.*

Plaintiffs attempt to resuscitate their argument that the Project is "highly controversial" by citing to comments made by the public. [Doc. 117 at 20-21]. The "highly controversial" significance factor is triggered only when there is "a substantial dispute about the size, nature or effect of a federal action," not merely "the existence of opposition to a use." *Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F.Supp.3d 1260, 1297 (M.D. Fla. 2017). Once again, Plaintiffs "point[] only to the public comments, and provid[] no scientific or other evidence that the project was highly controversial." [Order at *5]. The fact that certain commenters (to whom the Service cited in its analysis)[22] disagreed with the Service's ultimate conclusions is insufficient to set aside the decision of the expert agency. *Balt. Gas & Elec Co.*, 462 U.S. at 97-98.

> (4) *Impacts on species and critical habitat do not trigger an EIS*

Plaintiffs assert that an EIS was required under the theory that the Project will harm endangered species and habitat. [Doc. 117 at 21]. Plaintiffs cherry pick discussion of the impacts of the Project on species, and state that "nothing in the record contradicts these findings." [Doc.

---

[22] By Plaintiffs own account, the Service "relied on the work of Ms. Posley," [Doc. 117 at 20], and the Court previously concluded that the Wirth declaration is inadmissible given that the Service already addressed his work.  [Doc. 120 at 2].

117 at 22]. By focusing the Court on the Service's analysis of the impacts of the HCP, Plaintiffs conveniently omit the discussion of the net benefits of implementation of the HCP and the conclusion of the expert agency. Indeed, the Court has already found that implementation of the HCP will lead to an increase in species abundance. [Order at *5; *see also* BiOp at 29 and 172].

Once again, Plaintiffs exaggerate the uniqueness of the Project property.  "The 83 acres to be developed are pine rocklands subjected to a variety of historic impacts, such as scraping, lack of vegetation management, or fire suppression.  In their current state, they provide relatively low quality habitat for the pine rockland dependent Covered Species . . . ." [SOF at 2; Order at *5].   The development is concentrated primarily on land that is comprised of abandoned buildings, parking lots, and roads and within vegetated communities that are not classified as pine rocklands. [HCP at 92-92].   The 33-acres of degraded pine rockland within the Development Areas comprise less than .16 % of the pine rocklands in Florida.  [BiOp at 21].

As they did in their Objections to the Magistrate Judge's Report and Recommendation, [Doc. 82 at 22-24], Plaintiffs cite to *Sierra Club v. Norton*, 207 F.Supp.2d 1310 (S.D. Ala. 2002), and ask the Court to draw conclusions based on that easily distinguishable case, [Doc. 117 at 22]. The Court should again reject these arguments as "unavailing because there, the Service acknowledged uncertainty about the effect of the development on a native species." [Order at *5, n.1.][23]  Here, in contrast, the Service has made detailed findings on the effects of the HCP (both negative and positive) on each species. Further, the EA at Section 4.6.7 also thoroughly analyzed the effects on each species. Moreover, the HCP is based on an approach that assumes that species

---

[23] In *Norton*, the court found that an EIS was appropriate given that the Service recognized uncertainty concerning the impact of the proposed development. *Id*. at 1335. As Plaintiffs explained, in *Norton* "the Service did not know what effect the loss of optimal habitat will have on the species nor what minimum habitat requirements are necessary for the survival and recovery of the species." [Doc. 82 at 22].

are "reasonably certain to be present in the HCP area and likely to sustain take incidental to the proposed action." [SOF at 15]. Thus, any "unknowns" were resolved in favor of the species.

> (5)     *The Service provided adequate opportunities for public participation.*

Plaintiffs assert that by denying the public a hearing, the Service deprived the public and itself of "valuable information necessary to analyze CRC." [Doc. 117 at 23]. They do not indicate what "valuable" information would have been provided during the hearing.[24] In support of a preliminary injunction, Plaintiffs also "argued that the FWS thwarted meaningful public participation in the environmental analysis and approval of the proposed project." [R&R at *11]. Magistrate Judge Turnoff concluded that the "record reflects that FWS responded appropriately to the submitted comments and addressed them accordingly." *Id.* Plaintiffs did not challenge this.

The permitting process was open to the public, including the Plaintiffs, who, in fact, participated and submitted extensive comment and analysis to the Service.   The Service evaluated the Plaintiffs' comments and concerns and appropriately addressed them in the SOF issued with the ITP and the EA.   The Service made the draft HCP available to the public in 2015, although it was not required to do so at that stage.   In turn, the HCP, EA and all supporting materials were subject to 60-day public notice and comment and the Service also set up a webinar where the public could ask questions. [SOF at 8]. The underlying documents were sufficiently detailed for the public to understand the environmental consequences of the agency action and to participate in the process.   Nothing more is required.

---

[24] Plaintiffs did not challenge the findings that the public was thoroughly involved throughout this process and that the Service "responded appropriately to the submitted comments and addressed them accordingly." [Doc. 80 at 22].

Plaintiffs repeat their argument that the Service violated NEPA by not making the final FONSI available for a 30-day public review. [Doc. 117 at 24].  This argument was already rejected by the Court, [Order at *6], and is no stronger.

**III      PLAINTIFFS ARE NOT ENTITLED TO THE TYPE OF RELIEF THEY SEEK**

Plaintiffs assert that the Court "must vacate the ITP pursuant to the APA."  [Doc. 117 at 25-26).  Even assuming that Plaintiffs were to prevail, vacatur is not automatic; the Court must weigh the likelihood that the Service can correct the deficiencies in its decision making on remand, the disruption that would be caused by an interim change in the permits that itself may be changed after remand, and the public interest.[25]  *See Sugar Cane Growers Co-op. of Fla. v. Veneman,* 289 F.3d 89, 98 (D.C. Cir. 2002) (rejecting, as "simply not the law," the argument that a reviewing court must vacate agency action that violates APA); *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,* 429 F.3d 1136, 1151 (D.C. Cir. 2005) (citation omitted).  Instead, remand without vacatur is the usual remedy where the consequences of vacatur are disruptive and the administrative error is procedural or is likely to be remedied on remand.  Here, as demonstrated at the preliminary injunction stage, the Permittees have already started work on the Project and have invested over $40 million in the Project.  [Doc. 34-2]

## CONCLUSION

For the foregoing reasons, the Service did not act arbitrarily or capriciously or contrary to the ESA in issuing the ITP and BiOp, and the EA complies with NEPA. Therefore, the Court should enter summary judgment in favor of Defendants and Permittees.

---

[25] This analysis is not dissimilar from the injunctive relief framework.  *See Int'l Union, United Mine Workers v. Fed. Mine Safety & Health Admin.,* 920 F.2d 960, 967 (D.C. Cir. 1990) (both vacatur and injunctive relief turn on "analogous factors"). Plaintiffs have already failed to demonstrate irreparable harm and cannot reanimate those arguments for purposes of relief.